UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FRANCISCO GUZMAN, ROSARIO AYALA, MANUEL FLORES DOMINGUEZ, NELY OLMOS FLORES, ERNESTO MEJIA GONZALEZ, ONEIDA TACUBA MEJIA, MARIO ENRIQUE MUÑOZ, GREGORIO PEREZ ORTEGA, PATRICIA PAVIA, ROSA PEREZ, ALICIO RAMOS, MARTIN TORRES REYES, S.F.C., D.P.C., B.R.E., O.C.F., R.M.F., A.M.M., J.M., M.M., A.M.O., E.G.R., F.T.R., R.M.R., J.C.R., F.T.V., AND MAKE THE ROAD NEW YORK; | Civil Action No. 18 CV 3947 |
| Plaintiffs, | |
| -against- | |
| THOMAS T. HECHT, LEONARD H. HECHT, THOMAS T. HECHT, P.C., AND LUIS GUERRERO; | |
| Defendants. | |

**COMPLAINT**

## Table of Contents

NATURE OF THE ACTION ................................................................................. 1

PARTIES ............................................................................................................. 2

JURISDICTION AND VENUE ............................................................................. 4

RICO CAUSE OF ACTION ................................................................................. 5

    The RICO Enterprise ................................................................................... 5

    Background on Asylum Procedures ............................................................ 6

    The Ten Year Scheme ................................................................................. 8

    Roles of the Members of the Enterprise ..................................................... 10

    Pattern of Racketeering Activity ................................................................. 12

    The RICO Conspiracy ................................................................................. 14

    Injuries Suffered By Plaintiffs ..................................................................... 15

STATEMENT OF FACTS SPECIFIC TO EACH PLAINTIFF ............................. 16

    Mr. Guzman & Ms. Pavia ............................................................................ 16

    Ms. Ayala .................................................................................................... 19

    Mr. Flores Dominguez and Mrs. Olmos Flores ........................................... 21

    Mr. Mejia and Ms. Tacuba .......................................................................... 24

    Mr. Muñoz ................................................................................................... 27

    Mr. Perez Ortega and Mrs. Perez ............................................................... 29

    Mr. Ramos ................................................................................................... 33

    Mr. Torres ................................................................................................... 35

    S.F.C. and A.M.O. ...................................................................................... 37

    D.P.C. ......................................................................................................... 41

    B.R.E. ......................................................................................................... 43

    O.C.F. and R.M.F. ...................................................................................... 46

A.M.M. ......................................................................................................................... 49

J.M. and M.M. ............................................................................................................. 53

E.G.R. ......................................................................................................................... 57

F.T.R. and J.R.C. ....................................................................................................... 60

R.M.R. ......................................................................................................................... 62

F.T.V. ........................................................................................................................... 65

Make the Road New York ......................................................................................... 67

NON-RICO CAUSES OF ACTION ............................................................................ 70

Fraud and Deceit ....................................................................................................... 70

Deceptive Business Practices (NY General Business Law § 349) ........................... 73

Unjust Enrichment  (Hecht Defendants) ................................................................... 73

Breach of Fiduciary Duty  (Hecht Defendants) ....................................................... 74

PRAYER FOR RELIEF ................................................................................................. 75

Plaintiffs Francisco Guzman, Rosario Ayala, Manuel Flores Dominguez, Nely Olmos Flores, Ernesto Mejia Gonzalez, Oneida Tacuba Mejia, Mario Enrique Muñoz, Gregorio Perez Ortega, Patricia Pavia, Rosa Perez, Alicio Ramos, Martin Torres Reyes, S.F.C., D.P.C., B.R.E., O.C.F., R.M.F., A.M.M., J.M., M.M., A.M.O., E.G.R., F.T.R., R.M.R., J.C.R., and F.T.V. (the "Plaintiffs") and Plaintiff Make the Road New York ("MRNY"), by and through their undersigned counsel, bring this action against Defendants Thomas T. Hecht, Leonard H. Hecht, the law office of Thomas T. Hecht, P.C., and Luis Guerrero, and hereby allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs—a group of 26 noncitizen parents and longtime New York residents— bring this action against Plaintiffs' former immigration attorneys, a tax preparer, and their associates (collectively "Defendants") who defrauded Plaintiffs out of thousands of dollars and put each of them at risk of deportation.  Defendants, all trusted professionals, used their positions to take advantage of Plaintiffs' trust, lack of legal expertise, and inability to read English in order to financially profit.

2.      Specifically, Defendants falsely represented that they could simply apply for and obtain work authorization and/or lawful permanent residency on Plaintiffs' behalf through mechanisms that do not exist under U.S. immigration law.  Instead, Defendants filed asylum applications on Plaintiffs' behalf without their knowledge, much less their informed consent.

3.      Defendants filed these asylum applications fully knowing that if the applications were not approved by the Asylum Office, Plaintiffs would be placed into deportation proceedings and potentially face separation from their homes, their communities, and their U.S. citizen children.  Defendants intentionally concealed that grave risk from Plaintiffs.

4.      Defendants' actions violate not only fundamental moral principles and the governing ethical rules, but also a host of laws.  Defendants preyed upon this vulnerable community with the expectation that Plaintiffs would not attempt to vindicate their rights because of their lack of financial resources and noncitizen status.

5.      Plaintiffs are, lamentably, only a fraction of the people who have fallen victim to Defendants' scheme, and bring this action to hold Defendants accountable, prevent Defendants from reaping the financial benefits of this fraud, and hopefully prevent Defendants from subjecting other noncitizen families to this financial toll and psychological devastation.

## PARTIES

6.      Each individual Plaintiff is an immigrant who has been a resident of New York for more than ten years and is the parent of one or more U.S. citizen children.

7.      Plaintiff Make the Road New York is a nonprofit, membership-based § 501(c)(3) organization dedicated to building the power of immigrant, Latin, and working-class communities in New York state.  With offices in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to support low-income New Yorkers in improving their own lives and neighborhoods.

8.      Upon information and belief, Defendant Thomas Tolek Hecht ("Defendant Thomas") is a licensed attorney who has been admitted to practice law in the state of New York since April 11, 1958.

9.      Upon information and belief, Defendant Leonard Henry Hecht ("Defendant Leonard") is a licensed attorney who has been admitted to practice law in the state of New York since December 5, 1988.

10.     Defendant Thomas T. Hecht, P.C. ("Defendant Law Firm") is a New York professional corporation, Department of State Number 316881, with its principal place of business at 729 Seventh Avenue, 14th Floor, New York, NY 10019.  Defendant Law Firm's principal place of business was previously located at 1270 Avenue of the Americas, New York, NY 10020.

11.     Defendant Thomas and Defendant Leonard regularly conduct business in New York, New York and the surrounding boroughs through Defendant Law Firm.

12.     Defendant Law Firm was founded by Defendant Thomas in 1971, and offers legal representation on immigration matters, as well as a variety of other areas.

13.     Defendant Law Firm advertises on its website that it has many clients from all over the world, including the Spanish-speaking community.

14.     At all times relevant hereto, Defendant Thomas was acting on his own behalf and/or as the actual or apparent agent, servant, and/or employee of Defendant Law Firm.

15.     At all times relevant hereto, Defendant Leonard was acting on his own behalf and/or as the actual or apparent agent, servant, and/or employee of Defendant Law Firm.

16.     At all times relevant hereto, Defendant Law Firm was acting by and through its agents, servants and employees, including but not limited to attorneys, secretaries, paralegals, receptionists, bookkeepers and any and all other support or administrative staff and personnel acting within the course and scope of their employment with Defendant Law Firm.

17.     Collectively, Defendant Thomas, Defendant Leonard, and Defendant Law Firm will be referred to as the "Hecht Defendants."

18.     Upon information and belief, Defendant Luis Guerrero ("Defendant Guerrero") is and/or has been a registered tax preparer in the state of New York.

3

19.     Defendant Guerrero is and/or has been employed as the Office Manager of a franchise of ATAX Accounting & Financial Services ("ATAX"), with its principal place of business at 2035 A Victory Boulevard, Staten Island, NY 10314.

20.     Defendant Guerrero regularly assists individuals with the preparation and filing of their income taxes.

21.     Collectively, the Hecht Defendants and Defendant Guerrero will be referred to as the "Defendants."

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under 18 U.S.C. § 1964. This is a civil action arising under 18 U.S.C. §§ 1961-1968, §901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in particular, under 18 U.S.C. § 1964(c) and other causes of action as set forth hereafter.

23.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

24.     Venue is proper in this judicial district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred within this judicial district.

25.     Defendants, either on their own or through their agents, at the time of the commission of the acts alleged herein, were found in, and/or transacted business in the State of New York, and the cause of action which is the object of this Complaint arises out of business transactions and specific acts that took place within this juridical district.

26.     Defendants, either on their own or through their agents, conspired to commit the wrongful acts alleged in this Complaint within the State of New York and/or committed or

participated in the commission of those acts within the State of New York, purposefully directing their wrongful acts toward this judicial district and causing in this district the violations of RICO and the other causes of action set forth herein as well as Plaintiffs' resultant injuries.

27.     Defendants' racketeering activities were conducted through a pattern of acts and transactions which occurred or had their effect within the State of New York, in this judicial district.

28.     In connection with the wrongful acts and fraudulent conduct described herein, the Defendants directly or indirectly used the means of interstate commerce, including the mails.

## RICO CAUSE OF ACTION

### The RICO Enterprise

29.     Each individual Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

30.     MRNY is a "person" within the meaning of 18 U.S.C. § 1964(c).

31.     Plaintiffs and the Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

32.     The Defendants carried out their racketeering activity through an association-in-fact "enterprise" (the "Enterprise"), as the term is defined in 18 U.S.C. § 1961(4).

33.     The Enterprise consists of Defendant Thomas, Defendant Leonard, Defendant Law Firm, Defendant Guerrero, and Sylvia's Translation Service (the "Enterprise Members").

34.     Although all Enterprise Members, including the Defendants, participated in the Enterprise and were a part of it, they each also have an existence separate and distinct from the Enterprise.

35.     The Enterprise Members conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

5

36.    In the alternative, Defendant Law Firm constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4) (the "Corporate Enterprise").

37.    Under the Corporate Enterprise alternative, the law firm of Thomas P. Hecht, P.C. is not a defendant.

38.    Under the Corporate Enterprise alternative, Defendant Thomas, Defendant Leonard, and Defendant Guerrero used the law firm of Thomas P. Hecht, P.C. to conduct their scheme using a pattern of racketeering activity

39.    The Enterprise affects interstate commerce because its activities have a direct impact on whether Plaintiffs can live and work in the United States and Defendants use interstate mails to perpetrate the scheme.

## Background on Asylum Procedures

40.    Asylum is a form of humanitarian immigration relief that affords protection to noncitizens who fear persecution in their home country on account of a protected ground.

41.    To be eligible for asylum, an applicant must establish either past persecution or a well-founded fear of future persecution in their home country on account of the applicant's race, religion, nationality, membership in a particular social group, or political opinion, and that the government is unable or unwilling to protect them.  8 U.S.C. § 1158(b)(1)(B)(i).

42.    Individuals must apply for asylum within one year of entering the United States. There are two narrow exceptions to this rule: "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."  8 U.S.C. §§ 1158(a)(2)(B), (D).

43.    To apply for asylum affirmatively, an applicant completes and submits a Form I-589, Application for Asylum, to the United States Citizenship and Immigration Services ("USCIS"), a sub-agency of the Department of Homeland Security.

44.     When an attorney prepares the Form I-589 on behalf of an applicant, the attorney must sign the form as the preparer, and declare (i) that the responses on the application are based on the attorney's personal knowledge or on information provided by the applicant, and (ii) that the completed application was read to the applicant in a language that they understand before (iii) the applicant signed the document in the presence of the preparer.

45.     Knowingly submitting an asylum application that contains a false statement or fails to contain a reasonable basis in law or fact constitutes visa fraud under 18 U.S.C. § 1546(a).

46.     After an asylum application is submitted, USCIS will contact the applicant for an interview with a USCIS Asylum Officer.  8 C.F.R. § 208.9.  Due to a serious backlog in processing the applications, between December 2014 and January 2018, interviews scheduled in the New York area typically occurred more than two years after an application was filed.

47.     When an asylum application has been pending for 180 days, an applicant becomes eligible for an employment authorization document ("work permit"), which allows the applicant to work legally while waiting for the interview.  8 U.S.C. § 1158(d).

48.     Aside from receiving general receipt and appointment notices, this interview is usually the first time that individuals who have affirmatively applied for asylum come into contact with the asylum office.

49.     The interview is USCIS's adjudicatory procedure for making a determination on the asylum application.  The interview is conducted by an asylum officer at a USCIS asylum office.

50.     If USCIS grants the application, the applicant has the right to remain lawfully in the United States with asylum status and employment authorization.  8 U.S.C. § 1158(c)(1).

51.     If USCIS does not grant the application and the applicant is not in other lawful status or on valid parole, USCIS generally takes the position that it must refer the applicant to immigration court for removal proceedings.   *See Types of Asylum Decisions*, USCIS, https://www.uscis.gov/humanitarian/refugees-asylum/asylum/types-asylum-decisions   (last updated June 16, 2015).

52.     It is the Asylum Office's general practice that if the applicant includes a spouse or child who does not have lawful status in the United States on the application, that spouse or child also will be placed into removal proceedings. *Id.*

53.     In immigration court, the applicant may again assert his or her asylum claim and/or seek another form of relief, but if an immigration judge denies asylum and all other relief, the applicant will be ordered to be deported and ultimately removed from the United States.

54.     Thus, affirmatively applying for asylum begins a process that carries substantial risk for applicants and their families.

### The Ten Year Scheme

55.     The Defendants knowingly and intentionally represented that Plaintiffs were eligible for and could obtain work authorization and/or lawful permanent resident status via an affirmative application based on the fact that they have ten years of residence in the United States and/or have U.S. citizen children.

56.     The Defendants knew that representation was false; U.S. immigration laws do not permit individuals to obtain work authorization and/or any form of lawful status based solely on the fact that they have ten years of residence in the United States and have U.S. citizen children.

57.     Instead, the Defendants knowingly and intentionally devised, implemented, and coordinated a scheme to profit by knowingly preparing and submitting asylum applications to

USCIS without informing the applicant, seeking the applicant's consent, or even verifying that the applicant qualified for asylum (the "Ten Year Scheme").

58.     Each Plaintiff was a victim of the Ten Year Scheme.

59.     The Hecht Defendants prepared asylum applications for Plaintiffs without regard to the truth or falsity of the information contained therein, and never intended to put forth a cognizable claim for asylum for any of the Plaintiffs.

60.     Given their many years practicing immigration law, the Hecht Defendants could not have reasonably believed that the applications established that Plaintiffs had experienced legally cognizable past persecution or that Plaintiffs had a well-founded fear of future persecution in their home country.

61.     Furthermore, the Hecht Defendants knew that they were submitting applications that were outside the one-year time limit set forth in 8 U.S.C. §§ 1158(a)(2)(B), and did not seek to establish that Plaintiffs qualified for an exception.

62.     Nonetheless, the Hecht Defendants submitted the asylum applications by mail across state lines to USCIS's Vermont Service Center in St. Albans, Vermont.

63.     Upon information and belief, the Hecht Defendants only intended to use aspects of the asylum application process to further their schemes to defraud Plaintiffs out of thousands of dollars and, upon information and belief, never intended to put forth a cognizable claim for asylum for any of the Plaintiffs.

64.     The Hecht Defendants knowingly and intentionally concealed from or misrepresented to Plaintiffs the services they intended to provide.

65.     The Hecht Defendants knowingly and intentionally concealed from or misrepresented to Plaintiffs the requirements, nature, and contents of the asylum applications.

66.    The Hecht Defendants knowingly and intentionally concealed from or misrepresented to Plaintiffs the risks and potential consequences of submitting these asylum applications, including the possibility of being placed into deportation proceedings.

67.    The Hecht Defendants failed to review the completed application forms with Plaintiffs and, in some cases, instructed them to sign blank or incomplete application forms.

68.    The Hecht Defendants also refused to answer questions from Plaintiffs about their applications.  When Plaintiffs asked questions about their applications, the Hecht Defendants generally became angry or curt, often yelling at them or using profanities.  Instead of addressing Plaintiffs' questions, the Hecht Defendants typically just instructed Plaintiffs to trust them.

69.    Plaintiffs hired the Hecht Defendants for their legal expertise and reasonably relied on the Hecht Defendants' ethical obligations as attorneys to deal honestly with clients and act in good faith.

70.    The Hecht Defendants exploited this reliance and Plaintiffs' limited literacy, lack of English language skills, and unfamiliarity with the complicated U.S. immigration system to carry out the Ten Year Scheme to defraud.

## Roles of the Members of the Enterprise

71.    Defendant Thomas and Defendant Leonard direct the operations of the Enterprise.

72.    Defendant Thomas and Defendant Leonard use their law licenses as a guise of legitimacy to carry out the Ten Year Scheme and defraud immigrants in the New York City area.

73.    Specifically, Defendant Thomas and Defendant Leonard make misrepresentations to immigrants to induce them to hire Defendant Law Firm for legal representation.

74.    Defendant Law Firm and its employees play a material role in the operation or management of the Enterprise.

75.     Defendant Law Firm and its employees complete and submit the asylum applications, communicate with clients, and collect and process payments.

76.     Defendant Law Firm and its employees provide material support in furtherance of the Ten Year Scheme to defraud described herein.

77.     Upon information and belief, Defendant Law Firm and its employees understood and agreed to engage in the Ten Year Scheme to defraud.

78.     Defendant Guerrero also plays a material role in the operation or management of the Enterprise.

79.     Defendant Guerrero has intimate knowledge of his clients' immigration status because of his role as a tax preparer.  On information and belief, Defendant Guerrero targets clients without social security numbers, informs them of the "ten year law," and refers them to the Hecht Defendants.

80.     Upon information and belief, Defendant Guerrero has a reciprocal referral relationship with Defendant Law Firm, and on information and belief, Defendant Guerrero benefits from referring clients to the Hecht Defendants by receiving referrals from the Hecht Defendants in return.

81.     On information and belief, Defendant Guerrero conspired with the Hecht Defendants and provided material support in furtherance of the Ten Year Scheme to defraud described herein.

82.     Upon information and belief, Defendant Guerrero understood and agreed to engage in the Ten Year Scheme to defraud Plaintiffs.

83.     Sylvia's Translation Services ("Sylvia's") is an unincorporated business entity that provides translation services from Spanish to English.  Sylvia's principal place of business is

operated out of the same office as Defendant Law Firm, 729 Seventh Avenue, 14th Floor, New York, NY 10019.

84.     Sylvia's also plays a material role in the operations of the Enterprise.

85.     The Hecht Defendants inform applicants that English translations of certain documents are required for their case, and Sylvia's provides those translations in exchange for additional fees.

86.     On information and belief, Sylvia's conspired with the Hecht Defendants and provided material support in furtherance of the Ten Year Scheme to defraud described herein.

### Pattern of Racketeering Activity

87.     Under both the Enterprise and the Corporate Enterprise, the pattern of racketeering activity is the same.

88.     At all times relevant and in violation of 18 U.S.C. §1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described herein.

89.     Defendants furthered the Ten Year Scheme through, among other illegal activity, engaging in fraud and swindles (hereafter "mail fraud") under 18 U.S.C. § 1341 and fraud and misuse of visas, permits, and other documents (hereafter "visa fraud") under 18 U.S.C. § 1546.

90.     Defendants engaged in mail fraud because they used the interstate mails or caused the interstate mails to be used for the purpose of furthering and executing their scheme to defraud.

91.     Examples of mail fraud include Defendant Law Firm's mailings of asylum applications from New York to the USCIS Service Center in Vermont, as well as mailings to Plaintiffs from Defendants regarding their cases or outstanding invoices.

92.     Defendants' use of the mails was incident to an essential part of the scheme to defraud, namely to deceive and/or defraud Plaintiffs into paying Defendants.

93.     Defendants engaged in visa fraud because they knowingly presented asylum applications to USCIS which contained false statements and/or did not contain any reasonable basis in law or fact.

94.     Examples of visa fraud include the Hecht Defendants knowingly preparing asylum applications on behalf of Plaintiffs without regard to the truth or falsity of the information contained therein, and intentionally mailing those asylum applications to the USCIS Service Center in Vermont without intending to put forth a cognizable claim.

95.     Defendants each participated in the Ten Year Scheme knowingly, willfully and with a specific intent to defraud Plaintiffs.

96.     Each of the Defendants shared a common purpose to carry out the scheme to defraud Plaintiffs, and each of the Defendants shared a common interest of benefitting financially by defrauding Plaintiffs.

97.     The Enterprise, as well as each Defendant, received monetary benefits from defrauding and exploiting Plaintiffs.  These benefits were primarily in the form of legal fees, increased referrals, and increased profits and income.

98.     Defendants' conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because Defendants, through interstate commerce, committed multiple related acts of mail and/or visa fraud.

99.     The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding Plaintiffs for profit.

100.   Defendants were common participants in the predicate acts.   Their activities amount to a common course of action with a similar pattern and purpose to defraud similarly situated victims.

101.   Furthermore, on information and belief, the scale of the harm caused by Defendants goes far beyond the Plaintiffs named herein.

102.   Responses to Freedom of Information Act ("FOIA") requests show that since 2006, nearly 250 asylum applications filed by the Hecht Defendants have been referred to removal proceedings.

103.   Responses to FOIA requests also show that the Hecht Defendants currently have nearly 1,000 asylum applications pending that could be referred to removal proceedings.

104.   Accordingly, there is a serious threat of future repetition if Defendants are allowed to continue the Ten Year Scheme, and there is a serious threat that more immigrants will be defrauded and placed into removal proceedings.

## The RICO Conspiracy

105.   Through the Enterprise, Defendants conspired to commit fraud and carry out the Ten Year Scheme to defraud Plaintiffs as set forth herein, and that conspiracy continues today.

106.   Defendants knowingly agreed to the overall objective of the conspiracy to profit by taking advantage of immigrants, and agreed to commit mail fraud and visa fraud in furtherance of that scheme.

107.   Upon information and belief, Defendants' conspiracy includes members of the Enterprise, as well as various unknown employees and agents of Defendant Law Firm.

108.   Defendants knowingly and willingly combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) and conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity.

14

109.    Defendants have engaged in overt acts in furtherance of the conspiracy, including engaging in, or supporting co-Defendants in engaging in, a pattern of racketeering activity that involves conduct that constitutes mail fraud under 18 U.S.C. § 1341, and visa fraud under 18 U.S.C. § 1546.

110.    Defendants have engaged in other overt acts in furtherance of the conspiracy, including making false and misleading representations to Plaintiffs and otherwise participating in the daily operations of the Enterprise.

111.    Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the Ten Year Scheme.

112.    Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c).

113.    Furthermore, upon information and belief, Defendants knowingly and willfully conspired to conceal the Ten Year Scheme.

114.    Plaintiffs exercised reasonable diligence in attempting to uncover Defendants' fraud by confronting the Hecht Defendants about their activities and misrepresentations.

115.    When confronted by Plaintiffs about the misrepresentations, the Hecht Defendants lied to Plaintiffs in order to conceal the Ten Year Scheme.

116.    Most Plaintiffs were only able to discover the fraudulent nature of the Ten Year Scheme with assistance from unaffiliated attorneys.

**Injuries Suffered By Plaintiffs**

117.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c) and (d), Plaintiffs have been injured in their business or property in that they have collectively been defrauded out of thousands of dollars in fees.  For Plaintiffs, who are members of low-income families, the loss of this money has been economically devastating.

15

118.    Plaintiffs' injuries were a direct, proximate, and reasonably foreseeable result of Defendants' violations of 18 U.S.C. § 1962(c) and (d).

119.    Plaintiffs also suffered additional harm as a direct result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c) and (d), including but not limited to additional legal costs, transportation expenses, and possible deportation from the United States.

120.    Pursuant to 18 U.S.C. § 1964(c) and (d), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

121.    In addition, Plaintiffs have been placed into the deportation pipeline as a direct result of Defendants' actions.  Many Plaintiffs have already been placed in removal proceedings, and other Plaintiffs still face the threat of referral to immigration court and deportation.

122.    Plaintiffs have also suffered mental and emotional distress as a direct result of Defendants' actions.

## STATEMENT OF FACTS SPECIFIC TO EACH PLAINTIFF

### Mr. Guzman & Ms. Pavia

123.    Plaintiffs Francisco Guzman ("Mr. Guzman") and Patricia Pavia ("Ms. Pavia") were victims of the Ten Year Scheme.  Mr. Guzman and Ms. Pavia are married and live with their two U.S. citizen children in Staten Island, New York.  Mr. Guzman's and Ms. Pavia's native language is Spanish.  They speak and understand very limited English.

124.    In or around late 2015, at the recommendation of friends in the community, Mr. Guzman met with Defendant Leonard at Defendant Law Firm.  During the first meeting, and in all subsequent meetings, Mr. Guzman truthfully answered all questions asked by Defendant Leonard, but Defendant Leonard never asked for the information necessary to determine whether Mr. Guzman and Ms. Pavia were eligible for or had a reasonable basis in law or fact to apply for asylum.

125.    Defendant Leonard informed Mr. Guzman that he and Ms. Pavia were eligible to apply for lawful permanent residency "por los diez años" (because of the ten years).

126.    Defendant Leonard's representations caused Mr. Guzman to reasonably believe (i) that he and Ms. Pavia were eligible for a work permit and for lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

127.    Defendant Leonard instructed Mr. Guzman and Ms. Pavia to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

128.    When Mr. Guzman asked Defendant Leonard questions about the legal process or the documents he was signing, Defendant Leonard refused to answer his questions and told Mr. Guzman that he did this kind of application all the time.

129.    The Hecht Defendants did not advise Mr. Guzman about the legal requirements for or the potential risks of applying for asylum, or even inform him that they intended to submit an application for asylum on his behalf.

130.    In or around March 2016, the Hecht Defendants submitted an asylum application on behalf of Mr. Guzman, with Ms. Pavia as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

131.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mr. Guzman or Ms. Pavia, and without their informed consent.

132.    In or around March 2016, Mr. Guzman and Ms. Pavia received a notice in the mail that their asylum application had been received by USCIS.  Mr. Guzman and Ms. Pavia were confused by this notice because they did not intend to apply for asylum.

133.    Mr. Guzman went to Defendant Law Firm to speak with Defendant Leonard, but Defendant Leonard was not there.  Another employee of Defendant Law Firm told Mr. Guzman not to worry about it, because this is how Defendant Leonard does the applications, and he knows what he is doing.

134.    Mr. Guzman returned the following week to speak with Defendant Leonard who also told him not to worry.

135.    In or around October 2016, Mr. Guzman attended a meeting at MRNY, where he learned that Defendants had promised him lawful status through a process that does not exist.

136.    After discovering that they were victims of the Ten Year Scheme, Mr. Guzman and Ms. Pavia undertook steps to attempt to rectify Defendants' fraudulent actions, including firing Defendant Law Firm.

***Injury Suffered***

137.    Based on Defendants' representations, Mr. Guzman agreed to pay a total of $8,500 for the Hecht Defendants' legal services.

138.    As of today, Mr. Guzman and Ms. Pavia have paid at least $2,000 in multiple payments by cash and money orders.  Mr. Guzman and Ms. Pavia made these payments to staff at Defendant Law Firm.

139.    Mr. Guzman and Ms. Pavia also paid Defendant Law Firm $120 for the translation of certain documents for their case.  The invoice provided to Mr. Guzman and Ms. Pavia is on letterhead of Sylvia's Translation Service.

140.    But for the representations made by Defendant Leonard, Mr. Guzman would not have hired or paid the Hecht Defendants for legal representation. As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Guzman and Ms. Pavia suffered a financial injury of at least $2,120.

18

141.    Also as a result of Defendants' fraudulent and predatory acts, Mr. Guzman and Ms. Pavia have suffered mental and emotional distress, because they live in constant fear of being deported and separated from their children.

### Ms. Ayala

142.    Plaintiff Rosario Ayala ("Ms. Ayala") was a victim of the Ten Year Scheme.  Ms. Ayala lives with her husband and their three U.S. citizen children in Staten Island, New York. Ms. Ayala's native language is Spanish. She speaks and understands very limited English.

143.    In or around March 2015, Ms. Ayala and her husband met with Defendant Leonard at Defendant Law Firm.  During this meeting, Defendant Leonard told Ms. Ayala and her husband that they were eligible to get work permits because of the length of time they had been living in the United States. Defendant Leonard said they would be included in the same application and would both receive work authorization.

144.    In or around February 2016, Ms. Ayala and her husband met with Defendant Leonard at Defendant Law Firm.  During that meeting, and in all subsequent meetings, Ms. Ayala and her husband truthfully answered all questions asked by Defendant Leonard, but he never asked for the information necessary to determine whether Ms. Ayala and her husband were eligible for or had a reasonable basis in law or fact to apply for asylum.

145.    Defendant Leonard's representations caused Ms. Ayala and her husband to reasonably believe (i) that she was eligible for a work permit that could eventually lead to lawful permanent residency, and (ii) that she would obtain this benefit through an affirmative application based on the eligibility criterion of length of residency.

146.    Defendant Leonard instructed Ms. Ayala to sign several documents, which he said were necessary to apply for work authorization.  Defendant Leonard did not explain or translate the documents.

147.     When Ms. Ayala or her husband asked Defendant Leonard questions about the legal process or the documents she was signing, Defendant Leonard refused to answer the questions and told them not to worry.

148.     The Hecht Defendants did not advise Ms. Ayala about the legal requirements for or the potential risks of applying for asylum, or even inform her that they intended to submit an application for asylum on her behalf.

149.     On or around May 31, 2016, the Hecht Defendants submitted an asylum application on behalf of Ms. Ayala and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

150.     The Hecht Defendants submitted the asylum application without discussing or reviewing it with Ms. Ayala, and without her informed consent.  In fact, Defendant Leonard told Ms. Ayala and her husband that they would both be included in the same application, but the application was only in Ms. Ayala's name, and excluded her husband from the process.

151.     In or around September 2017, Ms. Ayala attended a MRNY workshop about the "myth of the ten year law."  At this workshop, Ms. Ayala learned that Defendants had promised her lawful status through a process that does not exist.

152.     After discovering that she was a victim of the Ten Year Scheme, Ms. Ayala undertook steps to attempt to rectify Defendants' fraudulent actions.  By letter delivered on or around January 24, 2018, Ms. Ayala fired Defendant Law Firm and demanded a copy of her entire file.  Defendants have not yet replied to Ms. Ayala's letter nor have Defendants sent Ms. Ayala a copy of her file.

### *Injury Suffered*

153.     Based on Defendants' representations, Ms. Ayala agreed to pay a total of $8,000 for the Hecht Defendants' legal services.

154.    As of today, Ms. Ayala and her husband have paid Defendants a total of $2,300 in multiple cash payments.    Every time that Ms. Ayala had an appointment with Defendant Leonard, she had to pay him in order for the case to progress.

155.    Ms. Ayala also paid Defendant Leonard $120 for the translation of Ms. Ayala's birth certificate, her husband's birth certificate, and their marriage certificate into English in order to include those documents with her application.    Ms. Ayala received a bill from Sylvia's Translation Service for the translations.

156.    But for the representations made by Defendants, Ms. Ayala would not have hired or paid the Hecht Defendants for legal representation.

157.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Ms. Ayala suffered financial injury of at least $2,420, including translation costs.

Also as a result of Defendants' fraudulent and predatory acts, Ms. Ayala has suffered mental and emotional distress, because she lives in constant fear of being deported and separated from her children.

**Mr. Flores Dominguez and Mrs. Olmos Flores**

158.    Plaintiffs Manuel Flores Dominguez ("Mr. Flores Dominguez") and Nely Olmos Flores ("Mrs. Olmos Flores") were victims of the Ten Year Scheme.    Mr. Flores Dominguez and Mrs. Olmos Flores are married and live with their three U.S. citizen children in Astoria, New York.    Mrs. Olmos Flores's and Mr. Flores Dominguez's native language is Spanish.    They speak and understand very limited English.

159.    In or around 2012, on the recommendation of an acquaintance, Mr. Flores Dominguez and Mrs. Olmos Flores met with Defendant Thomas at Defendant Law Firm.    During the first meeting, and in all subsequent meetings, Mr. Flores Dominguez and Mrs. Olmos Flores truthfully answered all questions asked by Defendant Thomas, but he never asked for the

information necessary to determine whether Mr. Flores Dominguez and Mrs. Olmos Flores were eligible for or had a reasonable basis in law or fact to apply for asylum.

160.    Defendant Thomas informed Mr. Flores Dominguez and Mrs. Olmos Flores that they did not yet qualify for lawful status under "la ley de diez años" (the "ten year law") because they had not yet been in the United States for ten years, but that once they had ten years of presence they would qualify because they had U.S. citizen children.  Defendant Thomas told them that Defendant Leonard would handle their case once they accrued the ten years.

161.    In or around early 2015, Mr. Flores Dominguez and Mrs. Olmos Flores returned to meet with Defendant Leonard.  Defendant Leonard informed them that they were now eligible to apply for lawful permanent residency under the "ten year law."

162.    Defendant Leonard's representations caused Mr. Flores Dominguez and Mrs. Olmos Flores to reasonably believe (i) that they were eligible for a work permit and for lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

163.    Defendant Leonard instructed Mr. Flores Dominguez and Mrs. Olmos Flores to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Leonard did not explain or translate the documents.  On one occasion, they tried to read some of the documents that were written in English, but Defendant Leonard told them to just sign.

164.    When Mr. Flores Dominguez and Mrs. Olmos Flores asked Defendant Leonard questions about the legal process or the documents they were signing, Defendant Leonard refused to answer the questions and told them not to worry.

22

165.    The Hecht Defendants did not advise Mr. Flores Dominguez and Mrs. Olmos Flores about the legal requirements for or the potential risks of applying for asylum, or even inform them that they intended to submit an application for asylum on their behalf.

166.    On or around May 23, 2016, the Hecht Defendants submitted an asylum application on behalf of Mr. Flores Dominguez, with Mrs. Olmos Flores as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

167.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mr. Flores Dominguez or Mrs. Olmos Flores, and without their informed consent.

168.    In or around June 2016, Mr. Flores Dominguez and Mrs. Olmos Flores received a notice in the mail that their asylum application had been received by USCIS. The notice was in English, and they did not understand what it said.

169.    In or around September 2017, Mr. Flores Dominguez and Mrs. Olmos Flores saw on the news—on the Spanish-language channel Univision—that there would be a story later that night about the "ten year law," and the word "fraude" ("fraud") was written on the screen in red letters. They waited until the story aired at 11p.m., and watched an interview with a woman who had been a victim of the scam. The news story mentioned an organization in Harlem that was advising people about the scam.

170.    Mr. Flores Dominguez and Mrs. Olmos Flores contacted that community organization and attended a workshop on the "ten year law" scam. At this workshop, Mr. Flores Dominguez and Mrs. Olmos Flores learned that Defendants had promised them lawful status through a process that did not exist.

171.   After discovering that they were victims of the Ten Year Scheme, Mr. Flores Dominguez and Mrs. Olmos Flores undertook steps to rectify Defendants' fraudulent actions. Mr. Flores Dominguez and Mrs. Olmos Flores fired Defendant Law Firm and hired MRNY as pro bono counsel.

172.   Mr. Flores Dominguez and Mrs. Olmos Flores intend to report these actions to USCIS and withdraw the asylum application that was submitted on their behalf.

***Injury Suffered***

173.   Based on Defendants' representations, Mr. Flores Dominguez and Mrs. Olmos Flores agreed to pay a total of $8,000 for the Hecht Defendants' legal services.

174.   As of today, Mr. Flores Dominguez and Mrs. Olmos Flores have paid Defendants a total of $2,450 in six separate payments by cash or money orders.  Mr. Flores Dominguez and Mrs. Olmos Flores made these payments to a secretary at Defendant Law Firm.

175.   Mr. Flores Dominguez and Mrs. Olmos Flores also paid Defendant Law Firm $120 for the translation of certain documents for their case.  The invoice provided to Mr. Flores Dominguez and Mrs. Olmos Flores is on letterhead of Sylvia's Translation Service.

176.   But for the fraudulent misrepresentations made by Defendants, Mr. Flores Dominguez and Mrs. Olmos Flores would not have hired or paid the Hecht Defendants for legal representation.

177.   As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Flores Dominguez and Mrs. Olmos Flores suffered a financial injury of at least $2,570.

178.   Also as a result of Defendants' fraudulent and predatory acts, Mr. Flores Dominguez and Mrs. Olmos Flores have suffered mental and emotional distress, because they live in constant fear of being deported and separated from their children.

**Mr. Mejia and Ms. Tacuba**

24

179.     Plaintiffs Ernesto Mejia Gonzalez ("Mr. Mejia") and Oneida Tacuba Mejia ("Ms. Tacuba") were victims of the Ten Year Scheme.  Mr. Mejia and Ms. Tacuba are married and live with their four U.S. citizen children in Brooklyn, New York.  Mr. Mejia's and Ms. Tacuba's native language is Spanish.  They speak and understand very limited English.

180.     In or around November 2014, at the recommendation of Mr. Mejia's colleague, Mr. Mejia met with Defendant Thomas at the office of Defendant Law Firm.  During the first meeting, and in all subsequent meetings, Mr. Mejia truthfully answered all questions asked by Defendant Thomas, but Defendant Thomas never asked for the information necessary to determine whether Mr. Mejia was eligible for or had a reasonable basis in law or fact to apply for asylum.

181.     Defendant Thomas informed Mr. Mejia that he and his wife were eligible to apply for lawful permanent residency under the "ten year law."

182.     Ms. Tacuba's first meeting with Defendant Thomas was in or around November 2014, and Mr. Mejia also attended this meeting.  During the first meeting, and in all subsequent meetings, Ms. Tacuba truthfully answered all questions asked by Defendant Thomas, but he never asked for the information necessary to determine whether Ms. Tacuba was eligible for or had a reasonable basis in law or fact to apply for asylum.

183.     Defendant Thomas informed Ms. Tacuba that she was eligible to apply for lawful permanent residency under the "ten year law."

184.     Defendant Thomas's representations caused Mr. Mejia and Ms. Tacuba to reasonably believe (i) that they were eligible for a work permit and lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

185.    Defendant Thomas instructed Mr. Mejia and Ms. Tacuba to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Thomas did not explain or translate the documents.

186.    When Mr. Mejia or Ms. Tacuba asked Defendant Thomas questions about the legal process or the documents they were signing, Defendant Thomas refused to answer the questions and told Mr. Mejia and Ms. Tacuba not to worry.

187.    The Hecht Defendants did not advise Mr. Mejia or Ms. Tacuba about the legal requirements for or the potential risks of applying for asylum.

188.    In or around November 2014, the Hecht Defendants submitted an asylum application on behalf of Mr. Mejia and Ms. Tacuba and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont. Mr. Mejia and Ms. Tacuba received a receipt notification dated December 19, 2014.

189.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mr. Mejia or Ms. Tacuba, and without their informed consent.

190.    In or around January 2017, Mr. Mejia and Ms. Tacuba met with attorneys at MRNY. At the meeting, Mr. Mejia and Ms. Tacuba learned that Defendants had promised them lawful status through a process that did not exist.

191.    After discovering that they were victims of the Ten Year Scheme, Mr. Mejia and Ms. Tacuba undertook steps to attempt to rectify Defendants' fraudulent actions including firing Defendant Law Firm, and securing new counsel.

### *Injury Suffered*

192.    Based on Defendants' representations Mr. Mejia and Ms. Tacuba agreed to pay a total of $8,000 for Defendants' legal assistance.

193. As of today, Mr. Mejia and Ms. Tacuba have paid at least $3,120 in multiple cash payments. Mr. Mejia and Ms. Tacuba made the payments to employees at Defendant Law Firm.

194. But for the representations made by Defendant Thomas, Mr. Mejia and Ms. Tacuba would not have hired or paid Defendants for legal representation.

195. Furthermore, Mr. Mejia and Ms. Tacuba were required to pay for new legal representation. Mr. Mejia and Ms. Tacuba agreed to pay a total of $12,000 for the new legal representation.

196. As of today, Mr. Mejia and Ms. Tacuba have paid $4,650 for the new legal representation.

197. As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Mejia and Ms. Tacuba suffered a financial injury of at least $7,770.

198. Also as a result of Defendants' fraudulent and predatory acts, Mr. Mejia and Ms. Tacuba have suffered mental and emotional distress, because they live in constant fear of being deported and separated from their children.

**Mr. Muñoz**

199. Plaintiff Mario Enrique Muñoz ("Mr. Muñoz") was a victim of the Ten Year Scheme. Mr. Muñoz has five children, including three U.S. citizen children. Mr. Muñoz lives in Queens, New York. Mr. Muñoz's native language is Spanish. He speaks and understands English.

200. In or around October 2015, at the recommendation of neighbors, Mr. Muñoz met with Defendant Thomas at the office of Defendant Law Firm. During the first meeting, and in all subsequent meetings, Mr. Muñoz truthfully answered all questions asked by Defendant Thomas, but Defendant Thomas never asked for the information necessary to determine whether Mr. Muñoz was eligible for or had a reasonable basis in law or fact to apply for asylum.

201.    Defendant Thomas told Mr. Muñoz that he was eligible to apply for lawful permanent residency under the "ten year law."

202.    Defendant Thomas's representations caused Mr. Muñoz to reasonably believe (i) that he was eligible for a work permit and lawful permanent residency, and (ii) that he would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

203.    Defendant Thomas instructed Mr. Muñoz to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain the documents.

204.    When Mr. Muñoz asked Defendant Thomas questions about the legal process or the documents he was signing, Defendant Thomas refused to answer the questions and told Mr. Muñoz not to worry.

205.    The Hecht Defendants did not advise Mr. Muñoz about the legal requirements for or the potential risks of applying for asylum, or even inform him that they intended to submit an application for asylum on his behalf.

206.    On or around October 20, 2016, the Hecht Defendants submitted an asylum application on behalf of Mr. Muñoz and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

207.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mr. Muñoz, and without his informed consent.

208.    In or around January 2017, Mr. Muñoz received a notice in the mail that his asylum application had been received by USCIS.  Mr. Muñoz was confused by this notice because he did not intend to apply for asylum.

209.   In or around September 2017, Mr. Muñoz contacted another immigration attorney for a second opinion about the asylum notice he had received.   In that meeting, Mr. Muñoz learned that Defendants had promised him lawful status through a process that does not exist.

210.   After discovering that he was a victim of the Ten Year Scheme, Mr. Muñoz undertook steps to attempt to rectify Defendants' fraudulent actions, including firing Defendant Law Firm and retaining new counsel.

***Injury Suffered***

211.   Based on Defendants' representations, Mr. Muñoz agreed to pay a total of $15,000 for the Hecht Defendants' legal services for Mr. Muñoz and his ex-wife.

212.   As of today, Mr. Muñoz has paid Defendants $750 in cash payments.  Mr. Muñoz made these payments to an employee at Defendant Law Firm.

213.   But for the fraudulent misrepresentations made by Defendant Thomas, Mr. Muñoz would not have hired or paid Defendants for legal representation.

214.   Furthermore, Mr. Muñoz was required to pay for new legal representation, which thus far has cost him at least $4,250 for legal services for Mr. Muñoz and his ex-wife.

215.   Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Muñoz suffered a financial injury of at least $5,000.

216.   Also as a result of Defendants' fraudulent and predatory acts, Mr. Muñoz has suffered mental and emotional distress, because he lives in constant fear of being deported and separated from his children.

### Mr. Perez Ortega and Mrs. Perez

217.   Plaintiffs Gregorio Perez Ortega ("Mr. Perez Ortega") and Rosa Perez ("Mrs. Perez") were victims of the Ten Year Scheme.  Mr. Perez Ortega and Mrs. Perez are married and

live with their three U.S. citizen children in Staten Island, New York.  Mr. Perez Ortega's and Mrs. Perez's native language is Spanish.  They speak and understand very limited English.

218.   In or around late 2011 or early 2012, at the recommendation of a friend, Mrs. Perez and Mr. Perez Ortega met with Defendant Thomas at the office Defendant Law Firm. During the first meeting, and in all subsequent meetings, Mrs. Perez and Mr. Perez Ortega truthfully answered all questions asked by Defendant Thomas, but he never asked for the information necessary to determine whether Mrs. Perez and Mr. Perez Ortega were eligible for or had a reasonable basis in law or fact to apply for asylum.

219.   Defendant Thomas told Mrs. Perez and Mr. Perez Ortega that they were eligible to apply for lawful permanent residency under the "ten year law."

220.   All subsequent meetings that Mrs. Perez and Mr. Perez Ortega had at Defendant Law Firm were conducted by Defendant Leonard.

221.   The Hecht Defendants' representations caused Mrs. Perez and Mr. Perez Ortega to reasonably believe (i) that they were eligible for a work permit and lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

222.   Defendant Leonard instructed Mrs. Perez and Mr. Perez Ortega to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

223.   When Mrs. Perez and Mr. Perez Ortega asked Defendant Leonard questions about the legal process or the documents they were signing, Defendant Leonard refused to answer their questions and told them he knew what he was doing and they should not worry.

224.    The Hecht Defendants did not advise Mrs. Perez and Mr. Perez Ortega about the legal requirements for or the potential risks of applying for asylum, or even inform them that they intended to submit an application for asylum on their behalf.

225.    In or around September 2014, the Hecht Defendants submitted an asylum application for Mr. Perez Ortega, with Mrs. Perez as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

226.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mrs. Perez and Mr. Perez Ortega, and without their informed consent.

227.    Defendant Leonard told Mr. Perez Ortega that he needed to pay all his back taxes for the "ten year case."

228.    A friend suggested to Mrs. Perez and Mr. Perez Ortega that they should meet with Defendant Guerrero since he is very popular in the community.  In or around October 2014, Mrs. Perez and Mr. Perez Ortega met with Defendant Guerrero for assistance with preparing and filing their taxes.

229.    During that meeting, Defendant Guerrero asked Mrs. Perez and Mr. Perez Ortega if they had an immigration attorney and said that he could refer the Hecht Defendants. Mrs. Perez and Mr. Perez Ortega informed Defendant Guerrero that they were already working with the Hecht Defendants.

230.    Mrs. Perez and Mr. Perez Ortega saw a stack of Defendant Hecht's business cards on Defendant Guerrero's desk while they were at his office.

231.    In or around October 2014, Mrs. Perez and Mr. Perez Ortega received a notice in the mail that their asylum application had been received by USCIS.  Mrs. Perez and Mr. Perez Ortega were confused by this notice because they did not intend to apply for asylum.

232.    Mrs. Perez and Mr. Perez Ortega called Defendant Law Firm to ask about the notice, and Defendant Leonard told them not to worry and he would take care of everything.

233.    On at least two occasions, Ms. Perez and Mr. Perez Ortega asked Defendant Leonard for copies of the documents they had signed and for copies of their entire file.  On both occasions, Defendant Leonard refused to provide the copies.

234.    In or around April 2016, Mrs. Perez and Mr. Perez Ortega saw a commercial on TV talking about the "myth of the ten year law."  They started to investigate this issue on the internet and met with attorneys at MRNY.  Mrs. Perez and Mr. Perez Ortega learned that the Defendants had promised them lawful status through a process that does not exist.

235.    After discovering that they were victims of the Ten Year Scheme, Mrs. Perez and Mr. Perez Ortega undertook steps to attempt to rectify Defendants' fraudulent actions, including firing Defendant Law Firm and retaining new pro bono counsel.

***Injury Suffered***

236.    Based on Defendants' representations, Mrs. Perez and Mr. Perez Ortega agreed to pay a total of $8,000 for the Hecht Defendants' legal services.

237.    As of today, Mrs. Perez and Mr. Perez Ortega have paid Defendants a total of $2,600 in multiple payments by cash, money order, and credit card.  Mrs. Perez and Mr. Perez Ortega made these payments directly to Defendant Thomas or Defendant Leonard.

238.    But for the representations made by the Hecht Defendants, Mrs. Perez and Mr. Perez Ortega would not have hired or paid the Hecht Defendants for legal representation.

239.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Mrs. Perez and Mr. Perez Ortega suffered financial injury of at least $2,600.

240.    Also as a result of Defendants' fraudulent and predatory acts, Mrs. Perez and Mr. Perez Ortega have suffered mental and emotional distress.

**Mr. Ramos**

241.    Plaintiff Alicio Ramos ("Mr. Ramos") was a victim of Defendants' Ten Year Scheme.  Mr. Ramos is married and lives with his wife and his two U.S. citizen children in Staten Island, New York.   Mr. Ramos' native language is Spanish. He speaks and understands very limited English.

242.    In June 2015, Mr. Ramos met with Defendant Guerrero for assistance with preparing and filing his taxes.

243.    Defendant Guerrero told Mr. Ramos that he qualified for lawful permanent residence status based on the number of years he had been living in the U.S.

244.    Defendant Guerrero referred Mr. Ramos to Defendant Law Firm to get help with the legal process in applying for the ten year visa.

245.    In June 2015, Mr. Ramos met with Defendant Leonard at Defendant Law Firm. During the first meeting, and in all subsequent meetings, Mr. Ramos truthfully answered all questions asked by Defendant Leonard, but he never asked him for the information necessary to determine whether he was eligible for or had a reasonable basis in law or fact to apply for asylum.

246.    Defendant Leonard informed Mr. Ramos that he was eligible for a visa under the "ten year law."

247.    Defendant Leonard's representations caused Mr. Ramos to reasonably believe (i) that he was eligible for a work permit and for lawful permanent residency, and (ii) that he would obtain both benefits through an affirmative application based on the eligibility criterion of length of residency.

248.   Defendant Leonard instructed Mr. Ramos to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

249.   The Hecht Defendants did not advise Mr. Ramos about the legal requirements for or the potential risks of applying for asylum, or even inform him that they intended to submit an application for asylum on his behalf.

250.   In or around September 2015, the Hecht Defendants submitted an asylum application for Mr. Ramos, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

251.   The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mr. Ramos, and without his informed consent.  Although Mr. Ramos only met with Defendant Leonard, the asylum application was signed by Defendant Thomas.

252.   Around November 2017, Mr. Ramos saw a news program reporting that the "ten year law" did not exist and that many immigrants were being defrauded by attorneys that were telling them that they were eligible for the "ten year visa." Mr. Ramos called the "311" hotline, and learned that Defendants had promised him lawful status through a process that did not exist.

253.   After discovering that he was a victim of the Ten Year Scheme, Mr. Ramos undertook steps to attempt to rectify Defendants' fraudulent actions, including firing Defendant Law Firm and retaining new counsel.

### *Injury Suffered*

254.   Based on Defendants' representations, Mr. Ramos agreed to pay a total of $8,000 for Defendants' legal services for him and his wife, to be paid in installments.

255.    As of today, Mr. Ramos has paid at least $2,400, in multiple payments by cash. Mr. Ramos made these payments to an employee at Defendant Law Firm.

256.    But for the fraudulent misrepresentations made by Defendant Leonard, Mr. Ramos would not have hired or paid the Hecht Defendants for legal representation.

257.    As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Ramos suffered a financial injury of at least $2,400.

258.    Also as a result of Defendants' fraudulent and predatory acts, Mr. Ramos has suffered mental and emotional distress, because he lives in constant fear of being deported and separated from his children.

### Mr. Torres

259.    Plaintiff Martin Torres Reyes ("Mr. Torres") was a victim of the Ten Year Scheme.  Mr. Torres is married and lives with his two U.S. citizen children in Staten Island, New York.  Mr. Torres' native language is Spanish.  He speaks and understands limited English.

260.    In or around March 2015, at the recommendation of an acquaintance, Mr. Torres first visited Defendant Law Firm.  When he entered Defendant Law Firm, he noticed a sign-in sheet where each visitor put the date, their name, and the reason for their visit.  When he arrived, there was already a long list of names and most of them listed either "10 años" ("10 years") or "por el tiempo" ("because of time") as the reason for their visit.

261.    Mr. Torres waited for approximately three hours before he met with Defendant Thomas.  After a brief discussion, Defendant Thomas told Mr. Torres that he had a "good case" and that it would cost $750 to start.  During the first meeting, and in all subsequent meetings, Mr. Torres truthfully answered all questions asked by Defendant Thomas and Defendant Leonard, but neither ever asked for the information necessary to determine whether Mr. Torres was eligible for or had a reasonable basis in law or fact to apply for asylum.

262.    In or around May 2015, Mr. Torres' wife and children accompanied him for a second meeting at Defendant Law Firm, and Defendant Leonard asked him about whether he had ever been arrested, whether he paid taxes, and for his copies of his birth and marriage certificates.

263.    Defendant Leonard informed Mr. Torres that he was eligible for lawful immigration status because he had been in the U.S. for more than ten years and had U.S. citizen children.  Defendant Leonard also told Mr. Torres that he should come back six months after he was fingerprinted by USCIS to complete paperwork for work authorization.

264.    Defendant Leonard's representations caused Mr. Torres to reasonably believe (i) that he was eligible for a work permit and for lawful immigration status, and (ii) that he would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

265.    When Mr. Torres asked Defendant Leonard questions about the legal process or the documents he was signing, Defendant Leonard refused to answer the questions and told him not to worry.

266.    The Hecht Defendants did not advise Mr. Torres about the legal requirements for or the potential risks of applying for asylum, or even inform him that they intended to submit an application for asylum on his behalf.

267.    In or around August 2015, the Hecht Defendants submitted an asylum application for Mr. Torres, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

268.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with Mr. Torres, and without his informed consent.

269.    In or around 2016, Mr. Torres's English teacher invited him to a presentation on immigration issues at MRNY and he went.  The presentation was about the Ten Year Scheme, which is when Mr. Torres learned that Defendants had promised him lawful status through a process that does not exist.

270.    After discovering that he was a victim of the Ten Year Scheme, Mr. Torres called the Defendant Law Firm and a man answered.  Mr. Torres asked for a copy of his file, and the man said "F*** You!" and then hung up.  Mr. Torres immediately called again and a man took down his name and number and said someone would call him back.  No one from Defendant Law Firm ever called him back.

*Injury Suffered*

271.    As of today, Mr. Torres has paid Defendants a total of $1,100 in multiple payments by cash and money order.  Mr. Torres made these payments either directly to Defendant Leonard or to a secretary at Defendant Law Firm.

272.    But for the fraudulent representations made by Defendants, Mr. Torres would not have hired or paid the Hecht Defendants for legal representation.

273.    Mr. Torres also received a letter saying that he owed Sylvia's $40 for the translation of his birth certificate, which he paid via mail by money order.

274.    As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Torres suffered a financial injury of at least $1,140.

275.    Also as a result of Defendants' fraudulent and predatory acts, Mr. Torres has suffered mental and emotional distress, because he lives in constant fear of being deported and separated from his children.

**S.F.C. and A.M.O.**

276.     Plaintiffs S.F.C. and A.M.O. were victims of the Ten Year Scheme.  S.F.C. and A.M.O. are married and live with their three U.S. citizen children in Brooklyn, New York. S.F.C.'s and A.M.O.'s native language is Spanish.  They speak and understand very limited English.

277.     In or around June 2012, at the recommendation of A.M.O.'s cousin, A.M.O. met with Defendant Leonard at Defendant Law Firm.  During the first meeting, and in all subsequent meetings, A.M.O. truthfully answered all questions asked by Defendant Leonard, but he never asked for the information necessary to determine whether A.M.O. was eligible for or had a reasonable basis in law or fact to apply for asylum.

278.     In or around June 2012, S.F.C. met with Defendant Leonard.  During the first meeting, and in all subsequent meetings, S.F.C. truthfully answered all questions asked by Defendant Leonard, but Defendant Leonard never asked for the information necessary to determine whether S.F.C. was eligible for or had a reasonable basis in law or fact to apply for asylum.

279.     Defendant Leonard told S.F.C. and A.M.O. to bring evidence to show that they had been in the United States for ten years and that they were eligible to apply for lawful permanent residency.

280.     Defendant Leonard's representations caused S.F.C. and A.M.O. to reasonably believe (i) that they were eligible for a work permit and for lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criterion of U.S. citizen children.

281.   Defendant Leonard instructed S.F.C. and A.M.O. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

282.   When S.F.C. and A.M.O. asked Defendant Leonard questions about the legal process or the documents they were signing, Defendant Leonard refused to answer the questions and told S.F.C. and A.M.O. not to worry.

283.   The Hecht Defendants did not advise S.F.C. or A.M.O. about the legal requirements for or the potential risks of applying for asylum, or even inform them that they intended to submit an application for asylum on their behalf.

284.   In or around the summer or fall of 2013, the Hecht Defendants submitted separate asylum applications on behalf of S.F.C. and A.M.O. and used a mail carrier to send the applications across state lines to the USCIS Service Center in Vermont.

285.   The Hecht Defendants submitted the asylum applications without discussing or reviewing them with S.F.C. and A.M.O.'s, and without their informed consent.

286.   In or around August 2013, A.M.O. received a notice in the mail that her asylum application had been received by USCIS.  A.M.O. was confused by this notice because she did not intend to apply for asylum.  When she contacted Defendant Law Firm, Defendant Leonard told A.M.O. not to worry because this was the first step in her petition.

287.   In or around December 2013, S.F.C. received a notice in the mail that his asylum application had been received by USCIS.  S.F.C. was confused by this notice, because he did not intend to apply for asylum.  When S.F.C. contacted Defendant Law Firm, Defendant Leonard told S.F.C. that this was the first step towards his petition.

288.    In or around spring 2014, S.F.C. and A.M.O. attended asylum interviews in Jamaica, Queens.  They answered all of the questions truthfully.

289.    As a direct result of the Ten Year Scheme, S.F.C. and A.M.O. were placed into removal proceedings in or about March 2014 and September 2015, respectively.

290.    In or around 2017, S.F.C. and A.M.O. became suspicious when Defendants demanded more money to move the application forward.  S.F.C. and A.M.O. contacted other attorneys, and learned that Defendants had promised them lawful status through a process that does not exist.

291.    After discovering that they were victims of the Ten Year Scheme, S.F.C. and A.M.O. undertook steps to attempt to rectify Defendants' fraudulent actions, including firing the Hecht Defendants and finding alternative representation.

*Injury Suffered*

292.    Based on Defendants' representations, S.F.C. and A.M.O. initially agreed to pay a total of $4,000 for Defendants' legal services.

293.    During the course of the representation, Defendants demanded additional payments to move the case forward.  Over the course of five years, S.F.C. and A.M.O. paid the Hecht Defendants a total of $7,900 in ten or twelve separate payments.

294.    But for the fraudulent representations made by Defendant Leonard, S.F.C. and A.M.O. would not have hired or paid the Hecht Defendants for legal representation.

295.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, S.F.C. and A.M.O. suffered a significant financial injury of at least $7,900 from payments to Defendants, and additional funds paid to their new counsel.

296. Defendants' fraudulent and predatory acts also caused S.F.C. and A.M.O. to suffer mental and emotional distress because they live in constant fear of being deported and separated from their U.S. citizen children.

### D.P.C.

297. Plaintiff D. P. C. was a victim of the Ten Year Scheme. D.P.C. lives with her husband and four children, including three U.S. citizen children, in Brooklyn, New York. D.P.C.'s native language is Spanish. She speaks and understands very limited English.

298. In or around 2015, at the recommendation of her brother, D.P.C. met with Defendant Thomas at the office of Defendant Law Firm. During the first meeting, and in all subsequent meetings, D.P.C. truthfully answered all questions asked by Defendant Thomas, but he never asked her for the information necessary to determine whether she was eligible for or had a reasonable basis in law or fact to apply for asylum.

299. Defendant Thomas told D.P.C. that she was eligible to apply for lawful permanent residency under the "ten year law."

300. Defendant Thomas's representations caused D.P.C. to reasonably believe (i) that she was eligible for a work permit and lawful permanent residency, and (ii) that she would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

301. Defendant Thomas instructed D.P.C. to sign several documents which he said were necessary to apply for lawful permanent residency. Defendant Thomas did not explain or translate the documents.

302. When D.P.C. asked Defendant Thomas questions about the legal process or the documents she was signing, Defendant Thomas refused to answer the questions and told D.P.C. not to worry, because he was the expert.

41

303.    The Hecht Defendants did not advise D.P.C. about the legal requirements for or the potential risks of applying for asylum, or even inform her that they intended to submit an application for asylum on her behalf.

304.    On or around March 3, 2016, the Hecht Defendants submitted an asylum application on behalf of D.P.C. and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

305.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with D.P.C., and without her informed consent.

306.    Between March and October 2016, D.P.C. received a notice in the mail that her asylum application had been received by USCIS.  D.P.C. was confused by this notice because she did not intend to apply for asylum.

307.    D.P.C. called Defendant Law Firm to ask about the notice, and the person who answered the phone, who upon information and belief was an employee of Defendant Law Firm, told D.P.C. not to worry, because that application was just a "name" of the form for the "ten-year law" application.

308.    At the end of 2017, D.P.C. met with attorneys at MRNY.  At the meeting, D.P.C. learned that Defendants had promised her lawful status through a process that does not exist.

309.    After discovering that she was a victim of the Ten Year Scheme, D.P.C. undertook steps to attempt to rectify Defendants' fraudulent actions, including firing Defendant Law Firm and retaining new counsel.

### *Injury Suffered*

310.    Based on Defendants' representations, D.P.C. agreed to pay a total of $8,000 for the Hecht Defendants' legal services for D.P.C. and her husband.

311.    As of today, D.P.C. has paid Defendants $1,880 in cash payments.  D.P.C. made these payments to employees at Defendant Law Firm.

312.    D.P.C. also paid Defendant Thomas $80 for the translation of the birth certificates of D.P.C. and her husband.   The receipt provided to D.P.C. is on letterhead of Sylvia's Translation Service.

313.    But for the fraudulent misrepresentations made by Defendant Thomas, D.P.C. would not have hired or paid Defendants for legal representation.

314.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, D.P.C. suffered a financial injury of at least $1,960.

Also as a result of Defendants' fraudulent and predatory acts, D.P.C. has suffered mental and emotional distress, because she lives in constant fear of being deported and separated from her children.

### B.R.E.

315.    Plaintiff B.R.E. was a victim of the Ten Year Scheme.  B.R.E. lives with her three U.S. citizen children in Staten Island, New York.  B.R.E.'s native language is Spanish.  She speaks and understands very limited English.

316.    In or around 2012, at the recommendation of her father, B.R.E. met with Defendant Thomas at Defendant Law Firm.  During the first meeting, and in all subsequent meetings, B.R.E. truthfully answered all questions asked by Defendant Thomas, but he never asked for the information necessary to determine whether B.R.E. was eligible for or had a reasonable basis in law or fact to apply for asylum.

317.    Defendant Thomas informed B.R.E. that she was eligible to apply for lawful permanent residency through the "ley de diez años," which means "law of ten years."

318.   Defendant Thomas's representations caused B.R.E. to reasonably believe (i) that she was eligible for a work permit and for lawful permanent residency, and (ii) that she would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

319.   Defendant Thomas instructed B.R.E. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain or translate the documents.

320.   When B.R.E. asked Defendant Thomas questions about the legal process or the documents she was signing, Defendant Thomas refused to answer the questions and told her not to worry because he was the attorney.

321.   The Hecht Defendants did not advise B.R.E. about the legal requirements for or the potential risks of applying for asylum, or even inform her that they intended to submit an application for asylum on her behalf.

322.   On or around October 22, 2013, the Hecht Defendants submitted an asylum application for B.R.E. and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

323.   The Hecht Defendants submitted the asylum application without discussing or reviewing it with B.R.E., and without her informed consent.

324.   In or around November 2013, B.R.E. received a phone call from Defendant Thomas informing her that she was scheduled for an asylum interview.  B.R.E. was confused by this phone call because she did not intend to apply for asylum.

325.   Defendant Thomas told B.R.E. not to worry, because the interview was the first step towards status through the law of ten years.

326.    On or around December 3, 2013, B.R.E. attended the asylum interview and answered all of the questions truthfully.

327.    On or around December 12, 2013, B.R.E. received a charging document directing her to appear in immigration court in January 2014.  The Hecht Defendants did not explain that this meant that she had been placed in removal proceedings.

328.    On or around January 12, 2014, neither Defendant Thomas nor Defendant Leonard accompanied B.R.E. to immigration court; instead, they sent a representative that B.R.E. had never met before.

329.    In or around October 2016, B.R.E. attended a MRNY workshop about the "myth of the ten year law."  At this workshop, B.R.E. learned that Defendants had promised her lawful status through a process that does not exist.

330.    After discovering that she was a victim of the Ten Year Scheme, B.R.E. undertook steps to attempt to rectify Defendants' fraudulent actions.  B.R.E. fired Defendant Law Firm and found alternative representation.

### *Injury Suffered*

331.    Based on Defendants' representations, B.R.E. agreed to pay a total of $1,500 for the Hecht Defendants' legal services.

332.    B.R.E. paid Defendants the full amount in five or six separate payments by cash or check.  B.R.E. made these payments to employees of Defendant Law Firm.

333.    Defendant Thomas and/or Defendant Leonard also referred B.R.E. to Sylvia's Translation Service for translations they said were necessary for her case.  B.R.E. paid Sylvia's Translation Service $40 for the translation of her birth certificate.

334.    But for the fraudulent representations made by Defendant Thomas, B.R.E. would not have hired or paid the Hecht Defendants for legal representation.

335.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, B.R.E. suffered financial injury of at least $1,540.

336.    Also as a result of Defendants' fraudulent and predatory acts, B.R.E. has suffered mental and emotional distress, because she lives in constant fear of being deported and separated from her children.

### O.C.F. and R.M.F.

337.    Plaintiffs O.C.F. and R.M.F. were victims of the Ten Year Scheme.  O.C.F. and R.M.F. are married and live with their two U.S. citizen children in Staten Island, New York. O.C.F.'s and R.M.F.'s native language is Spanish.  They speak and understand very limited English.

338.    R.M.F. heard from a friend that Defendant Law Firm could help her obtain status.

339.    On or around September 1, 2015, R.M.F. went to Defendant Law Firm to ask about an appointment.  The secretary instructed R.M.F. to fill out an intake form and reviewed the documents R.M.F. brought with her.

340.    After the secretary reviewed the documents and intake form, she told R.M.F. that she had a "strong case" under the "ten year law."  She made copies of all of Ms. R.M.F.'s documents, charged R.M.F. $240, and scheduled an appointment for R.M.F. and O.C.F. to meet with Defendant Leonard.

341.    On or around September 29, 2015, R.M.F. and O.C.F. met with Defendant Leonard at Defendant Law Firm.  During their first and only meeting, R.M.F. and O.C.F. truthfully answered all questions asked by Defendant Leonard, but he never asked for the information necessary to determine whether R.M.F. and O.C.F. were eligible for or had a reasonable basis in law or fact to apply for asylum.

342.   The meeting was rushed and did not last more than ten minutes, and Defendant Leonard ate a sandwich while he spoke to R.M.F. and O.C.F.

343.   Defendant Leonard told R.M.F. and O.C.F. that they were eligible to apply for lawful permanent residency under the "ten year law."

344.   Defendant Leonard's representations caused R.M.F. and O.C.F. to reasonably believe (i) that they were eligible for a work permit and for lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

345.   Defendant Leonard instructed R.M.F. and O.C.F. to sign a retainer agreement. The agreement was in English and Defendant Leonard did not explain or translate it for them. Defendant Leonard also instructed R.M.F. and O.C.F. to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Leonard did not explain or translate the documents.

346.   When R.M.F. or O.C.F. tried to ask questions about the legal process or the documents they were signing, Defendant Leonard cut them off, told them not to worry, and dismissed their concerns.

347.   The Hecht Defendants did not advise R.M.F. or O.C.F. about the legal requirements for or the potential risks of applying for asylum, or even inform them that they intended to submit an application for asylum on their behalf.

348.   On or around September 29, 2015, O.C.F. delivered certain documents to the secretary at Defendant Law Firm, who upon information and belief then remitted them to Sylvia's to be translated.  Sylvia's charged O.C.F. $80, which O.C.F. paid to the secretary.

349.    In or around October 2015, the Hecht Defendants submitted an asylum application for O.C.F., with R.M.F. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

350.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with R.M.F. and O.C.F., and without their informed consent.

351.    In or around October 2015, R.M.F. and O.C.F. received a notice in the mail that their asylum application had been received by USCIS.  R.M.F. and O.C.F. were confused by this notice because they did not intend to apply for asylum.

352.    R.M.F. has been a member of MRNY since December 20, 2011.  Worried that something was wrong, R.M.F. contacted a staff member at MRNY to ask about the notice, and that staff member informed her about the "ten year scam."  R.M.F. learned that the Hecht Defendants had promised her lawful status through a process that does not exist.

353.    After discovering that they were victims of the Ten Year Scheme, R.M.F. and O.C.F. undertook steps to attempt to rectify Defendants' fraudulent actions.  R.M.F. and O.C.F. fired Defendant Law Firm, and have met with other immigration attorneys in relation to their immigration case.

354.    On or around March 15, 2018, R.M.F. and O.C.F. received notice from USCIS that their asylum interview had been scheduled.  On or around March 16, 2018, R.M.F. and O.C.F. received a letter from Defendant Law Firm notifying them that an interview in connection to their application had been scheduled.  That letter did not mention asylum.

***Injury Suffered***

355.    Based on Defendants' representations, R.M.F. and O.C.F. agreed to pay a total of $8,000 for the Hecht Defendants' legal services.

356.    As of today, R.M.F. and O.C.F. have paid Defendants at least $834 in various cash payments.  R.M.F. and O.C.F. made these payments to Defendant Leonard in person or to the secretary at Defendant Law Firm.

357.    But for the fraudulent misrepresentations made by Defendants, R.M.F. and O.C.F. would not have hired or paid the Hecht Defendants for legal representation.

358.    Furthermore, R.M.F. and O.C.F. were required to pay for new legal representation, which, thus far, has cost them $1,000.

359.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, R.M.F. and O.C.F. suffered a financial injury of at least $1,830.

360.    Also as a result of Defendants' fraudulent and predatory acts, R.M.F. and O.C.F. have suffered mental and emotional distress, because they live in constant fear of being deported and separated from their children.  This fear is exacerbated because their eight-year-old son is physically disabled and depends on treatment and therapy in the United States.

### A.M.M.

361.    Plaintiff A.M.M. was a victim of the Ten Year Scheme.  A.M.M. lives with her two adult U.S. citizen daughters in Brooklyn, New York.  A.M.M.'s native language is Spanish. She speaks and understands limited English.

362.    In or around May 2014, at the recommendation of a family friend, A.M.M. met with Defendant Thomas at Defendant Law Firm.  During the first meeting, and in all subsequent meetings, A.M.M. truthfully answered all questions asked by Defendant Thomas and Defendant Leonard, but neither ever asked A.M.M. for the information necessary to determine whether she was eligible for or had a reasonable basis in law or fact to apply for asylum.

363.    Defendant Thomas informed A.M.M. that she was eligible for lawful permanent residency because she had been in the U.S. for more than ten years and had U.S. citizen children.

364.    In or around July 2014, A.M.M. returned to the Defendant Law Firm and met with Defendant Leonard, who told her that Defendant Thomas was his father and that they worked together.   Defendant Leonard confirmed that A.M.M. qualified for lawful permanent residency.  He also said that after six months, she would get permission to work.

365.    The Hecht Defendants' representations caused A.M.M. to reasonably believe (i) that she was eligible for a work permit and for lawful permanent residency and (ii) that she would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

366.    In or around August or September 2014, A.M.M. met again with Defendant Leonard, who instructed her to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

367.    When A.M.M. asked Defendant Leonard questions about the legal process or the documents she was signing, Defendant Leonard refused to answer and told her not to worry.

368.    The Hecht Defendants did not advise A.M.M. about the legal requirements for or the potential risks of applying for asylum, or even inform her that they intended to submit an application for asylum on her behalf.

369.    In or around October 2014, the Hecht Defendants submitted an asylum application for A.M.M.,  and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

370.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with A.M.M.,  and without her informed consent.  Later that month, Defendant Thomas sent A.M.M. a letter directing to her go to a USCIS office to get her fingerprints taken.

371.   In or around fall 2015, A.M.M.'s eldest daughter began an internship with a community organization run by and for immigrants facing deportation.  As she learned more about immigration law, she became suspicious of the Hecht Defendants.

372.   In or around January 2016, A.M.M., accompanied by her eldest daughter, returned to Defendant Law Firm and met with Defendant Leonard.  When A.M.M.'s daughter asked Defendant Leonard questions about why the paperwork from USCIS said "asylum" when he had told them he was filing an application based on her length of residency and children, Defendant Leonard said he was the lawyer and "knew what he was doing."

373.   A.M.M. asked Defendant Leonard to withdraw her asylum application.  But in or around July 2016, A.M.M. received another letter signed by Defendant Thomas instructing her to appear at the USCIS office in Brooklyn for a second set of fingerprints.

374.   A.M.M. and her eldest daughter returned to the Defendant Law Firm in or around July 2016 and met with Defendant Leonard.  They asked why he had not withdrawn the application, and requested a copy of A.M.M.'s file.  Defendant Leonard said that A.M.M. needed to pay everything she owed before he would give her a copy, became very aggressive, and demanded that A.M.M.'s daughter leave the room.

375.   Later in July, A.M.M. received a notice that her asylum interview was scheduled for August 16, 2016.  A.M.M. and her eldest daughter again met with Defendant Leonard to ask why he had not withdrawn the application.

376.   Defendant Leonard dismissed their questions and said that he would note in A.M.M.'s file that she was "difficult to work with" because her daughter asked so many questions.  Defendant Leonard also said that he would not accompany her to the asylum interview.

377.    On or around August 2, 2016, now accompanied by her youngest daughter, A.M.M. returned to Defendant Law Firm.  Defendant Leonard encouraged A.M.M. to attend the asylum interview.  Defendant Leonard told A.M.M. that if she had suffered something like domestic violence in the country where she was born, she should say that at the interview and they could give her a green card on the spot.  This is not accurate under immigration law.

378.    Defendant Leonard also repeatedly stated that there was no risk of deportation and that a judge would not deport a single woman without a criminal history.  Obviously, this is also not accurate under immigration law.

379.    After discovering that she was a victim of the Ten Year Scheme, A.M.M. undertook steps to attempt to rectify Defendants' fraudulent actions, including firing Defendant Law Firm and writing to the Asylum Office to withdraw her application.

380.    As a direct result of the Ten Year Scheme, A.M.M. was placed into removal proceedings on or around March 30, 2017.

***Injury Suffered***

381.    Based on Defendants' representations, A.M.M. agreed to pay a total of $9,000 for the Hecht Defendants' legal services.

382.    As of today, A.M.M. has paid Defendants a total of approximately $4,856, in at least eight separate payments by cash and money orders.  A.M.M. made these payments directly to an employee at Defendant Law Firm.

383.    A.M.M. also paid $40 for the translation of her birth certificate.  She sent the payment to Defendant Law Firm via mail.

384.    But for the fraudulent misrepresentations made by Defendants, A.M.M. would not have hired or paid the Hecht Defendants for legal representation.

385.    As a direct and proximate result of Defendants' fraudulent and predatory acts, A.M.M. suffered a financial injury of at least $4,896.

386.    Also as a result of Defendants' fraudulent and predatory acts, A.M.M. has suffered mental and emotional distress, because she lives in constant fear of being deported and separated from her daughters.

### J.M. and M.M.

387.    Plaintiffs J.M. and M.M. were victims of Defendant's Ten Year Scheme.  J.M. and M.M. are married and live with their two U.S. citizen children in Staten Island, New York. M.M.'s and J.M.'s native language is Spanish.  They speak and understand very limited English.

388.    In or around January 2014, J.M. and M.M. met with Defendant Guerrero for assistance with preparing and filing their taxes.

389.    Defendant Guerrero asked them if they had heard about the "ten year law," a way to obtain lawful immigration status for people who had been living in the U.S. for at least ten years.  J.M. and M.M. told Defendant Guerrero that they only had been living in the United States for nine years.  Defendant Guerrero told J.M. and M.M. that he would send them to a good lawyer once they had been living in the United States for ten years.

390.    In or around April 2015, J.M. and M.M. again met with Defendant Guerrero for assistance with preparing and filing their taxes.  Defendant Guerrero again asked them how long they had been living in the United States.  When they said that they had lived in the United States for almost ten years, Defendant Guerrero took a business card out of his desk for Defendant Law Firm and gave it to them.

391.    Defendant Guerrero told J.M. and M.M. that Defendant Law Firm could "fix their papers" using the "ten year law."  Defendant Guerrero encouraged them to schedule an appointment with Defendant Law Firm, assuring them that the Hecht Defendants were good

lawyers. Defendant Guerrero also told them that the process would move quickly because they have U.S. citizen children.

392. At the recommendation of Defendant Guerrero, J.M. and M.M. made an appointment at Defendant Law Firm for a consultation.

393. At the time of their first meeting with Defendant Thomas, J.M. and M.M. had lived in the United States for just under ten years. Defendant Thomas informed J.M. and M.M. that they would need to wait a few months to reach the ten-year mark before he could fix their papers using the "ten year law."

394. Defendant Thomas suggested to J.M. and M.M. that they should get married, because then he could charge them less money than if they each individually had a case with him.

395. During their first meeting, and in all subsequent meetings, J.M. and M.M. truthfully answered all questions asked by Defendant Thomas and Defendant Leonard, but the Defendants never asked for the information necessary to determine whether J.M. and M.M. were eligible for or had a reasonable basis in law or fact to apply for asylum.

396. Defendant Thomas and Defendant Leonard informed J.M. and M.M. that they were eligible to apply for lawful permanent residency under the "ten year law."

397. Defendant Thomas and Defendant Leonard's representations caused J.M. and M.M. to reasonably believe (i) that they were eligible for a work permit and for lawful permanent residency, and (ii) that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

398.    Defendant Thomas instructed J.M. and M.M. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain or translate the documents.

399.    When J.M. and M.M. asked questions about the legal process or the documents they were signing, Defendant Thomas and Defendant Leonard told them not to worry because the "ten year law" was real and they had a good case.

400.    The Hecht Defendants did not advise J.M. and M.M. about the legal requirements for or the potential risks of applying for asylum, or even inform them that they intended to submit an application for asylum on their behalf.

401.    In or around July 2015, the Hecht Defendants submitted an asylum application for J.M., with M.M. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

402.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with J.M. and M.M., and without their informed consent.

403.    Defendant Leonard repeatedly told J.M. and M.M. that their case would move faster if they made additional payments.

404.    In or around the summer of 2015, J.M. met an immigration attorney at the community center "La Colmena" in Staten Island, New York, who told him that the "ten year law" does not exist.

405.    That attorney referred J.M. to an immigration attorney at Staten Island Legal Services, who agreed to represent J.M. and M.M.  This attorney instructed J.M. and M.M. to return to Defendant Law Firm to request their case file.

406.    On two separate occasions, J.M. and M.M. went to Defendant Law Firm to request their case file.   On both occasions, they were made to wait for hours, and each time Defendant Leonard told J.M. and M.M. that they did not need their case file because they do not speak English.

407.    As a direct result of Ten Year Scheme, J.M. and M.M. were placed into removal proceedings and had their first appearance in front of an Immigration Judge on April 20, 2018.

*Injury Suffered*

408.    Based on Defendants' representations, J.M. and M.M. agreed to pay a total of $7,500 for the Hecht Defendants' legal services.

409.    As of today, J.M. and M.M. have paid Defendants a total of $1,060 in three separate payments by cash.

410.    J.M. and M.M. also paid Defendant Leonard $60 for the translation of their birth certificates.   The receipt provided to J.M. and M.M. is on letterhead of Sylvia's Translation Service.

411.    But for the fraudulent misrepresentations made by Defendants, J.M. and M.M. would not have hired or paid the Hecht Defendants for legal representation.

412.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, J.M. and M.M. suffered financial injury of at least $1,120.

Also as a result of Defendants' fraudulent and predatory acts, J.M. and M.M. have suffered mental and emotional distress, because they live in constant fear of being deported and separated from their children.

## E.G.R.

413.    Plaintiff E.G.R. was a victim of the Ten Year Scheme.  E.G.R. is married and lives with her two U.S. citizen children in Staten Island, New York.  E.G.R's native language is Spanish.  She speaks and understands limited English.

414.    In or around March 2015, E.G.R. met with Defendant Guerrero for assistance with preparing and filing her taxes.

415.    Defendant Guerrero told E.G.R. that she qualified for lawful permanent residence status based on the number of years she had been living in the United States, her U.S. citizen children, and since she had paid taxes all those years.

416.    Defendant Guerrero referred E.G.R. to Defendant Law Firm to get help with the legal process in applying for lawful permanent resident status under the "ten year law."

417.    In or around March 2015, E.G.R. met with Defendant Thomas at Defendant Law Firm.  During the first meeting, and in all subsequent meetings, E.G.R. truthfully answered all questions asked by Defendant Thomas, but he never asked for the information necessary to determine whether E.G.R. was eligible for or had a reasonable basis in law or fact to apply for asylum.

418.    Defendant Thomas informed E.G.R. that she was eligible to apply for lawful permanent residency under the "ten year law."

419.    Defendant Thomas's representations caused E.G.R. to reasonably believe (i) that she was eligible for a work permit and for lawful permanent residency, and (ii) that she would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

420.    Defendant Thomas instructed E.G.R. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain or translate the documents.

421.    When E.G.R. asked Defendant Thomas questions about the legal process or the documents she was signing, Defendant Thomas refused to answer the questions and told her not to worry.

422.    The Hecht Defendants did not advise E.G.R. about the legal requirements for or the potential risks of applying for asylum, or even inform her that they intended to submit an application for asylum on her behalf.

423.    In or around April 2015, the Hecht Defendants submitted an asylum application for E.G.R.'s husband with E.G.R. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

424.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with E.G.R., and without her informed consent.

425.    In or around July 2017, E.G.R. received a letter from Defendant Thomas stating that she had an interview with USCIS on August 1, 2017, in relation to the asylum application. She was confused because she had not intended to apply for asylum.

426.    E.G.R. called Defendant Thomas to ask about the letter and the scheduled interview.  Defendant Thomas told her to not worry and that this was a required step in the process under the "ten year law."

427.    Defendant Thomas told E.G.R. that he would not be present for the interview. Defendant Thomas advised her to say in the interview that she feared returning to Mexico

because of the high criminal rate and frequent kidnappings.  Defendant Thomas also advised her to say she wanted to stay in the United States to provide her children with a better life.

428.   In or around September 2017, E.G.R. attended a Make the Road New York workshop about the "myth of the ten year law."   At this workshop, E.G.R. learned that Defendants had promised her lawful status through a process that does not exist.

429.   After discovering that she was a victim of the Ten Year Scheme, E.G.R. undertook steps to attempt to rectify Defendants' fraudulent actions.  E.G.R. fired Defendant Law Firm, and has met with other immigration attorneys in relation to her immigration case.

430.   As a direct result of the Ten Year Scheme, E.G.R. was placed into removal proceedings in or around August 2017.

### Injury Suffered

431.   Based on Defendants' representations, E.G.R. agreed to pay a total of $7,500 for the Hecht Defendants' legal services.

432.   As of today, E.G.R. has paid Defendants a total of $3,750 in six separate payments by cash and money orders.  E.G.R. made these payments either directly to Defendant Thomas or to his assistant at Defendant Law Firm.

433.   But for the fraudulent misrepresentations made by Defendants, E.G.R. would not have hired or paid the Hecht Defendants for legal representation.

434.   Furthermore, E.G.R. was required to pay for new legal representation. E.G.R. has agreed to pay a total of approximately $7,500 for the new legal representation for her and her husband.

435.   As of today, E.G.R. has paid $3,500 for the new legal representation.

436.   Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, E.G.R. suffered a financial injury of at least $7,250.

437.    Also as a result of Defendants' fraudulent and predatory acts, E.G.R. has suffered mental and emotional distress, because she lives in constant fear of being deported and separated from her children.

**F.T.R. and J.R.C.**

438.    Plaintiffs F.T.R. and J.C.R. were victims of the Ten Year Scheme.  F.T.R. and J.R.C. are married and live with their three U.S. citizen children in Staten Island, New York. F.T.R.'s and J.R.C.'s native language is Spanish.  They speak and understand very limited English.

439.    In or around June 2014, at the recommendation of J.R.C.'s aunt, J.R.C. met with Defendant Thomas at Defendant Law Firm.  During the first meeting, and in all subsequent meetings, J.R.C. truthfully answered all questions asked by Defendant Thomas, but Defendant Thomas never asked for the information necessary to determine whether J.R.C. was eligible for or had a reasonable basis in law or fact to apply for asylum.

440.    Defendant Thomas told J.R.C. that he and his wife were eligible to apply for lawful permanent residency under the "ten year visa."

441.    F.T.R.'s first meeting with Defendant Thomas was in or around October 2014, and J.R.C. also attended this meeting.  During this meeting, and in all subsequent meetings, F.T.R. truthfully answered all questions asked by Defendant Thomas, but again he did not ask for the information necessary to determine whether F.T.R. was eligible for or had a reasonable basis in law or fact to apply for asylum.

442.    Defendant Thomas also told F.T.R. that she was eligible to apply for lawful permanent residency under the "ten year visa."

443.    Defendant Thomas's representations caused J.R.C. and F.T.R. to reasonably believe (i) that they were eligible for a work permit and for lawful permanent residency, and (ii)

that they would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

444.   Defendant Thomas instructed J.R.C. and F.T.R. to sign several documents, which he said were necessary to apply for the ten-year visa.  Defendant Thomas did not explain or translate the documents.

445.   When J.R.C. or F.T.R. asked Defendant Thomas questions about the legal process or the documents they were signing, Defendant Thomas would cut them off and tell them not to worry.

446.   The Hecht Defendants did not advise J.R.C. and F.T.R. about the legal requirements for or the potential risks of applying for asylum, or even inform them that they intended to submit an application for asylum on their behalf.

447.   In or around March 2015, the Hecht Defendants submitted an asylum application for J.R.C., with F.T.R. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

448.   The Hecht Defendants submitted the asylum application without discussing or reviewing it with J.R.C. or F.T.R., and without their informed consent.

449.   In or around March 2015, J.R.C. and F.T.R. received a notice in the mail that their asylum application had been received by USCIS.  J.R.C. and F.T.R. were confused by this notice because they did not intend to apply for asylum.

450.   J.R.C. called Defendant Law Firm's office to ask about the notice.  The person who answered the phone, who upon information and belief was an employee of Defendant Law Firm, told J.R.C. that this was the first step under the "ten year visa."

451.   In or around early fall of 2016, J.R.C. and F.T.R. attended a MRNY workshop about the "myth of the ten year law."   At this workshop, J.R.C. and F.T.R. learned that Defendants had promised them lawful status through a process that does not exist.

452.   After discovering that they were victims of the Ten Year Scheme, J.R.C. and F.T.R. undertook steps to attempt to rectify Defendants' fraudulent actions.   J.R.C. and F.T.R. fired Defendant Law Firm, secured other counsel, withdrew their asylum application, and reported Defendant Law Firm's actions to USCIS.

### Injury Suffered

453.   Based on Defendants' representations, J.R.C. and F.T.R. agreed to pay a total of $7,000 for the Hecht Defendants' legal services.

454.   As of today, J.R.C. and F.T.R. have paid Defendants $850 in three separate payments in cash.   J.R.C. and F.T.R. made these payments either directly to Defendant Thomas and Defendant Leonard or to a secretary at Defendant Law Firm.

455.   F.T.R. and J.R.C. also paid either Defendant Thomas or a secretary at Defendant Law Firm $80 for the translation of their birth certificates.   The receipt provided to F.T.R. and J.R.C. is on letterhead of Sylvia's Translation Service.

456.   But for the fraudulent representations made by Defendant Thomas, J.R.C. and F.T.R. would not have hired or paid the Hecht Defendants for legal representation.

457.   Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, J.R.C. and F.T.R. suffered financial injury of at least $930.

458.   Also as a result of Defendants' fraudulent and predatory acts, J.R.C. and F.T.R. have suffered mental and emotional distress, because they live in constant fear of being deported and separated from their children.

**R.M.R.**

459.     Plaintiff R.M.R. was a victim of the Ten Year Scheme.   R.M.R. lives with her husband and their two U.S. citizen children in Brooklyn, New York.  R.M.R.'s native language is Spanish.  She speaks and understands very limited English.

460.     R.M.R. heard of Defendant Law Firm's services through distant relatives.   She consulted Defendant Law Firm multiple times to advise her about her options for immigration relief.  In all meetings, R.M.R. truthfully answered all questions asked by Defendant Leonard, but he never asked for the information necessary to determine whether R.M.R. was eligible for or had a reasonable basis in law or fact to apply for asylum.

461.     In approximately 2015, Defendant Leonard advised R.M.R. that she was eligible to apply for lawful permanent residency.  Defendant Leonard repeatedly assured R.M.R. that the application process was safe and that the government would not deport her, because "it was not looking to split up tax-paying families."

462.     Defendant Leonard's representations caused R.M.R. to reasonably believe (i) that she was eligible for a work permit and for lawful permanent residency, and (ii) that she would obtain both benefits through an affirmative application.

463.     Defendant Leonard instructed R.M.R. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

464.     The Hecht Defendants did not advise R.M.R. about the legal requirements for or the potential risks of applying for asylum, or even inform her that they intended to submit an application for asylum on her behalf.

465.    In or around March 2016, the Hecht Defendants submitted an asylum application on behalf of R.M.R. and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

466.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with R.M.R., and without her informed consent.

467.    A family member of R.M.R. advised R.M.R. to seek a second opinion on her immigration case, as the family member had heard about issues with Defendant Law Firm's services.

468.    R.M.R. consulted with Make the Road New York in or around February 2017.  At this consultation, R.M.R. learned that Defendants had promised her status through a process that does not exist.

469.    After discovering that she was a victim of the Ten Year Scheme, R.M.R. undertook steps to attempt to rectify Defendants' fraudulent actions.  R.M.R. fired Defendant Law Firm, and retained Make the Road New York to represent her.

### *Injury Suffered*

470.    Based on Defendants' representations, R.M.R. agreed to pay a total of $7,500 for Defendants' legal services.

471.    As of today, R.M.R. has paid Defendants $3,100 in multiple cash payments. R.M.R. made these payments either directly to Defendant Thomas and Defendant Leonard or to a secretary at Defendant Law Firm.

472.    R.M.R. also paid either Defendant Leonard or a secretary at Defendant Law Firm $40 for the translation of her birth certificate.  The receipt provided to R.M.R. is on letterhead of Sylvia's Translation Service.

473.    But for the fraudulent representations made by Defendant Leonard, R.M.R. would not have hired or paid the Hecht Defendants for legal representation.

474.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, R.M.R. suffered financial injury of at least $3,140.

475.    Also as a result of Defendants' fraudulent and predatory acts, R.M.R. has suffered mental and emotional distress, because she lives in constant fear of being deported and separated from her family.

**F.T.V.**

476.    Plaintiff F.T.V. was a victim of the Ten Year Scheme.  F.T.V. is married and lives with his wife and youngest U.S. citizen child in Bronx, New York.  F.T.V.'s native language is Spanish.  He speaks and understands very limited English.

477.    In or around early 2016, on the recommendation of an acquaintance, F.T.V. and his wife met with Defendant Leonard at the office of Defendant Law Firm.  During the first meeting, and in all subsequent meetings, F.T.V. truthfully answered all questions asked by Defendant Leonard, but Defendant Leonard never asked F.T.V. for the information necessary to determine whether he was eligible for or had a reasonable basis in law or fact to apply for asylum.

478.    Defendant Leonard informed F.T.V. that he was eligible to apply for lawful permanent residency under the "ten year law."

479.    Defendant Leonard's representations caused F.T.V. to reasonably believe (i) that he was eligible for a work permit and to apply for lawful permanent residency, and (ii) that he would obtain both benefits through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

65

480.    Defendant Leonard instructed F.T.V. to sign several documents.    Defendant Leonard did not explain or translate the documents.

481.    The Hecht Defendants did not advise F.T.V. about the legal requirements for or the potential risks of applying for asylum, or even inform him that they intended to submit an application for asylum on his behalf.

482.    On or about May 3, 2016, the Hecht Defendants submitted an asylum application on behalf of F.T.V., and used a mail carrier to send it to the USCIS Service Center in Vermont.

483.    The Hecht Defendants submitted the asylum application without discussing or reviewing it with F.T.V., and without his informed consent.

484.    F.T.V. became suspicious of Defendant Leonard's representation because of the brief and simplistic answers he gave to questions. His daughter, who speaks English, accompanied him to the office of Defendant Law Firm to ask about the case but Defendant Leonard evaded answering questions.

485.    At the recommendation of his daughter, F.T.V. sought an immigration consultation with an attorney at Make the Road New York in April 2018.    At this meeting, F.T.V. learned that Defendants had promised him a benefit that did not exist.

486.    After discovering that he was a victim of the Ten Year Scheme, F.T.V. undertook steps to rectify Defendants' fraudulent actions.    F.T.V. fired Defendant Law Firm and began seeking alternate counsel.

### *Injury Suffered*

487.    Based on Defendants' representations, F.T.V. agreed to pay a total of $8,000 for Defendants' legal assistance.

488.    As of today, F.T.V. has paid Defendants a total of $1,800 in three separate payments by cash. F.T.V. made these payments to Defendant Leonard.

489.    F.T.V. also paid Defendant Law Firm $120 via money order for the translation of certain documents for his case.   The invoice provided to F.T.V. is on letterhead of Sylvia's Translation Service.

490.    But for the fraudulent misrepresentations made by Defendants, F.T.V. would not have hired or paid the Hecht Defendants for legal representation.   As a direct and proximate result of Defendants' fraudulent and predatory acts, F.T.V. suffered a financial injury of at least $1,920.

491.    Also as a result of Defendants' fraudulent and predatory acts, F.T.V. has suffered mental and emotional distress, because he lives in fear of being deported and separated from his children.

### Make the Road New York

492.    Plaintiff Make the Road New York brings this action on behalf of itself, as well as on behalf of its members, clients and all similarly situated individuals.

493.    MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to building the power of immigrant, Latinx, and working-class communities in New York.   With offices in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to support low-income New Yorkers in improving their own lives and neighborhoods.

494.    MRNY has more than 22,000 dues-paying members residing in New York City, Long Island, and Westchester, primarily in the boroughs of Brooklyn and Queens.   Its members include many of the Plaintiffs, along with others who have suffered from Defendants' scheme but are not participating in this lawsuit.

495.    MRNY has a legal department staffed by twenty-seven attorneys and fourteen advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as with affirmative applications for immigration benefits.  Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

496.    MRNY has had to dedicate significant resources to mitigating the harm caused by Defendants.

497.    MRNY first noticed a trend regarding former clients of Defendants in Staten Island in or around 2016.  Since then, MRNY has encountered survivors with similar stories throughout the city, including in Brooklyn and Queens.

498.    MRNY now experiences a continuous and increasing flow of community members entering its offices in search of assistance after having suffered from Defendants' actions.  MRNY's limited legal staff struggles to provide consultations to meet the demand. Consultations of this type are resource-intensive and each typically lasts several hours, just in order to appropriately understand the case posture and advise the affected individuals regarding their options moving forward, because the threat of deportation proceedings requires assessing all potential forms of immigration relief and because the individuals' understanding of their own case posture is far from the reality.

499.    MRNY's legal department has at present retained six former clients of Defendants for full representation before the asylum office and/or immigration court.

500.    MRNY has also invested significant resources in securing new representation for people who are caught up in this scheme and are now without counsel, because once started, the process continues to move forward in conveyor belt fashion even after Defendants are fired.

501.    Between early 2016 and today, MRNY organizers and legal staff have given at least fifteen presentations to groups of members within the organization about the Ten Year Scheme so that community members understand, among other things: (i) the risks of filing an affirmative asylum application, including the potential to be placed in removal proceedings, and (ii) how to tell when an employment authorization document is based on a pending asylum application.

502.    MRNY organizers and lawyers have invested time and resources creating educational materials to be distributed in the community about the Ten Year Scheme.

503.    In an attempt to educate the immigrant community, MRNY staff and members have conducted four recent print, radio, and film interviews about the Ten Year Scheme.

504.    MRNY lawyers, as well as lawyers working pro bono as extensions of the legal department, have drafted at least three legal memoranda on topics such as the referral process from the asylum office to immigration court and remedies for people who have been scammed, including various civil legal claims in state and federal court.

505.    MRNY lawyers have prepared and given presentations to at least three external groups of lawyers on the Ten Year Scheme and case strategies for representing people who have been scammed.  As a result, MRNY's lawyers receive frequent requests for technical assistance from people at other legal services organizations.

506.    As a direct and proximate result of Defendants' racketeering activity and violations of 18 U.S.C. § 1962(c), Plaintiff Make the Road New York suffered injury to its business and property through diversion of organizational resources.

507.    In responding to the massive need created in the community because of Defendants' fraud, Make the Road New York staff, including attorneys, organizers and paralegals, have spent hundreds of hours working on behalf of members and clients defrauded by the Hecht firm.

508.    Pursuant to 18 U.S.C. § 1964(c), MRNY is entitled to injunctive relief to prevent Defendants from continuing to exploit immigrants through the Ten Year Scheme.

## NON-RICO CAUSES OF ACTION

### Fraud and Deceit

509.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

510.    As set forth above, the Defendants made numerous intentional misrepresentations and omissions to defraud Plaintiffs through the Ten Year Scheme.

511.    Specifically, Defendant Leonard and Defendant Thomas, by and through Defendant Law Firm, intentionally misrepresented (i) Plaintiffs' eligibility for immigration benefits and the requirements for qualifying for these benefits, (ii) the types of applications Defendants were filing on behalf of Plaintiffs and/or the process by which Plaintiffs would obtain immigration benefits, and (iii) the material risks of the types of applications the Hecht Defendants were filing on Plaintiffs' behalf.

512.    Additionally, Defendant Guerrero intentionally misrepresented Plaintiffs' eligibility for immigration benefits and the requirements for qualifying for these benefits.

513.    Based on Defendants' blatant intentional misrepresentations and fundamental omissions, Plaintiffs reasonably believed that they were eligible for work authorization and/or

lawful status in the United States based on the length of their residency in the United States and their U.S. citizen children.

514.    Based on Defendants' misrepresentations and omissions, Plaintiffs either did not know Defendants were applying for asylum on their behalf, or did not know the purpose, requirements and process of applying for asylum.

515.    Based on Defendants' misrepresentations and omissions, Plaintiffs reasonably believed that they were paying for legal representation to lawfully obtain immigration benefits for which they were qualified.

516.    Defendants made these statements with knowledge of their falsity or with recklessness as to whether or not they were true.

517.    Upon information and belief, Defendant Leonard and Defendant Thomas knew that they had not established Plaintiffs' eligibility for asylum.

518.    Upon information and belief, Defendant Leonard and Defendant Thomas knew, from the many unsuccessful asylum applications they had filed on similar bases, that Plaintiffs would be referred to removal proceedings.

519.    Upon information and belief, Defendant Leonard and Defendant Thomas knew before accepting Plaintiffs as clients and before completing the asylum applications that Plaintiffs' eligibility for asylum would not be established.

520.    The Defendants made the aforementioned representations with the intent of misleading Plaintiffs and convincing them to pay for legal representation.

521.    Plaintiffs' reliance on these misrepresentations was justified because Plaintiffs trusted the Hecht Defendants due to the trust inherent in the attorney-client relationship.

522.   Defendants actively concealed the Ten Year Scheme through their material misstatements and omissions.

523.   For the reasons described above, Plaintiffs could not have discovered that (i) Plaintiffs' eligibility for the immigration benefits Defendants misrepresented to them had not been established or (ii) the Hecht Defendants were filing asylum applications that failed to establish Plaintiffs' eligibility for asylum.

524.   Plaintiffs would not have made payments to the Hecht Defendants for legal representation had they known (i) that Plaintiffs were not in fact eligible for the immigration benefits Defendants misrepresented to them, (ii) that the Hecht Defendants were in fact filing asylum applications that failed to establish Plaintiffs' eligibility for asylum, or (iii) that they may face deportation as a result of those asylum applications.

525.   As set out above, as a direct and proximate result of Defendants' false representations and omissions, Plaintiffs suffered a collective financial injury of at least $58,506, the amount they paid to the Hecht Defendants in justified reliance on Defendants' misrepresentations and omissions and the amount they have had to pay for new counsel as a result of Defendants' actions.

526.   As set out above, Plaintiffs have also suffered additional harm as a direct and proximate result of Defendants' misrepresentations, including additional legal costs and related expenses.

527.   Defendants' fraud affected Plaintiffs specifically but was aimed at the public generally.

528.    Defendants' fraud was malicious, represents a high degree of moral culpability, and rises to such a level of wanton dishonesty as to imply a criminal indifference to civil obligations.  Defendants are therefore also liable for punitive damages.

### Deceptive Business Practices (NY General Business Law § 349)

### (Hecht Defendants)

529.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

530.    The Hecht Defendants have engaged in numerous practices that are deceptive and misleading in a material way through the Ten Year Scheme.

531.    The Ten Year Scheme was aimed at the consumer public at large.

532.    As a direct and proximate result of the Hecht Defendants' deceptive and misleading practices, Plaintiffs are each entitled to restitution of the money that they paid to the Hecht Defendants.

533.    Because the Hecht Defendants acted knowingly when they violated NY General Business Law § 349, Plaintiffs are each entitled to treble damages of up to $1,000.

534.    As set out above, the Hecht Defendants' conduct evidences a high degree of moral culpability.  Defendants are therefore also liable for punitive damages.

### Unjust Enrichment

### (Hecht Defendants)

535.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

536.    Plaintiffs conferred a benefit to Hecht Defendants in the form of payments for legal services.

537.    The Hecht Defendants accepted and received the payments.

538.    It would be against equity and good conscience to allow the Hecht Defendants to retain these monies, which were procured by false and misleading representations.

539.    Specifically, the Hecht Defendants misrepresented the requirements for qualifying for lawful permanent residency to Plaintiffs in order to induce Plaintiffs to make payments to the Hecht Defendants for what Plaintiffs believed to be legitimate and ethical legal services.

540.    The Hecht Defendants received payments for legal fees they should not have received, as payments were made under false pretenses and due to the Hecht Defendants' misrepresentations.

541.    The Hecht Defendants' breaches of fiduciary duty entitle Plaintiffs to disgorgement of attorneys' fees already paid to the Hecht Defendants.  Plaintiffs are therefore entitled to relief for this unjust enrichment equal to the benefits unjustly retained by the Hecht Defendants, as well as interest on these amounts.

542.    As set out above, the Hecht Defendants' conduct evidences a high degree of moral culpability.  Accordingly, the Hecht Defendants are also liable for punitive damages.

## Breach of Fiduciary Duty

## (Hecht Defendants)

543.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

544.    At all times relevant, Defendant Thomas and Defendant Leonard were attorneys acting within the scope of their actual and apparent agency, and were employed by Defendant Law Firm.  The Hecht Defendants provided legal services to Plaintiffs.

545.    The Hecht Defendants had an attorney-client relationship with each Plaintiff.

546.    Pursuant to the attorney-client relationship, the Hecht Defendants had a fiduciary duty to act in the best interests of the Plaintiffs.

547.    The Hecht Defendants intentionally failed to act in the best interests of the Plaintiffs in the matters for which they were retained.

548.    Alternatively, the Hecht Defendants negligently failed to act in the best interests of the Plaintiffs in the matters for which they were retained.

549.    The Plaintiffs suffered injury as a direct result of the Hecht Defendants' failure to act in their best interests.

550.    The Hecht Defendants' breaches of fiduciary duty entitle Plaintiffs to disgorgement of attorneys' fees already paid to the Hecht Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Enjoin Defendants from continuing to perpetrate the Ten Year Scheme;

B.  Award compensatory and punitive damages to Plaintiffs;

C.  Declare, pursuant to 28 U.S.C. § 2201, that documentary submissions, including asylum applications, filed by Defendants on Plaintiffs' behalf are inherently unreliable;

D.  Award Plaintiffs costs and reasonable attorneys' fees incurred in this action; and

E.  Grant other such relief as the Court deems just and proper.

Dated: May 2, 2018
       New York, New York

                                        Respectfully submitted,


**KATHRYN O. GREENBERG**          **MAKE THE ROAD NEW YORK**
**IMMIGRATION JUSTICE CLINIC**
**BENJAMIN N. CARDOZO SCHOOL**
**OF LAW**

Lindsay Nash                      Amy S. Taylor
*lindsay.nash@yu.edu*             *amy.taylor@maketheroadny.org*
Jaynah Ross-Mendoza*              Scott Foletta
*jjross@law.cardozo.yu.edu*       *scott.foletta@maketheroadny.org*
Lorena Espino-Piepp*              Kendal Nystedt
*espinopi@law.cardozo.yu.edu*     *kendal.nystedt@maketheroadny.org*
Rehana Jamal*
*rjamal@law.cardozo.yu.edu*       301 Grove Street
Roxenna Reyes-Seri*               Brooklyn, NY 11237
*reyesser@law.cardozo.yu.edu*     Tel: (718) 418-7690

55 Fifth Avenue                   **CLEARY GOTTLIEB STEEN &**
New York, NY 10003                **HAMILTON LLP**
Tel: (212) 790-0433

*Motion to Appear as Law Students
forthcoming.                      Abena Mainoo
                                  *amainoo@cgsh.com*
                                  Vanessa Richardson
                                  *vrichardson@cgsh.com*

                                  One Liberty Plaza
                                  New York, NY 10006
                                  Tel: (212) 225-2000


                                  *Attorneys for Plaintiffs*