UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FRANCISCO GUZMAN, ROSARIO AYALA,
MANUEL FLORES DOMINGUEZ, NELY
OLMOS FLORES, ERNESTO MEJIA
GONZALEZ, ONEIDA TACUBA MEJIA,
MARIO ENRIQUE MUÑOZ, GREGORIO
PEREZ ORTEGA, PATRICIA PAVIA, ROSA
PEREZ, ALICIO RAMOS, MARTIN TORRES
REYES, EDITH DURAN, CATALINA
RODRIGUEZ, SABINO GUERRERO
VICTORIO, LIDIA HERNANDEZ
HERNANDEZ, GERARDO VARGAS DIAZ,
GLORIA VALLE VERONICA, JUAN
PAUCAR, S.F.C., D.P.C., B.R.E., O.C.F.,
R.M.F., A.M.M., J.M., M.M., A.M.O., E.G.R.,
F.T.R., R.M.R., J.C.R., F.T.V., AND MAKE
THE ROAD NEW YORK;

Civil Action No. 18-cv-03947

                    Plaintiffs,

        -against-

THOMAS T. HECHT AND LEONARD H.
HECHT;
                    Defendants.

**AMENDED COMPLAINT**

# Table of Contents

**Page**

NATURE OF THE ACTION ................................................................. 1

PARTIES .......................................................................................... 2

    Plaintiffs............................................................................................2

    Defendants .......................................................................................3

    Non-Parties .......................................................................................3

JURISDICTION AND VENUE .............................................................. 4

RICO CAUSE OF ACTION.................................................................. 5

    The RICO Enterprise .........................................................................5

    Defendants' Scheme ........................................................................6

    The "Ten Year Law" Fraud ...............................................................11

    Operation of the Enterprise.............................................................20

    Pattern of Racketeering Activity ......................................................21

    The RICO Conspiracy ......................................................................25

    Injuries Suffered by Plaintiffs..........................................................26

STATEMENT OF FACTS SPECIFIC TO EACH PLAINTIFF ................... 27

    Mr. Guzman & Ms. Pavia .................................................................27

    Ms. Duran ......................................................................................30

    Mr. Paucar......................................................................................34

    Mr. Torres ......................................................................................37

    Mr. Perez Ortega and Mrs. Perez.....................................................40

    Ms. Ayala.......................................................................................43

    Mr. Flores Dominguez and Mrs. Olmos Flores ..................................46

    Ms. Rodriguez................................................................................49

Mr. Muñoz ...................................................................................................................... 53

Mr. Ramos ...................................................................................................................... 55

Mr. Sabino Guerrero & Ms. Hernandez ......................................................................... 58

Mr. Gerardo Vargas Diaz & Ms. Gloria Valle Veronica ................................................. 62

Mr. Mejia and Ms. Tacuba ............................................................................................. 66

S.F.C. and A.M.O. .......................................................................................................... 69

D.P.C. ............................................................................................................................. 72

B.R.E. ............................................................................................................................. 74

A.M.M. ........................................................................................................................... 77

J.M. and M.M. ................................................................................................................ 81

E.G.R. ............................................................................................................................. 85

F.T.R. and J.C.R. ............................................................................................................ 88

R.M.R. ............................................................................................................................ 91

F.T.V. .............................................................................................................................. 93

O.C.F. and R.M.F. .......................................................................................................... 95

Make the Road New York ............................................................................................... 99

NON-RICO CAUSES OF ACTION ............................................................................... 102

Fraud and Deceit ............................................................................................................ 102

Deceptive Business Practices (NY General Business Law § 349) .................................. 104

Unjust Enrichment ......................................................................................................... 105

Breach of Fiduciary Duty ............................................................................................... 106

PRAYER FOR RELIEF ................................................................................................. 107

Plaintiffs Francisco Guzman, Rosario Ayala, Manuel Flores Dominguez, Nely Olmos Flores, Ernesto Mejia Gonzalez, Oneida Tacuba Mejia, Mario Enrique Muñoz, Gregorio Perez Ortega, Patricia Pavia, Rosa Perez, Alicio Ramos, Martin Torres Reyes, Edith Duran, Catalina Rodriguez, Sabino Guerrero Victorio, Lidia Hernandez Hernandez, Gerardo Vargas Diaz, Gloria Valle Veronica, Juan Paucar, S.F.C., D.P.C., B.R.E., O.C.F., R.M.F., A.M.M., J.M., M.M., A.M.O., E.G.R., F.T.R., R.M.R., J.C.R., and F.T.V. (the "Plaintiffs") and Plaintiff Make the Road New York ("Plaintiff MRNY"), by and through their undersigned counsel, bring this action against Defendants Thomas T. Hecht and Leonard H. Hecht, and hereby allege as follows:

## NATURE OF THE ACTION

1.      Plaintiff MRNY and Plaintiffs—a group of 33 noncitizen longtime New York residents—bring this action against Defendants Thomas T. Hecht and Leonard H. Hecht (the "Defendants"), who defrauded Plaintiffs out of thousands of dollars.  Defendants, trusted professionals, used their positions to take advantage of Plaintiffs' inexperience, lack of legal expertise, limited formal education, and limited ability to read English in order to financially profit.

2.      Defendants engaged in a bait-and-switch.  First, Defendants falsely represented to Plaintiffs the availability of an affirmative immigration benefit in the form of work authorization and/or lawful permanent residency based on Plaintiffs' residence in the United States for ten years or more and/or U.S. citizen children, when in fact no such affirmative immigration relief exists.

3.      Then, after inducing Plaintiffs to pay Defendants in order to pursue this non-existent affirmative relief, Defendants did not file applications for the non-existent affirmative relief but instead filed asylum applications on Plaintiffs' behalf.  By misrepresenting to Plaintiffs the nature of the applications they planned to submit, and failing to disclose that, as a result of Defendants' actions, Plaintiffs would eventually be placed in adversarial removal proceedings

1

where the immigration court would adjudicate their ability to remain in the United States and potentially order them deported, Defendants obtained tens of thousands of dollars from Plaintiffs.

4. Defendants' actions go beyond violating fundamental moral principles and the governing ethical rules and constitute fraud in the purest form. Defendants knowingly and intentionally devised, implemented, and coordinated a scheme to obtain money from vulnerable noncitizens by misrepresenting the availability of a form of affirmative immigration relief that does not exist and misrepresenting the nature of the applications they intended to submit on Plaintiffs' behalf and/or the consequences of those applications.

5. Plaintiffs are only a fraction of the people who have reported falling victim to Defendants' scheme. Plaintiffs bring this action to recover the money they paid to Defendants under false pretenses and to prevent Defendants from reaping the financial benefits of this fraud.

## PARTIES

### Plaintiffs

6. Each individual Plaintiff is an immigrant who resided in New York at the time he or she was defrauded by Defendants.

7. Plaintiff MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to building the power of immigrant, Latinx, and working-class communities in New York state. With offices in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County, MRNY integrates adult and youth education, legal and survival services, and community and civic engagement, in order to support low-income New Yorkers in improving their own lives and neighborhoods.

**Defendants**

8.     Upon information and belief, Defendant Thomas T. Hecht ("Defendant Thomas") is a licensed attorney who has been admitted to practice law in the state of New York since April 11, 1958.

9.     Upon information and belief, Defendant Leonard H. Hecht ("Defendant Leonard") is a licensed attorney who has been admitted to practice law in the state of New York since December 5, 1988.

10.     At all times relevant hereto, Defendant Thomas was acting on his own behalf and/or as the Chief Executive Officer and/or as an employee of Thomas T. Hecht, P.C.

11.     At all times relevant hereto, Defendant Leonard was acting on his own behalf and/or as an employee of Thomas T. Hecht, P.C.

**Non-Parties**

12.     Thomas T. Hecht, P.C. (the "Hecht Law Firm") is a New York professional corporation, Department of State Number 316881, with its principal place of business at 729 Seventh Avenue, 14th Floor, New York, NY 10019.  Hecht Law Firm's principal place of business was previously located at 1270 Avenue of the Americas, New York, NY 10020.

13.     Defendants Thomas and Leonard regularly conduct business in New York, New York and the surrounding boroughs through Hecht Law Firm.

14.     Hecht Law Firm was founded by Defendant Thomas in 1971 and offers legal representation on immigration matters, as well as a variety of other practice areas.

15.     Hecht Law Firm advertises on its website that it has many clients from all over the country and the world, including the Spanish-speaking community.

16.     Sylvia's Translation Service is an unincorporated business entity d/b/a Hecht Law Firm that provides translation services from Spanish to English.  Sylvia's Translation Service's

3

principal place of business is operated out of the same office as Hecht Law Firm, 729 Seventh Avenue, 14th Floor, New York, NY 10019.

17.     Upon information and belief, Mr. Luis Guerrero is and/or has been a registered tax preparer in the state of New York.

18.     Mr. Luis Guerrero is the owner of a franchise of ATAX Accounting & Financial Services ("ATAX"), with its principal place of business at 2035 C Victory Boulevard, Staten Island, NY 10314.

19.     Mr. Luis Guerrero regularly assists individuals with the preparation and filing of their income taxes.

**JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action under 18 U.S.C. § 1964. This is a civil action arising under 18 U.S.C. §§ 1961-1968, § 901(a) of Title IX of the Organized Crime Control Act of 1970, as amended, otherwise known as the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and in particular, under 18 U.S.C. § 1964(c) and other causes of action as set forth hereafter.

21.     This Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

22.     Venue is proper in this judicial district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred within this judicial district.

23.     Defendants, either on their own or through their agents, at the time of the commission of the acts alleged herein, were found in, and/or transacted business in, the State of New York, and the cause of action which is the object of this Complaint arises out of business transactions and specific acts that took place within this judicial district.

24.     Defendants, either on their own or through their agents, conspired to commit the wrongful acts alleged in this Complaint within the State of New York and/or committed or participated in the commission of those acts within the State of New York, purposefully directing their wrongful acts toward this judicial district and causing in this district the violations of RICO and the other causes of action set forth herein as well as Plaintiffs' resultant injuries.

25.     Defendants' racketeering activities were conducted through a pattern of acts and transactions which occurred or had their effect within the State of New York, including in this judicial district.

26.     In connection with the wrongful acts and fraudulent conduct described herein, Defendants directly or indirectly used the means of interstate commerce, including the mails.

## RICO CAUSE OF ACTION

### The RICO Enterprise

27.     Each individual Plaintiff is a "person" within the meaning of 18 U.S.C. § 1964(c).

28.     MRNY is a "person" within the meaning of 18 U.S.C. § 1964(c).

29.     Plaintiffs and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

30.     Hecht Law Firm constitutes an "enterprise" as defined in 18 U.S.C. § 1961(4) (the "Enterprise").

31.     Defendants Thomas and Leonard conducted and participated in the conduct of Hecht Law Firm's affairs through a pattern of racketeering activity.

32.     The Enterprise engaged in interstate commerce, and its activities affect interstate commerce, including because the Enterprise represents individuals outside of New York State and because its activities affect, and directly impact, the ability of Plaintiffs and others similarly

situated to live and work in the United States, including in States outside of New York. In addition, Defendants used interstate mails to perpetrate the scheme.

**Defendants' Scheme**

33.     In order to induce Plaintiffs to hire them, Defendants misrepresented their services to Plaintiffs—Defendants told Plaintiffs that they would prepare affirmative applications for them to receive immigration benefits in the form of work authorization and/or legal permanent residency based on Plaintiffs' ten-year residence in the United States and/or U.S. citizen children, sometimes referred to by Defendants as the "ten year law" (the "Ten Year Scheme"). Defendants did not disclose that they intended to cause Plaintiffs to be placed in adversarial removal proceedings by filing asylum applications. Defendants did not intend to, and could not, provide the services they promised because no such affirmative immigration relief exists, and there was no basis for Defendants to believe it would exist.

34.     Contrary to Defendants' representations to Plaintiffs, Defendants intended to, and did, submit—not affirmative applications for work authorization or legal permanent residency based on the criteria identified—but instead boilerplate asylum applications without Plaintiffs' knowledge of the nature of the application, with the effect and objective of placing Plaintiffs in removal proceedings where the immigration court would determine whether they should be removed from the United States.

35.     Defendants' racketeering activities caused the individual Plaintiffs collective financial injury of at least $99,350, the amount they paid to Defendants in justified reliance on Defendants' misrepresentations and omissions, and the amount they have had to pay for new counsel as a result of Defendants' actions, including additional legal costs. Defendants' actions caused Plaintiff MRNY to expend significant resources to mitigate the consequences of

Defendants' racketeering activities. But for Defendants' conduct, Plaintiff MRNY could have utilized these resources for other purposes.

<u>Affirmative Applications and Defenses to Removal</u>

36. An affirmative application involves a noncitizen applicant making an election to petition the United States Citizenship and Immigration Services ("USCIS"), through a "non-adversarial" process, for an immigration benefit. Individuals may file an affirmative application even if they are not in adversarial removal proceedings. Asylum is just one of several different types of immigration benefits for which individuals can affirmatively apply and, if successful, be granted lawful status.

37. A defense to removal, by contrast, is asserted by a noncitizen respondent who has been placed in adversarial removal proceedings. Removal proceedings are held before an immigration judge and are prosecuted by Immigration and Customs Enforcement ("ICE") attorneys who seek to deport noncitizens from the United States. There are limited types of defenses to removal, and some are difficult to satisfy. If all of a respondent's defenses to removal are denied by an immigration judge, he or she will generally be ordered removed from the United States.

38. One way that a noncitizen may be placed in removal proceedings is if USCIS does not grant an affirmative asylum application and the noncitizen does not have other lawful status or is not on valid parole. For asylum applicants in particular, this referral to removal proceedings is automatic because it is USCIS' policy to refer all asylum applicants whose asylum applications are not granted, and who do not have other lawful status or valid parole, for removal proceedings pursuant to 8 C.F.R. § 208.14(c)(1).

<u>Asylum</u>

39.     Asylum is a form of humanitarian immigration relief that affords protection to noncitizens who fear persecution in their home country on account of a protected ground.

40.     To be eligible for asylum, noncitizens must establish either past persecution or a well-founded fear of future persecution in their home country on account of their race, religion, nationality, membership in a particular social group, or political opinion, and that the government is unable or unwilling to protect them.  8 U.S.C. § 1158(b)(1)(B)(i).

41.     Fear of harm to a U.S. citizen child upon return to a home country is not a protected ground for asylum.

42.     Individuals must apply for asylum within one year of entering the United States. There are two narrow exceptions to this rule:  "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application."  8 U.S.C. §§ 1158(a)(2)(B), (D).   Whether an applicant establishes an exception for a late filing is a threshold inquiry in USCIS' review of an asylum application.

43.     Noncitizens can file affirmative applications for asylum with USCIS or, if they are put into removal proceedings, seek asylum as a defense to removal.

*Form I-589*

44.     To file an application for asylum, a noncitizen completes and submits a Form I-589, Application for Asylum.  The Form I-589 is in English, and USCIS does not publish or provide the Form I-589 in any other languages.

45.     In the Form I-589, an applicant must specify whether he or she seeks asylum on account of his or her race, religion, nationality, membership in a particular social group, or political opinion.

46.    The Form I-589 also includes, in relevant part, the following questions:  (1) "Do you fear harm or mistreatment if you return to your home country?;" and (2) "Are you filing this application more than 1 year after your last arrival in the United States?  If 'Yes,' explain why you did not file within the first year after you arrived."

47.    Finally, the Form I-589 contains an attestation that requires the preparer to attest under the heading "Declaration of Person Preparing Form, if Other Than Applicant, Spouse, Parent, or Child":

> I declare that I have prepared this application at the request of the [applicant], that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence.  I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

48.    As clearly indicated in the attestation, it is a crime for the preparer to knowingly submit an asylum application that contains a false statement or fails to contain a reasonable basis in law or fact.  That conduct constitutes the crime of visa fraud under 18 U.S.C. § 1546(a), which is a predicate act under RICO, 18 U.S.C. § 1961(1)(B).

49.    If an asylum application is submitted as an affirmative application, the applicant will receive an English-language Form I-589 receipt that serves as notification that USCIS received the application and will thereafter schedule an appointment for biometrics collection.

*Temporary Employment Authorization*

50.     Once an asylum application has been pending for 180 days, an applicant becomes eligible for an Employment Authorization Document ("EAD" or "work permit"), which—if granted—allows the applicant temporarily to work legally while waiting for the asylum interview. 8 U.S.C. § 1158(d).

51.     The procedure to obtain an EAD in connection with a lawfully filed Form I-589 is to file the Application for Employment Authorization, USCIS Form I-765, together with proof that the Form I-589 has been pending for sufficient time, typically a copy of the Form I-589 receipt.

52.     Subsequently, the applicant will be scheduled for an appointment to have biometrics taken and will be issued an EAD.  The applicant may then use the EAD to obtain a social security number from the Social Security Administration and a driver's license or New York State Non-Driver Identification from the Department of Motor Vehicles.

*Asylum Interview*

53.     At some point after the asylum application is filed, USCIS will contact the applicant for an interview with a USCIS Asylum Officer.  8 C.F.R. § 208.9.  On information and belief, due to a serious backlog in processing the applications and a change in the order in which USCIS processed asylum applications, between December 2014 and January 2018, interviews scheduled in the New York area typically occurred more than two years after a new application was filed.

54.     Aside from receiving the Form I-589 receipt and interview notices, this interview is usually the first time that individuals who have affirmatively applied for asylum come into contact with the asylum office.

55.     The interview is USCIS' adjudicatory procedure for making a determination on the asylum application.  The interview is conducted by an asylum officer at a USCIS asylum office.

56.     If USCIS grants the application, the applicant has the right to remain lawfully in the United States with asylum status and employment authorization. 8 U.S.C. § 1158(c)(1).

57.     If USCIS does not grant the application and the applicant is not in other lawful status or on valid parole, however, USCIS takes the position that it must refer the applicant to immigration court for removal proceedings pursuant to 8 C.F.R. § 208.14(c)(1).

58.     It is the Asylum Office's general practice that, if the asylum application includes a spouse or child who does not have lawful status in the United States, that spouse or child also will be placed into removal proceedings.

59.     In removal proceedings, the noncitizen may assert defenses to removal, including asylum, but if the noncitizen is unsuccessful in establishing his or her defenses, she or he will be ordered removed and ultimately subject to deportation from the United States.

Cancellation of Removal

60.     Solely in the context of removal proceedings, a non-permanent resident immigrant can raise a defense to removal called cancellation of removal, as set forth in 8 U.S.C. § 1229b(B). The eligibility requirements for cancellation of removal are stringent and include: (1) ten years of continuous presence in the United States prior to the initiation of removal proceedings or commission of certain offenses; and (2) that removal would result in "exceptional and extremely unusual hardship to the [respondent's] spouse, parent, or child, who is a citizen of the United States or . . . lawfully admitted for permanent residence." *Id*. It is also a requirement that the respondent have good moral character, and certain criminal convictions and other negative equities will either disqualify the respondent as a matter of law or result in denial in the judge's discretion.

**The "Ten Year Law" Fraud**

61.     Plainly, no law permits individuals to affirmatively apply for benefits simply because they have ten years residence and/or U.S. citizen children.

62.     The term "ten year law" appears to be a misleading reference to one of the requirements for eligibility for cancellation of removal, which, as described above, is a defense for an individual who is already in removal proceedings and is not something for which anyone can affirmatively apply.

63.     As experienced immigration law practitioners, Defendants knew that United States immigration laws do not permit individuals to affirmatively apply for and obtain work authorization and/or any form of lawful status based solely on having ten years of presence or residence in the United States and/or U.S. citizen children.

64.     Nevertheless, Defendants knowingly and intentionally devised, implemented, and coordinated a scheme to obtain money from vulnerable noncitizens by misrepresenting to Plaintiffs that they were eligible for and could obtain work authorization and/or lawful permanent resident status via an affirmative application based on having ten years of residence in the United States and/or U.S. citizen children.

65.     Each Plaintiff was a victim of the Ten Year Scheme.

### Initial Meetings

66.     Defendants' fraud and deception began with their first meetings with their prospective clients.  For the vast majority of Plaintiffs, their interaction with Defendants generally proceeded as follows:

a)    Plaintiffs briefly met with Defendants or their agents and truthfully answered any questions Defendants asked them.  Most Plaintiffs report that these meetings lasted between five to thirty minutes.

b)    During these meetings, and on most occasions prior to Plaintiffs paying Defendants any money, Defendants or their agents represented to Plaintiffs that they were eligible for lawful permanent residency because they had ten years of residence in

12

the United States and/or U.S. citizen children, which Defendants sometimes referred to as the "*ley de diez años*" ("ten year law"), or, in some instances, the "ten year visa." Defendants often requested an initial fee at their first meeting after representing to Plaintiffs that they were eligible for a benefit under the "ten year law."

c) Generally at the first meeting or a subsequent meeting, Defendants instructed Plaintiffs to sign several documents written in English that Defendants told them were necessary to apply for lawful permanent residency. Defendants did not explain the contents of or translate these documents.

d) Defendants generally also refused to answer questions from Plaintiffs about their applications. When Plaintiffs asked questions about their applications, Defendants generally became angry or curt, often yelling at Plaintiffs or using profanities. Instead of addressing Plaintiffs' questions, Defendants typically instructed Plaintiffs to trust them because they were attorneys.

e) Defendants misrepresented the nature of the applications they offered to submit for Plaintiffs.

f) Plaintiffs typically visited Hecht Law Firm several times and noted the reason for their re-visit as the "*diez años*" ("ten years") or "*por tiempo*" ("for time") on the office's sign-in sheet.

g) Defendants charged Plaintiffs fees, generally in varying-sized installments beginning with an initial payment at their first visit. At subsequent visits, Defendants asked Plaintiffs to make additional payments. Based on the

representation that Defendants would submit an affirmative application under the "ten year law," Plaintiffs made these additional payments.

67. The Ten Year Scheme functions through a flat-out misrepresentation of the services Defendants could and planned to provide. It is not a matter of Defendants providing unsound legal advice or underestimating the risk of the process represented to Plaintiffs—the misrepresentations were the means by which Defendants induced Plaintiffs to hire and pay them. If Defendants had disclosed to Plaintiffs that there was no affirmative application for benefits based on the eligibility criteria Defendants described, and that they intended to file boilerplate asylum applications in order to place Plaintiffs in adversarial removal proceedings where the immigration court would determine whether Plaintiffs could remain in the United States, Plaintiffs would have walked out of their office without paying any fee.

68. A couple examples demonstrate the nature of Defendants' fraud.

69. Prior to first visiting Defendants, Plaintiff Francisco Guzman ("Mr. Guzman") visited another immigration law firm that he had seen advertised on television. The lawyer Mr. Guzman met with at the law firm informed Mr. Guzman that he could seek lawful permanent resident status, but would need to first be placed in removal proceedings, which he could do by filing an asylum application. At the mention of asylum, Mr. Guzman decided not to continue with the appointment and left because he did not want to apply for asylum.

70. When Mr. Guzman met with Defendant Leonard, however, Defendant Leonard told him that he was eligible to lawfully work in the United States and to obtain lawful permanent residency through an affirmative application "*por los diez años*" ("because of the ten years"). Defendant Leonard did not disclose that Mr. Guzman would need to file an asylum application or be placed in removal proceedings in order to qualify.

71. Plaintiff J.M. was skeptical of the "ten year law" when Defendants explained it to him at their first meeting. J.M. told Defendants that he did not want to pursue the "ten year law" if it was not a valid or certain form of relief or would cause him any problems in the future.

72. Defendants assured J.M. that because he had lived in the United States for ten years and had U.S. citizen children, he would have his legal permanent residence "papers" in a year and a half.

73. The other Plaintiffs were similarly defrauded as laid out in paragraphs 140 to 617 below.

Asylum Applications

74. Following these meetings with Plaintiffs, Defendants submitted asylum applications for Plaintiffs. Defendants did this even though Plaintiffs hired Defendants to perform an entirely different service on their behalf. Plaintiffs had retained Defendants to apply for affirmative immigration relief that Defendants misrepresented to Plaintiffs as being available to them based on their ten year residence in the United States and/or U.S. citizen children. No such affirmative relief exists, however. Plaintiffs did not retain Defendants to apply for asylum on their behalf and to put them into removal proceedings where the immigration court would determine whether they could remain in the United States.

75. Defendants did not translate the English asylum applications, nor did they read them to Plaintiffs in a language they understood. Even worse, except for one limited exception further explained below,[1] Defendants did not tell Plaintiffs that they were submitting asylum

---

[1] As described below in paragraph 392, Defendant Thomas told Plaintiffs Ernesto Mejia Gonzalez ("Mr. Mejia") and Oneida Tacuba Mejia ("Ms. Tacuba") that Defendant Thomas would file an asylum application on their behalf because an asylum application was part of the process, and that later he was going to change the application to one for the "ten year visa." However, Defendants did not advise Mr. Mejia and Ms. Tacuba that Defendants intended to cause Mr. Mejia and Ms. Tacuba to be put in removal proceedings if and when the asylum

applications on their behalf. In some cases, Defendants instructed Plaintiffs to sign blank or incomplete application forms. Nonetheless, Defendants falsely attested on the Forms I-589 that they prepared the applications at the request of Plaintiffs and/or that the applications were read to Plaintiffs in a language that Plaintiffs understood.

76. Defendants also prepared the asylum applications without regard to the truth or falsity of the information contained therein. Defendants did not ask questions to determine whether Plaintiffs were eligible for asylum or had a reasonable basis in law or fact to apply for asylum before submitting asylum applications on their behalf. Instead, Defendants included the same generic, boilerplate information regarding the basis of the asylum claim in each application and universally provided "changed circumstances," without any further detail, as the reason Plaintiffs filed outside of the one year filing deadline even though Defendants did not discuss the nature and/or contents of the applications—let alone the reasons noted for the delay—with Plaintiffs.

77. The asylum applications universally included the same unverified language indicating that:

    a. Plaintiffs sought asylum based on their membership of a particular social group;

    b. Plaintiffs sought asylum based on "harm or mistreatment" to "United States citizen children" if returned to their home country; and

    c. Their otherwise time-barred application was justified by "changed circumstances"—with no elaboration.[2]

---

application was not approved. Rather, like all of the other Plaintiffs, Mr. Mejia and Ms. Tacuba understood that Defendants would apply for an affirmative immigration benefit solely based on Plaintiffs' residence in the United States for ten years or more and/or U.S. citizen children, when in fact no such affirmative immigration relief exists.

[2] With very slight variations, this is true of all of the asylum applications Plaintiffs' counsel was able to obtain (applications for 24 of 33 Plaintiffs). The remaining Plaintiffs have not been able to obtain their applications, and Defendants have refused to provide completed versions of the applications to some of those Plaintiffs.

78.     Defendants often instructed Plaintiffs to translate birth certificates and other supporting documents through Sylvia's Translation Service for an additional fee.

79.     Defendants submitted the asylum applications by mail across state lines to USCIS' Vermont Service Center in St. Albans, Vermont.

80.     Defendants typically applied for Plaintiffs to receive an initial EAD, which Plaintiffs could renew while their applications remained pending.

Defendants' Continued Misrepresentations

81.     Some Plaintiffs first realized an asylum application had been filed when they received notices from USCIS or correspondence from Defendants regarding the receipt of an asylum application or an upcoming asylum interview.  Other Plaintiffs had trouble reading notices from USCIS or correspondence from Defendants and first learned by other means that they had unknowingly applied for asylum.

82.     When Plaintiffs learned about the asylum applications, they were confused and concerned because they had retained Defendants to apply for affirmative immigration relief based on the "ten year law," and not "asylum" or "*asilo*."  Some Plaintiffs immediately became worried because their understanding was that people from their home countries typically do not qualify for asylum.  Other Plaintiffs called or visited Defendants and/or Hecht Law Firm because they were confused by the notifications.

83.     Plaintiffs D.P.C., E.G.R., Francisco Guzman, Patricia Pavia, F.T.R., J.C.R., Edith Duran, and Catalina Rodriguez called or visited Hecht Law Firm to ask about these notices.  The individuals these Plaintiffs spoke with at Hecht Law Firm—in at least one instance Defendant Thomas—admitted for the first time that Defendants filed an asylum application on their behalf, but assured these Plaintiffs, in substance, that the asylum application was just a standard first step

17

in the process under the "ten year law."  In at least one case, an employee of Hecht Law Firm told a Plaintiff that the asylum application was just the "name" of the "form" for the "ten year law" application.

84.     When Plaintiff A.M.M. visited Hecht Law Firm with her daughter, the daughter asked Defendant Leonard why the paperwork A.M.M. received from USCIS said "asylum," whereas Defendant Leonard had told them that he was filing an application based on Plaintiff's length of residency and children.  Defendant Leonard responded that *he* was the lawyer, not Plaintiff or her daughter, and said that he knew what he was doing.

85.     When Plaintiffs raised concerns, Defendants and other employees of Hecht Law Firm told Plaintiffs, for the first time, that Defendants filed an asylum application on Plaintiffs' behalf, that the application that Defendants had submitted was just the first step in the process for obtaining lawful permanent resident status, and that they should not worry.  Defendants did not disclose that, in fact, the asylum applications were intended to result in Plaintiffs' referral to removal proceedings.  Even after learning that Defendants had filed asylum applications on their behalf, Plaintiffs remained unaware of Defendants' intended purpose for the applications.

86.     Plaintiffs never would have retained or paid Defendants had they known Defendants intended to file asylum applications on their behalf for the purpose of placing them into removal proceedings and not to apply for the (non-existent) affirmative immigration relief based on the "ten year law" that was misrepresented to them by Defendants.

87.     Defendants exploited Plaintiffs' trust in them as attorneys, as well as Plaintiffs' lack of legal expertise, limited ability to read and understand English, limited formal education, and unfamiliarity with the complicated U.S. immigration system, to carry out the Ten Year Scheme.

88.     In addition to making misrepresentations to Plaintiffs, Defendants furthered their scheme by making inaccurate statements about immigration law to Mr. Luis Guerrero.

89.     Mr. Luis Guerrero, the owner of a franchise of ATAX, an accounting and financial services office, learned of Defendants and Hecht Law Firm through a client.

90.     In or around late 2013, a client who had previously used Mr. Luis Guerrero to prepare his taxes returned to Mr. Luis Guerrero's office. The client reported to Mr. Luis Guerrero that Defendants, through Hecht Law Firm, helped him obtain a Social Security number and employment authorization. The client told Mr. Luis Guerrero that he was eligible for the benefits because he had lived in the United States for at least ten years and paid his taxes.

91.     After that, Mr. Luis Guerrero heard from other clients that Defendants had secured employment authorizations and Social Security numbers for them based on the same criteria.

92.     Based on these reports, Mr. Luis Guerrero began referring many clients to Defendants because employment authorization and Social Security numbers would allow his clients to qualify for additional tax credits and get paid through an official payroll.

93.     On a few occasions, clients whom he had referred to Defendants told Mr. Luis Guerrero that they were turned away by Defendants because they did not qualify for employment authorization and a Social Security number. Through one of these returned referrals, Defendants relayed to Mr. Luis Guerrero that they wanted to meet.

94.     In or around March 2014, Mr. Luis Guerrero met with Defendant Leonard. Defendant Thomas was not present for the meeting.

95.     In order to attract still more clients, Defendant Leonard falsely represented to Mr. Luis Guerrero that immigrants without permanent legal status were eligible for employment

authorization and to apply for a green card if they had lived in the United States for ten years and had filed their tax returns for those years. Defendant Leonard did not mention filing asylum applications or removal proceedings.

96.     Based on those inaccurate statements, and without knowing that they were inaccurate, by October 2016, Mr. Luis Guerrero had referred an estimated one hundred people to Hecht Law Firm.

97.     In October 2016, Mr. Luis Guerrero attended a two-day course on immigration law in California. During that course, he learned that having ten years of presence in the United States and U.S. citizen children does not alone establish eligibility for immigration benefits.

98.     After the class and based on his newly-acquired knowledge that Defendants' statements were inaccurate, Mr. Luis Guerrero stopped referring his clients to Defendants and Hecht Law Firm.

## Operation of the Enterprise

99.     Defendants Thomas and Leonard at all relevant times directed and continue to direct the operations of the Enterprise and conduct and participate in the affairs of the Enterprise.

100.    Defendants Thomas and Leonard used their law licenses as a guise of legitimacy to carry out the Ten Year Scheme and defraud immigrants in the New York City area.

101.    Specifically, Defendants Thomas and Leonard made misrepresentations to immigrants to induce them to hire Hecht Law Firm and to pay it to provide a non-existent service.

102.    Defendants directed Hecht Law Firm and its employees to complete and submit the asylum applications, communicate with clients, and collect and process payments.

103.    By way of example, Sylvia's Translation Service is an unincorporated business entity d/b/a/ Hecht Law Firm that provides translation services from Spanish to English.

104. Defendants informed Plaintiffs that English translations of certain documents were required for their cases, and then directed Sylvia's Translation Service to provide those translations to Plaintiffs in exchange for additional payments. This was a necessary step in Defendants' Ten Year Scheme.

**Pattern of Racketeering Activity**

105. At all times relevant and in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described herein.

106. Defendants furthered the Ten Year Scheme through, among other illegal activity, engaging in fraud and swindles (hereafter "mail fraud") under 18 U.S.C. § 1341 and fraud and misuse of visas, permits, and other documents (hereafter "visa fraud") under 18 U.S.C. § 1546.

<u>Mail Fraud</u>

107. Defendants engaged in mail fraud because they used the interstate mails or caused the interstate mails to be used for the purpose of furthering and executing the Ten Year Scheme.

108. Examples of mail fraud include mailings of asylum and EAD applications between 2013 and 2016 from Hecht Law Firm in New York to the USCIS Service Center in Vermont, located at 75 Lower Welden Street in St Albans City, and are set forth below in paragraphs 140 to 617.

109. In addition, Defendants used the mails as the primary method to communicate with Plaintiffs. This included mailing letters to Plaintiffs when Defendants had an update on their case, informing Plaintiffs of scheduled biometrics appointments and eligibility to apply for an EAD and, at least for some Plaintiffs, informing them of asylum interviews.

110. Defendants omitted from these mailings that they intended to cause Plaintiffs to be placed in removal proceedings.

111.     Defendants' use of the mails was incident to an essential part of the scheme to defraud, namely to deceive and/or defraud Plaintiffs into paying and continuing to pay Defendants for a non-existent affirmative immigration benefit.

112.     Plaintiffs relied on Defendants' fraudulent explanation of a non-existent affirmative immigration benefit in paying Defendants for purported legal services.

Visa Fraud

113.     Defendants engaged in visa fraud because they knowingly presented asylum applications to USCIS which contained false statements and/or did not contain any reasonable basis in law or fact.

114.     Examples of visa fraud include signing the attestation swearing that the following statements were true, when in fact one or both statements were not:  (1) Defendants filed the asylum applications at the request of Plaintiffs; and (2) Defendants read the completed asylum application to the applicant in his or her native language or a language he or she understood for verification.  Defendants swore to these attestations, knowing that they were not all true.

115.     In each application, Defendant Thomas, without informing all but one Plaintiff that Defendants were filing an asylum application on Plaintiffs' behalf, and without reviewing the application with any Plaintiff in English *or* Spanish, signed the preparer attestation that provides:

> I declare that I have prepared this application at the request of the [Plaintiff], that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence.  I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

116.     In addition, Defendants knowingly prepared asylum applications on behalf of Plaintiffs without regard to the truth or falsity of the information contained therein, and intentionally mailed those asylum applications to the USCIS Service Center in Vermont.

<u>Intent and Pattern</u>

117.     Defendants each participated in the Ten Year Scheme knowingly, willfully, and with a specific intent to defraud Plaintiffs.

118.     Defendants induced Plaintiffs to pay them by knowingly misrepresenting the existence of the "ten year law" as an affirmative immigration benefit.

119.     This misrepresentation capitalized on the significant time-delay in USCIS' processing of asylum applications, which Defendants knew and believed would delay Plaintiffs from ever discovering the nature of the fraud that had been perpetrated on them or from acting on that fraud once it was discovered.  Specifically, Defendants capitalized on the facts that (1) Plaintiffs' receipt of an initial EAD and any subsequent renewals would give Plaintiffs the false impression that their case was on track and (2) a change in USCIS policy and the significant backlog in USCIS processing asylum applications, between December 2014 and January 2018, would delay Plaintiffs' discovery of the fraud that had been perpetrated on them and the actual nature of the applications that Defendants had filed on their behalf during that period.  In addition, even if uncovered, Defendants knew and believed that Plaintiffs were unlikely to fire Defendants or report the fraud out of fear that, among other things, they would face removal proceedings without any counsel, which would significantly increase the likelihood that they would be ordered removed.

120.     At the least, Defendants were consciously reckless in representing that the "ten year law" was an affirmative form of immigration relief and failing to explain the nature of the

applications they were actually filing on Plaintiffs' behalf, specifically that the application was one for asylum that would result in Plaintiffs being put in removal proceedings.

121.    The Enterprise, as well as each Defendant, received monetary benefits from defrauding and exploiting Plaintiffs. These benefits were primarily in the form of payments received, increased referrals, and overall increased profits and income generated from the illegitimate Ten Year Scheme. Plaintiffs were injured in the amount that they were induced to pay Defendants based on Defendants' false representations.

122.    Defendants' conduct constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) because Defendants, through interstate commerce, committed multiple related acts of mail and/or visa fraud.

123.    The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of defrauding Plaintiffs for profit. The predicate acts involved the same or similar methods of commission. They involve Defendants' knowing and purposeful misrepresentations to Plaintiffs about some or all of the following: (i) the services Defendants intended to provide to Plaintiffs, (ii) the existence of an affirmative immigration benefit based on an individual's ten year residence in the United States and/or U.S. citizen children, (iii) Plaintiffs' eligibility for work authorization and lawful permanent residency and the requirements for qualifying for these benefits, (iv) the context in which Plaintiffs' ten year residence in the United States and/or U.S. citizen children could potentially be considered in connection to their immigration matters, (v) the type of application Defendants intended to, and did, file on behalf of Plaintiffs, and (vi) the risks and purpose of the applications Defendants actually intended to, and did, file on Plaintiffs' behalf. The predicate acts also involved Defendants' filing of asylum applications on behalf of Plaintiffs with the false preparer attestations, Defendants' filing of the

applications including the same boilerplate language without regard to the truth or falsity of the information contained therein, and Defendants' filing of EAD applications to further and conceal the scheme.

124.     Defendants' activities amounted to a common course of action with a similar pattern and purpose to defraud large numbers of similarly situated victims on a frequent basis over a period of multiple years.

125.     Defendants hold themselves and Hecht Law Firm out to the community as experienced immigration law practitioners, possessing the skills and knowledge to assist clients in obtaining immigration benefits.  The predicate acts were Defendants' regular way of operating Hecht Law Firm, such that the scale of the harm caused by Defendants goes beyond Plaintiffs named herein.

## The RICO Conspiracy

126.     Through the Enterprise, Defendants conspired to commit fraud and carry out the Ten Year Scheme to defraud Plaintiffs as set forth herein.

127.     Defendants knowingly agreed to the overall objective of the conspiracy to profit by taking advantage of immigrants, and agreed to commit mail fraud and visa fraud in furtherance of that scheme.

128.     Upon information and belief, Defendants' conspiracy includes members of the Enterprise, as well as various unknown employees and agents of Hecht Law Firm.

129.     Defendants knowingly and willingly combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) and conduct and participate in the affairs of the Enterprise through a pattern of racketeering activity.

130.     Defendants have engaged in overt acts in furtherance of the conspiracy, including engaging in, or supporting each other in engaging in, a pattern of racketeering activity that involves conduct that constitutes mail fraud under 18 U.S.C. § 1341, and visa fraud under 18 U.S.C. § 1546.

131.     Defendants have engaged in other overt acts in furtherance of the conspiracy, including making false and misleading representations to Plaintiffs and otherwise participating in the daily operations of the Enterprise.

132.     Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the Ten Year Scheme.

133.     Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c).

134.     Furthermore, upon information and belief, Defendants knowingly and willfully conspired to conceal the Ten Year Scheme.

135.     Plaintiffs exercised reasonable diligence in attempting to uncover Defendants' fraud by confronting Defendants about their activities and misrepresentations, seeking out additional information from other sources, and/or firing Hecht Law Firm.  When confronted by Plaintiffs about the misrepresentations, Defendants became dismissive and angry with Plaintiffs and misled Plaintiffs in order to conceal the Ten Year Scheme.

136.     Most Plaintiffs were only able to discover the fraudulent nature of the Ten Year Scheme with assistance from unaffiliated attorneys.

### Injuries Suffered by Plaintiffs

137.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c) and (d), Plaintiffs have been injured in their business or property in that they have collectively been defrauded out of thousands of dollars in payments to Defendants and, in some cases, subsequently incurred legal costs to defend against referral to removal proceedings and/or removal proceedings initiated, in either case, as a direct result of Defendants'

submission of asylum applications on Plaintiffs' behalf as part of Defendants' fraud. For Plaintiffs, who are members of low-income families, the loss of this money has been economically devastating.

138. Plaintiffs' injuries were a direct, proximate, and reasonably foreseeable result of Defendants' violations of 18 U.S.C. § 1962(c) and (d).

139. Pursuant to 18 U.S.C. § 1964(c) and (d), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## STATEMENT OF FACTS SPECIFIC TO EACH PLAINTIFF

### Mr. Guzman & Ms. Pavia

140. Plaintiffs Francisco Guzman ("Mr. Guzman") and Patricia Pavia ("Ms. Pavia") are married and live with their two U.S. citizen children in Staten Island, New York. Mr. Guzman's and Ms. Pavia's native language is Spanish. They speak, read, and understand very limited English.

141. In or around late 2015, Mr. Guzman heard from friends in the community that "*El Papa y El Hijo*" ("the Father and the Son") (referring to Defendants) were guaranteeing visas to many immigrants based on the "ten year law." Mr. Guzman, interested to learn more, briefly met with Defendant Leonard at Hecht Law Firm. During the first meeting, and in all subsequent meetings, Mr. Guzman truthfully answered all questions asked by Defendant Leonard. Defendant Leonard did not ask for the information necessary to determine whether Mr. Guzman and Ms. Pavia were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

142. Defendant Leonard falsely represented to Mr. Guzman that he and Ms. Pavia were eligible to apply for a work permit and lawful permanent residency through an affirmative application "*por los diez años*" ("because of the ten years") because Mr. Guzman had lived in the United States for more than ten years and had U.S. citizen children.

143.     Immediately after the meeting, Mr. Guzman spoke with Defendant Leonard's secretary, who gave Mr. Guzman a list of documents to bring to his next appointment and explained the cost and payment method for the representation.

144.     Defendant Leonard's representations caused Mr. Guzman to reasonably believe that he and Ms. Pavia were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

145.     Defendant Leonard asked Mr. Guzman and Ms. Pavia for several documents which he said were necessary to obtain a work permit.  Defendant Leonard told Mr. Guzman that he would receive his work permit in six months.  Mr. Guzman does not recall whether he signed any documents in his initial meetings, and Ms. Pavia did not go to Hecht Law Firm or meet with Defendants.

146.     When Mr. Guzman asked Defendant Leonard questions about the legal process, Defendant Leonard refused to answer his questions and told Mr. Guzman that he did this kind of application all the time.

147.     Defendants did not advise Mr. Guzman that they intended to submit an application for asylum on his behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Guzman and Ms. Pavia to be put in removal proceedings if and when the asylum application was not approved.

148.     In fact, prior to first visiting Defendants, Mr. Guzman visited another immigration law firm that he had seen advertised on television.  The lawyer Mr. Guzman met with at the law firm informed Mr. Guzman that he could seek lawful permanent resident status, but he would need to first be placed in removal proceedings, which he could do by filing an asylum application.  At

the mention of asylum, Mr. Guzman decided not to continue with the appointment and left because he did not want to apply for asylum.

149.    In or around March 2016, Defendants submitted an asylum application on behalf of Mr. Guzman, with Ms. Pavia as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

150.    In fact, Defendants submitted the asylum application without telling Mr. Guzman or Ms. Pavia or reviewing the application with them.  Nevertheless, upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Guzman and Ms. Pavia and that he read the completed application to them in a language they understood for verification.  Their application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

151.    In or around March 2016, Mr. Guzman and Ms. Pavia received a notice in the mail that their asylum application had been received by USCIS.  Mr. Guzman and Ms. Pavia were confused by this notice because they did not intend to apply for asylum.

152.    Mr. Guzman went to Hecht Law Firm to speak with Defendant Leonard, but Defendant Leonard was not there.  Another employee of Hecht Law Firm told Mr. Guzman not to worry about it, because this is how Defendant Leonard does the applications, and he knows what he is doing.

153.    In or around October 2016, Mr. Guzman attended a meeting at MRNY, where he learned that Defendants had promised him lawful status through an affirmative immigration application that did not exist.

154. After discovering that they were victims of the Ten Year Scheme, Mr. Guzman and Ms. Pavia fired Hecht Law Firm and have met with other immigration attorneys in relation to their immigration case.

### *Injury Suffered*

155. Based on Defendants' false representations, Mr. Guzman agreed to pay a total of $8,500 to Defendants.

156. As of today, Mr. Guzman and Ms. Pavia have paid at least $2,000 in multiple payments by cash and money order. Mr. Guzman and Ms. Pavia made these payments to staff at Hecht Law Firm.

157. Mr. Guzman and Ms. Pavia also paid Hecht Law Firm $120 for the translation of certain documents for their case. The invoice provided to Mr. Guzman and Ms. Pavia is on Sylvia's Translation Service letterhead.

158. But for the false representations made by Defendant Leonard, Mr. Guzman would not have hired or paid Defendants. As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Guzman and Ms. Pavia suffered a financial injury of at least $2,120.

### Ms. Duran

159. Plaintiff Edith Duran ("Ms. Duran") lives with her husband and U.S. citizen child in Roosevelt, New York. Ms. Duran's native language is Spanish. She reads, understands, and speaks English proficiently.

160. In or around February 2014, at the recommendation of her cousin, Ms. Duran met with Defendant Leonard at Hecht Law Firm. During Ms. Duran's first meeting, and in all subsequent meetings, Ms. Duran truthfully answered all questions asked by Defendant Leonard. Defendant Leonard did not ask for the information necessary to determine whether Ms. Duran was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

161.    Defendant Leonard falsely represented to Ms. Duran that she was eligible to apply for lawful permanent residency under the "ten year law."

162.    Defendant Leonard's representations caused Ms. Duran to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

163.    When Ms. Duran would sign in for her appointments, she noted on the sign-in sheet that the purpose for her visit was "*por los diez años*" ("for the ten years").

164.    Defendant Leonard asked Ms. Duran to bring to her next appointment evidence to show that she had lived in the United States for ten years.  During the next meeting, Defendant Leonard instructed Ms. Duran to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

165.    When Ms. Duran asked Defendant Leonard questions about the legal process or the documents she was signing, Defendant Leonard refused to answer her questions and told her that he did this kind of application all the time.

166.    Defendants did not advise Ms. Duran that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Ms. Duran to be put in removal proceedings if and when the asylum application was not approved.

167.    In or around October 2014, Defendants submitted an asylum application on behalf of Ms. Duran and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

168.    In fact, Defendants submitted the asylum application without telling Ms. Duran or reviewing the application with her.  Nevertheless, upon information and belief, Defendant Thomas

signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Ms. Duran, and that he read the completed application to her in a language she understood for verification. Upon information and belief, the asylum application was signed by Defendant Thomas, although Ms. Duran only met with Defendant Leonard, and the application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

169.   When Ms. Duran received a notice in the mail that her asylum application had been received by USCIS, she believed the notice was related to the "ten year law." As Ms. Duran did not understand this notice, she brought it to Hecht Law Firm to ask about it. Defendant Leonard said not to worry about this notice and that Ms. Duran just needed to wait for an interview date. Defendant Leonard did not inform Ms. Duran that the notice was related to the asylum application Defendants had submitted. At this time, Ms. Duran understood that she was to have an interview related to the "ten year law."

170.   When Ms. Duran received a fingerprinting appointment notice and a work permit related to the asylum application filed on her behalf, she believed these documents were related to the "ten year law," and did not understand that they were related to an asylum application filed on her behalf.

171.   In or around July 2016, Ms. Duran received notice from USCIS that an asylum interview had been scheduled for her. Ms. Duran called Defendants and spoke with a secretary employed by Hecht Law Firm. This secretary informed Ms. Duran that she should go by herself to the interview and bring her own interpreter.

172.   In or around August 2016, Ms. Duran attended an asylum interview in Bethpage, Long Island. She answered all questions truthfully.

173.    In or around August 2016, Ms. Duran received a notice stating that her asylum application was not approved.  Ms. Duran brought the notice to Hecht Law Firm.  Defendant Leonard informed Ms. Duran that she would receive a notification in the mail for a court date.  Defendant Leonard instructed Ms. Duran to return to his office with a money order to "stop the deportation."  Defendant Leonard instructed Ms. Duran to sign additional documents.  Defendant Leonard did not explain or translate the documents.

174.    Ms. Duran was placed into removal proceedings in or around August 2016.

175.    In or around April 2017, neither Defendant Thomas nor Defendant Leonard accompanied Ms. Duran to her initial immigration court date; instead, without notifying Ms. Duran, they sent a representative that Ms. Duran had never met before.  Ms. Duran's hearing was at 9:30 in the morning and she arrived on time.  But the representative of Defendants did not arrive until the afternoon, after Ms. Duran had called Hecht Law Firm to ask when Defendant Leonard would be arriving.

176.    Defendant Leonard informed Ms. Duran that he would represent her in her individual hearing on June 19, 2018.

177.    On or around June 19, 2018, Defendants sent a different contract attorney Ms. Duran had never met before in their stead.  This individual arrived less than five minutes before Ms. Duran's hearing began and represented her in the cancellation of removal hearing.  Ms. Duran was not made aware that if her case was denied she would receive an order of removal and may have to leave the country.  During the hearing, Ms. Duran answered all questions truthfully.  After the conclusion of Ms. Duran's hearing, the immigration judge issued an oral decision denying her cancellation of removal case and entering an order of removal to leave the country.

178.    Ms. Duran was ordered removed from the United States on June 19, 2018.

179. Ms. Duran later discovered that she was a victim of the Ten Year Scheme, and she fired Hecht Law Firm and retained pro bono counsel to represent her in her appeal.

### *Injury Suffered*

180. Based on Defendants' false representations, Ms. Duran agreed to pay a total of $7,500 to Defendants.

181. As of today, Ms. Duran has paid Defendants the entire amount of $7,500 in at least six separate payments. Ms. Duran made all of these payments to employees of Hecht Law Firm prior to her immigration court date of June 19, 2018.

182. But for the false representations made by Defendant Leonard, Ms. Duran would not have hired or paid Defendants.

183. As a direct and proximate result of Defendants' fraudulent and predatory acts, Ms. Duran suffered a financial injury of at least $7,500.

## Mr. Paucar

184. Plaintiff Juan Paucar ("Mr. Paucar") lives with his wife and their two U.S. citizen daughters in Long Island, New York. Mr. Paucar's native language is Spanish. He speaks, reads, and understands very limited English.

185. In or around February 2012, Mr. Paucar heard of Hecht Law Firm through friends and made an appointment there. During the first meeting, and in all subsequent meetings, Mr. Paucar truthfully answered all questions asked by Defendants. Defendants did not ask for the information necessary to determine whether Mr. Paucar was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

186. Defendant Leonard falsely represented to Mr. Paucar that he was eligible to apply for lawful permanent residency "*por los diez años*" ("because of the ten years").

187. Defendant Leonard's representations caused Mr. Paucar to reasonably believe that he was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

188. Defendant Leonard instructed Mr. Paucar to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Leonard did not explain or translate the documents.

189. When Mr. Paucar asked Defendant Leonard questions about the legal process or the documents he was signing, Defendant Leonard refused to answer his questions and told Mr. Paucar not to worry and that everything would be fine.

190. Defendants did not advise Mr. Paucar that they intended to submit an application for asylum on his behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Paucar to be put in removal proceedings if and when his asylum application was not approved.

191. In or around June 2012, Defendants submitted an asylum application on behalf of Mr. Paucar, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

192. In fact, Defendants submitted the asylum application without telling Mr. Paucar, or reviewing the application with him. Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Paucar, and that he read the completed application to him in a language he understood for verification. The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

193.     In or around mid-2012, Defendant Leonard informed Mr. Paucar that he would need to attend an interview at an immigration office.  Neither Defendant accompanied Mr. Paucar to this interview.  After the interview, Defendant Leonard told Mr. Paucar that Defendants would ask a judge to grant Mr. Paucar's green card application.

194.     Defendant Thomas met with Mr. Paucar to gather documents and attended multiple court appearances with Mr. Paucar.  He never explained to Mr. Paucar that he was now in removal proceedings and at risk of being ordered to leave the country.  After Mr. Paucar's final hearing, Defendant Thomas assured him that he would obtain his green card.

195.     On May 4, 2018, the Immigration Judge issued an order denying Mr. Paucar's application for cancellation of removal and ordering him to leave the country within sixty days.  On or around May 14, 2018, Mr. Paucar met with Defendant Leonard at Hecht Law Firm.  Defendant Leonard told Mr. Paucar that his application had been denied, but did not explain that he had been in removal proceedings or that he had been ordered to leave the country within sixty days.

196.     After these events, Mr. Paucar saw news coverage about this case and learned about MRNY.  Mr. Paucar attended a workshop at MRNY about the Ten Year Scheme.  Through this workshop and consultations with immigration attorneys, Mr. Paucar learned that Defendants had promised him lawful status through an affirmative immigration application that did not exist, that he had been in removal proceedings, and that he had been ordered to leave the country.

197.     After discovering that he was a victim of the Ten Year Scheme, Mr. Paucar fired Hecht Law Firm, retained pro bono counsel to represent him in his appeal, and filed attorney grievance complaints against Defendants.

*Injury Suffered*

198.     Based on Defendants' false representations, Mr. Paucar agreed to pay a total of $4,500 to Defendants.

199.     As of today, Mr. Paucar has paid at least $4,500 in multiple payments by check and money order for his case.  Mr. Paucar made these payments to staff at Hecht Law Firm.

200.     After discovering that he was a victim of the Ten Year Scheme, Mr. Paucar paid another immigration attorney $600 to file a notice of appeal in his case.  Mr. Paucar paid another attorney $3,500 to file a Motion to Reopen his removal proceedings.

201.     But for the false representations made by Defendant Leonard, Mr. Paucar would not have hired or paid Defendants.  As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Paucar suffered a financial injury of at least $8,600.

### Mr. Torres

202.     Plaintiff Martin Torres Reyes ("Mr. Torres") is married and lives with his two U.S. citizen children in Staten Island, New York.  Mr. Torres' native language is Spanish.  He speaks, reads, and understands limited English.

203.     In or around March 2015, at the recommendation of an acquaintance, Mr. Torres first visited Hecht Law Firm.  When he entered Hecht Law Firm, he noticed a sign-in sheet where each visitor put the date, their name, and the reason for their visit.  When he arrived, there was already a long list of names and most of them listed either "*diez años*" ("ten years") or "*por el tiempo*" ("for time") as the reason for their visit.

204.     Mr. Torres waited for approximately three hours before he met with Defendant Thomas.  After a brief discussion, Defendant Thomas told Mr. Torres that he had a "good case" and that it would cost $750 to start.  During the first meeting, and in all subsequent meetings, Mr. Torres truthfully answered all questions asked by Defendants Thomas and Leonard.  Defendants

did not ask for the information necessary to determine whether Mr. Torres was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

205.    In or around May 2015, Mr. Torres' wife and children accompanied him for a second meeting at Hecht Law Firm.  Defendant Leonard falsely represented to Mr. Torres that he was eligible for lawful immigration status because he had lived in the United States for more than ten years and had U.S. citizen children.  Defendant Leonard told Mr. Torres' wife that she was not eligible for lawful immigration status, because she had not yet lived in the United States for ten continuous years.  Defendant Leonard charged Mr. Torres $500 for this visit.  Defendant Leonard also told Mr. Torres that he should come back six months after he was fingerprinted by USCIS to complete paperwork for work authorization.

206.    Defendant Leonard's representations caused Mr. Torres to reasonably believe that he was eligible for a work permit and lawful immigration status through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

207.    During one of their meetings, Defendant Leonard instructed Mr. Torres to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

208.    Defendants did not advise Mr. Torres that they intended to submit an application for asylum on his behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Torres to be put in removal proceedings if and when the asylum application was not approved.

209.    In or around August 2015, Defendants submitted an asylum application for Mr. Torres, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

210.     In fact, Defendants submitted the asylum application without telling Mr. Torres, or reviewing the application with him.    Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Torres and that he read the completed application to him in a language he understood for verification.    The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

211.     In or around 2016, Mr. Torres' English teacher invited him to a presentation at MRNY about the "myth of the ten year law."   Mr. Torres went, and that is when he learned that Defendants had promised him lawful status through an affirmative immigration application that did not exist.

212.     After discovering that he was a victim of the Ten Year Scheme, Mr. Torres called Hecht Law Firm and a man answered.    Mr. Torres asked for a copy of his file, and the man said "F*** You!" and then hung up.    Mr. Torres immediately called again and a man took down his name and number and said someone would call him back.    No one from Hecht Law Firm ever called him back.

### *Injury Suffered*

213.     As of today, Mr. Torres has paid Defendants a total of $1,100 in multiple payments by cash and money order.    Mr. Torres made these payments either directly to Defendant Leonard or to a secretary at Hecht Law Firm.

214.     Mr. Torres also received a letter saying that he owed Sylvia's Translation Service $40 for the translation of his birth certificate, which he paid via mail by money order.

215.     But for the false representations made by Defendants, Mr. Torres would not have hired or paid Defendants.

216.    As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Torres suffered a financial injury of at least $1,140.

### Mr. Perez Ortega and Mrs. Perez

217.    Plaintiffs Gregorio Perez Ortega ("Mr. Perez Ortega") and Rosa Perez ("Mrs. Perez") are married and live with their three U.S. citizen children in Staten Island, New York. Mr. Perez Ortega's and Mrs. Perez's native language is Spanish. They speak, read, and understand very limited English.

218.    In or around late 2011 or early 2012, at the recommendation of a friend, Mrs. Perez and Mr. Perez Ortega met with Defendant Thomas at Hecht Law Firm. During the first meeting, and in all subsequent meetings, Mrs. Perez and Mr. Perez Ortega truthfully answered all questions asked by Defendant Thomas. Defendant Thomas did not ask for the information necessary to determine whether Mrs. Perez and Mr. Perez Ortega were eligible for, or had a reasonable basis in law or fact to apply for, asylum. All subsequent meetings that Mrs. Perez and Mr. Perez Ortega had at Hecht Law Firm were conducted by Defendant Leonard.

219.    Defendant Thomas falsely represented to Mrs. Perez and Mr. Perez Ortega that they were eligible to apply for lawful permanent residency under the "ten year law."

220.    Defendants' representations caused Mrs. Perez and Mr. Perez Ortega to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

221.    Defendant Leonard instructed Mrs. Perez and Mr. Perez Ortega to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Leonard did not explain or translate the documents.

222. When Mrs. Perez and Mr. Perez Ortega asked Defendant Leonard questions about the legal process or the documents they were signing, Defendant Leonard refused to answer their questions and told them he knew what he was doing and they should not worry.

223. Defendants did not advise Mr. Perez Ortega or Mrs. Perez that they intended to submit an application for asylum on their behalf, and did not discuss the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Perez Ortega and Mrs. Perez to be put in removal proceedings if and when the asylum application was not approved.

224. In or around September 2014, Defendants submitted an asylum application for Mr. Perez Ortega, with Mrs. Perez as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

225. In fact, Defendants submitted the asylum application without telling Mrs. Perez and Mr. Perez Ortega, or reviewing the application with them. Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mrs. Perez and Mr. Perez Ortega and that he read the completed application to them in a language they understood for verification. The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

226. In or around October 2014, Mrs. Perez and Mr. Perez Ortega received a notice in the mail that their asylum application had been received by USCIS and also received a letter from Defendants that their fingerprint appointment had been scheduled. Mrs. Perez and Mr. Perez Ortega were confused by these mailings because they did not intend to apply for asylum.

227. Mrs. Perez and Mr. Perez Ortega called Hecht Law Firm to ask about the mailings, and Defendant Leonard acknowledged, for the first time, that Defendants filed an asylum application on their behalf, but told them not to worry and that he would take care of everything.

When they visited the office in person to ask about the mailings, a receptionist told them that the notice simply meant that their application was in process; the receptionist also explained that their work permits were delayed by the slow processing of immigration paperwork.

228. Mrs. Perez and Mr. Perez Ortega later learned that USCIS had not approved their asylum application. When they asked Defendants about this development, Defendants explained for the first time that the case would be sent to immigration court.

229. On at least two occasions, Mrs. Perez and Mr. Perez Ortega asked Defendant Leonard for copies of the documents they had signed and for copies of their entire file. On both occasions, Defendant Leonard refused to provide the copies.

230. In or around April 2016, Mrs. Perez and Mr. Perez Ortega saw a commercial on TV talking about the "myth of the ten year law." They started to investigate this issue on the internet and met with attorneys at MRNY. Mrs. Perez and Mr. Perez Ortega learned that Defendants had promised them lawful status through an affirmative immigration application that did not exist.

231. After discovering that they were victims of the Ten Year Scheme, Mrs. Perez and Mr. Perez Ortega fired Hecht Law Firm and retained pro bono counsel.

### *Injury Suffered*

232. Based on Defendants' false representations, Mrs. Perez and Mr. Perez Ortega agreed to pay a total of $8,000 to Defendants.

233. As of today, Mrs. Perez and Mr. Perez Ortega have paid Defendants a total of $2,600 in multiple payments by cash, money order, and credit card. Mrs. Perez and Mr. Perez Ortega made these payments directly to Defendant Thomas or Defendant Leonard.

234. But for the false representations made by Defendants, Mrs. Perez and Mr. Perez Ortega would not have hired or paid Defendants.

235.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Mrs. Perez and Mr. Perez Ortega suffered financial injury of at least $2,600.

**Ms. Ayala**

236.    Plaintiff Rosario Ayala ("Ms. Ayala") lives with her husband and their three U.S. citizen children in Staten Island, New York.  Ms. Ayala's native language is Spanish.  She speaks, reads, and understands very limited English.

237.    In or around 2013 Ms. Ayala's husband and her nephew, Plaintiff Gregorio Perez Ortega ("Mr. Perez Ortega"), met with Defendants based on the recommendation of Mr. Perez Ortega, who was at the time a client of Defendants and had not yet discovered that Defendants had defrauded him.

238.    In March 2015, Ms. Ayala's husband had a second meeting with Defendant Leonard at Hecht Law Firm, and this time, took Ms. Ayala with him.  During that meeting, and in all subsequent meetings, Ms. Ayala and her husband truthfully answered all questions asked by Defendant Leonard.  Defendant Leonard did not ask for the information necessary to determine whether Ms. Ayala and her husband were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

239.    During this meeting, Defendant Leonard falsely represented to Ms. Ayala and her husband that they were eligible to get work permits through an affirmative application because of the length of time they had been living in the United States.  Defendant Leonard said they would be included in the same application and would both receive work authorization.

240.    Defendant Leonard's representations caused Ms. Ayala and her husband to reasonably believe that she was eligible for a work permit through an affirmative application based on the eligibility criterion of length of residency.

241.    At each meeting Ms. Ayala had with Defendants, she described her case to the receptionist and to Defendant Leonard as a "*caso por tiempo*" ("case for time").

242.    During one of their meetings, Defendant Leonard instructed Ms. Ayala to sign several documents, which he said were necessary to apply for work authorization. Defendant Leonard did not explain or translate the documents.

243.    When Ms. Ayala or her husband asked Defendant Leonard questions about the legal process or the documents she was signing, Defendant Leonard refused to answer the questions, told them not to worry, and said that he would call them with any updates regarding their case.

244.    Defendants did not advise Ms. Ayala that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Ms. Ayala to be put in removal proceedings if and when the asylum application was not approved.

245.    On or around May 31, 2016, Defendants submitted an asylum application on behalf of Ms. Ayala and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

246.    In fact, Defendants submitted the asylum application without telling Ms. Ayala, or reviewing the application with her. Nevertheless, upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Ms. Ayala and that he read the completed application to her in a language she understood for verification. In fact, Defendant Leonard had told Ms. Ayala and her husband that they would both be included in the same application, but, as it turned out, the application was only in Ms. Ayala's name. Upon information and belief, the application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

247.     In or around September 2017, Ms. Ayala attended an MRNY workshop about the "myth of the ten year law."  At this workshop, Ms. Ayala learned that Defendants had promised her a work permit through an affirmative immigration application that did not exist.

248.     After discovering that she was a victim of the Ten Year Scheme, Ms. Ayala, by letter delivered on or around January 24, 2018, fired Hecht Law Firm and demanded a copy of her entire file.  Defendants did not reply to Ms. Ayala's letter.

249.     Defendants did eventually produce Ms. Ayala's file to Plaintiffs' counsel on August 31, 2018, but the file did not include the Form I-589 submitted by Defendants on behalf of Ms. Ayala.

### Injury Suffered

250.     Based on Defendants' false representations, Ms. Ayala agreed to pay a total of $4,000 to Defendants.

251.     As of today, Ms. Ayala and her husband have paid Defendants a total of $1,700 in multiple cash payments.  Every time that Ms. Ayala had an appointment with Defendant Leonard, he requested a payment from her, telling her that the payment would allow her case to progress.

252.     Ms. Ayala also paid Defendant Leonard $60 for the translation of Ms. Ayala's birth certificate and her marriage certificate into English in order to include those documents with her application.  Ms. Ayala received a bill from Sylvia's Translation Service for the translations.

253.     But for the false representations made by Defendants, Ms. Ayala would not have hired or paid Defendants.

254.     Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Ms. Ayala suffered financial injury of at least $1,760.

**Mr. Flores Dominguez and Mrs. Olmos Flores**

255.     Plaintiffs Manuel Flores Dominguez ("Mr. Flores Dominguez") and Nely Olmos Flores ("Mrs. Olmos Flores") are married and live with their three U.S. citizen children in Astoria, New York.  Mrs. Olmos Flores' and Mr. Flores Dominguez's native language is Spanish.  They speak, read, and understand very limited English.

256.     In or around 2012, on the recommendation of an acquaintance, Mr. Flores Dominguez and Mrs. Olmos Flores met with Defendant Thomas at Hecht Law Firm.  During the first meeting, and in all subsequent meetings, Mr. Flores Dominguez and Mrs. Olmos Flores truthfully answered all questions asked by Defendant Thomas.  Defendant Leonard did not ask for the information necessary to determine whether Mr. Flores Dominguez or Mrs. Olmos Flores were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

257.     Defendant Thomas falsely represented to Mr. Flores Dominguez and Mrs. Olmos Flores that once they had ten years of residence in the U.S., they would qualify for "*la ley de diez años*" ("the ten year law") because they had U.S. citizen children.  Defendant Thomas told them that Defendant Leonard would handle their case once they accrued the ten years.

258.     In or around early 2015, Mr. Flores Dominguez and Mrs. Olmos Flores returned to meet with Defendant Leonard, who falsely represented to them that they were now eligible to apply for lawful permanent residency under the "ten year law."

259.     Defendant Leonard's representations caused Mr. Flores Dominguez and Mrs. Olmos Flores to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

260.     At their visits to Hecht Law Firm, Mr. Flores Dominguez and Mrs. Olmos Flores would sign in and note the reason for their appointment as "*por tiempo*" ("for time").

261.    During one of their meetings, Defendant Leonard instructed Mr. Flores Dominguez and Mrs. Olmos Flores to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.  On one occasion, they tried to read some of the documents that were written in English, but Defendant Leonard told them to just sign.

262.    When Mr. Flores Dominguez and Mrs. Olmos Flores asked Defendant Leonard questions about the legal process or the documents they were signing, Defendant Leonard refused to answer the questions and told them not to worry.

263.    Defendants did not advise Mr. Flores Dominguez or Mrs. Olmos Flores that they intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Flores Dominguez and Mrs. Olmos Flores to be put in removal proceedings if and when the asylum application was not approved.

264.    On or around May 23, 2016, Defendants submitted an asylum application on behalf of Mr. Flores Dominguez, with Mrs. Olmos Flores as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

265.    In fact, Defendants submitted the asylum application without telling Mr. Flores Dominguez or Mrs. Olmos Flores, or reviewing the application with them.  Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Flores Dominguez and Mrs. Olmos Flores and that he read the completed application to them in a language they understood for verification. Moreover, their application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

266.    In or around June 2016, Mr. Flores Dominguez and Mrs. Olmos Flores received a notice in the mail that their asylum application had been received by USCIS.  The notice was in English, and they did not understand what it said.

267.    In or around September 2017, Mr. Flores Dominguez and Mrs. Olmos Flores saw an advertisement on television—on the Spanish-language channel Univision—that there would be a news story later that night about the "ten year law," and the word "*fraude*" ("fraud") was written on the screen in red letters.  They waited until the story aired at 11 p.m. and watched an interview with a woman who had been a victim of the scam.  The news story mentioned an organization in Harlem that was advising people about the scam.

268.    Mr. Flores Dominguez and Mrs. Olmos Flores contacted that community organization and attended a workshop on the "ten year law" scam.  At this workshop, Mr. Flores Dominguez and Mrs. Olmos Flores learned that Defendants had promised them lawful status through an affirmative immigration application that did not exist.

269.    After discovering that they were victims of the Ten Year Scheme, Mr. Flores Dominguez and Mrs. Olmos Flores fired Hecht Law Firm and hired pro bono counsel.

270.    Mr. Flores Dominguez and Mrs. Olmos Flores have reported Defendants' actions to USCIS and sought to withdraw the asylum application that was submitted on their behalf.

### *Injury Suffered*

271.    Based on Defendants' false representations, Mr. Flores Dominguez and Mrs. Olmos Flores agreed to pay a total of $8,000 to Defendants.

272.    As of today, Mr. Flores Dominguez and Mrs. Olmos Flores have paid Defendants a total of $2,450 in six separate payments by cash or money orders.  Mr. Flores Dominguez and Mrs. Olmos Flores made these payments to a secretary at Hecht Law Firm.

273.     Mr. Flores Dominguez and Mrs. Olmos Flores also paid Hecht Law Firm $120 for the translation of certain documents for their case.  The invoice provided to Mr. Flores Dominguez and Mrs. Olmos Flores is on Sylvia's Translation Service letterhead.

274.     But for the false representations made by Defendants, Mr. Flores Dominguez and Mrs. Olmos Flores would not have hired or paid Defendants.

275.     As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Flores Dominguez and Mrs. Olmos Flores suffered a financial injury of at least $2,570.

### Ms. Rodriguez

276.     Plaintiff Catalina Rodriguez ("Ms. Rodriguez") lives with her U.S. citizen husband and U.S. citizen children in Bronx, New York.  Ms. Rodriguez's native language is Spanish.  She speaks, reads, and understands very limited English.

277.     In or around 2012, Ms. Rodriguez made an appointment at Hecht Law Firm to determine whether she was eligible for an upcoming "provisional waiver" program she learned about on a television news program.   Ms. Rodriguez believed that she might qualify for a provisional waiver based on the fact that she was a beneficiary of an approved family-based petition.

278.     During this first meeting and in all subsequent meetings, Ms. Rodriguez truthfully answered all questions asked by Defendants.  Defendants did not ask for the information necessary to determine whether Ms. Rodriguez was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

279.     At the first meeting, Defendant Thomas asked whether Ms. Rodriguez had U.S. citizen children.  When Ms. Rodriguez told Defendant Thomas that she did have U.S. citizen children, he falsely represented to her that she was eligible to apply for lawful permanent residency

under the "ten year law." Defendant Thomas also told Ms. Rodriguez, without any explanation, that he did not believe a provisional waiver application would be successful in her case.

280. Defendants' representations caused Ms. Rodriguez to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

281. When Ms. Rodriguez would sign in for her appointments, she noted on the sign-in sheet that the purpose for her visit was "*por los diez años*" ("for the ten years"). Ms. Rodriguez observed during a typical appointment that a majority of the people who had signed in before her had also written "*por los diez años*" ("for the ten years").

282. During one of their meetings in 2012, Defendant Leonard instructed Ms. Rodriguez to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Leonard did not explain or translate the documents. Instead, Defendant Leonard stated that Hecht Law Firm would submit the application and then she would receive her work permit. Defendant Leonard told Ms. Rodriguez that later she would attend an interview, then wait to receive her green card.

283. When Ms. Rodriguez asked Defendant Leonard for more details about the legal process, Defendant Leonard refused to give her more information about her case. He would tell her that everything would be okay, that she wouldn't need to leave the country, and not to worry.

284. Defendants did not advise Ms. Rodriguez that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Ms. Rodriguez to be put in removal proceedings if and when the asylum application was not approved.

285.     When Ms. Rodriguez asked about the risks of the process, Defendants reassured Ms. Rodriguez that because her children were born in the United States and were minors, the process was not risky.

286.     Defendants submitted an asylum application on behalf of Ms. Rodriguez and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

287.     In fact, Defendants submitted the asylum application without telling Ms. Rodriguez or reviewing the application with her.  Nevertheless, upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Ms. Rodriguez, and that he read the completed application to her in a language she understood for verification.  Upon information and belief, the application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

288.     On or around May 25, 2012, Ms. Rodriguez received a notice in the mail that her asylum application had been received by USCIS.  Ms. Rodriguez's son translated this notice into Spanish for Ms. Rodriguez.  The notice alarmed her because she believed that people from her home country were not typically granted asylum.

289.     Less than a week later, on or around May 31, 2012, Ms. Rodriguez received a notice from USCIS that an asylum interview had been scheduled for her.

290.     Ms. Rodriguez visited Hecht Law Firm to express her concerns about the interview notice.  Ms. Rodriguez asked Defendant Leonard if he would attend the interview with her.  Defendant Leonard told her that he would not attend the interview and that she should bring her own interpreter and talk about "the violence" in her home country.  Defendant Leonard told her not to worry about the interview and that it was part of her "ten year" case.

291. On or around June 18, 2012, Ms. Rodriguez attended an asylum interview in Lyndhurst, New Jersey. She answered all questions truthfully.

292. Ms. Rodriguez's asylum application was not approved.

293. Ms. Rodriguez was placed into removal proceedings in or around July 2012.

294. On or around August 1, 2012, neither Defendants Thomas nor Leonard accompanied Ms. Rodriguez to her initial immigration court date; instead, they sent a representative that Ms. Rodriguez had never met before.

295. In or around February 2013, Ms. Rodriguez's removal proceedings were administratively closed. Her removal proceedings could be re-calendared at any time.

296. Defendants informed Ms. Rodriguez that she could continue to renew her work permit. Ms. Rodriguez returned to Hecht Law Firm every year to renew her work permit.

297. In or around May 2018, Ms. Rodriguez watched a news report in Spanish on Univision, Channel 41, about the Ten Year Scheme and Hecht Law Firm. At this time, Ms. Rodriguez learned that Defendants had promised her lawful status through an affirmative immigration application that did not exist.

298. After discovering that she was a victim of the Ten Year Scheme, Ms. Rodriguez fired Hecht Law Firm, and has consulted with pro bono immigration counsel in relation to her immigration case.

### *Injury Suffered*

299. Based on Defendants' false representations, Ms. Rodriguez agreed to pay money to Defendants. Ms. Rodriguez is unsure of the total amount.

300. As of today, Ms. Rodriguez estimates that she has paid Defendants a total of at least $3,500. Ms. Rodriguez made these payments to employees at Hecht Law Firm.

301.     But for the false representations made by Defendants, Ms. Rodriguez would not have hired or paid Defendants.

302.     As a direct and proximate result of Defendants' fraudulent and predatory acts, Ms. Rodriguez suffered a financial injury of at least $3,500.

### Mr. Muñoz

303.     Plaintiff Mario Enrique Muñoz ("Mr. Muñoz") has five children, including three U.S. citizen children.  Mr. Muñoz lives in Queens, New York.  Mr. Muñoz's native language is Spanish.  He speaks and understands English.

304.     In or around October 2015, an acquaintance of his now ex-wife told Mr. Muñoz about the "ten year law."  Based on this recommendation, Mr. Muñoz met with Defendant Thomas at Hecht Law Firm.  During the first meeting, and in all subsequent meetings, Mr. Muñoz truthfully answered all questions asked by Defendant Thomas.  Defendant Thomas did not ask for the information necessary to determine whether Mr. Muñoz was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

305.     Defendant Thomas falsely represented to Mr. Muñoz that he was eligible to apply for lawful permanent residency under the "ten year law."

306.     Defendant Thomas' representations caused Mr. Muñoz to reasonably believe that he was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

307.     Defendant Thomas told Mr. Muñoz that the application would be very easy and instructed Mr. Muñoz to sign several documents, some of which were only partially completed, which Defendant Thomas said would be filled out later.  Defendant Thomas said these forms were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain the documents.

308. When Mr. Muñoz asked Defendant Thomas questions about the legal process or the documents he was signing, Defendant Thomas refused to answer the questions and told Mr. Muñoz not to worry.

309. Defendant Thomas told Mr. Muñoz that he would receive his work permit and social security number within three to six months, and he would receive his visa granting him lawful permanent residency in about three years.

310. Defendants did not advise Mr. Muñoz that they intended to submit an application for asylum on his behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Muñoz to be put in removal proceedings if and when the asylum application was not approved.

311. On or around October 20, 2016, Defendants submitted an asylum application on behalf of Mr. Muñoz and his now ex-wife and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

312. In fact, Defendants submitted the asylum application without telling Mr. Muñoz, or reviewing the application with him. Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Muñoz and that he read the completed application to Mr. Muñoz in a language he understood for verification. The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

313. In or around January 2017, Mr. Muñoz received a notice in the mail that his asylum application had been received by USCIS. Mr. Muñoz was confused by this notice because he did not intend to apply for asylum.

314.     In or around September 2017, Mr. Muñoz contacted another immigration attorney for a second opinion about the asylum notice he had received.  In that meeting, Mr. Muñoz learned that Defendants had promised him lawful status through an affirmative immigration application that did not exist.

315.     After discovering that he was a victim of the Ten Year Scheme, Mr. Muñoz fired Hecht Law Firm and retained new counsel.

### *Injury Suffered*

316.     Based on Defendants' false representations, Mr. Muñoz agreed to pay a total of $15,000 to Defendants for him and his now ex-wife.

317.     As of today, Mr. Muñoz has paid Defendants $750 in cash payments.  Mr. Muñoz made these payments to an employee at Hecht Law Firm.

318.     But for the false representations made by Defendant Thomas, Mr. Muñoz would not have hired or paid Defendants.

319.     Furthermore, Mr. Muñoz was required to pay for legal representation, which thus far has cost him at least $9,000 for legal services for Mr. Muñoz and his now ex-wife.

320.     Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Muñoz suffered a financial injury of at least $9,750.

### Mr. Ramos

321.     Plaintiff Alicio Ramos ("Mr. Ramos") is married and lives with his wife and his two U.S. citizen children in Staten Island, New York.  Mr. Ramos' native language is Spanish.  He speaks, reads, and understands very limited English.

322.     In June 2015, Mr. Ramos met with Mr. Luis Guerrero for assistance with preparing and filing his taxes.

323.     Mr. Luis Guerrero told Mr. Ramos that he might be able to "get his papers" based on the number of years he had been living in the United States.

324.     Mr. Luis Guerrero referred Mr. Ramos to Hecht Law Firm to apply for lawful permanent resident status based on the number of years he had been living in the United States.

325.     In June 2015, Mr. Ramos met with Defendant Leonard at Hecht Law Firm. During the first meeting, and in all subsequent meetings, Mr. Ramos truthfully answered all questions asked by Defendant Leonard.  Defendant Leonard did not ask him for the information necessary to determine whether he was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

326.     Defendant Leonard falsely represented to Mr. Ramos that he was eligible for a visa under the "ten year law."

327.     Defendant Leonard's representations caused Mr. Ramos to reasonably believe that he was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criterion of length of residency.

328.     Defendant Leonard instructed Mr. Ramos to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

329.     Defendants did not advise Mr. Ramos that they intended to submit an application for asylum on his behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Ramos to be put in removal proceedings if and when the asylum application was not approved.

330.    In or around September 2015, Defendants submitted an asylum application for Mr. Ramos and his wife, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

331.    In fact, Defendants submitted the asylum application without telling Mr. Ramos, or reviewing the application with him.   Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Ramos and that he read the completed application to him in a language he understood for verification.   The asylum application was signed by Defendant Thomas, although Mr. Ramos only met with Defendant Leonard.   The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

332.    Around November 2017, Mr. Ramos saw a news program on television reporting that the "ten year law" did not exist and that many immigrants were being defrauded by attorneys that were telling them that they were eligible for the "ten year visa."  Mr. Ramos called the "311" hotline and learned that Defendants had promised him lawful status through an affirmative immigration application that did not exist.

333.    After discovering that he was a victim of the Ten Year Scheme, Mr. Ramos fired Hecht Law Firm and retained new counsel.

### *Injury Suffered*

334.    Based on Defendants' false representations, Mr. Ramos agreed to pay a total of $8,000 to Defendants for him and his wife.

335.    As of today, Mr. Ramos has paid at least $2,400, in multiple cash payments.  Mr. Ramos made these payments to an employee at Hecht Law Firm.

336.    But for the false representations made by Defendant Leonard, Mr. Ramos would not have hired or paid Defendants.

337.    As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Ramos suffered a financial injury of at least $2,400.

### Mr. Sabino Guerrero & Ms. Hernandez

338.    Plaintiffs Sabino Guerrero Victorio ("Mr. Sabino Guerrero") and Lidia Hernandez Hernandez ("Ms. Hernandez") are married and live with their U.S. citizen child in New Rochelle, New York.  Mr. Sabino Guerrero's and Ms. Hernandez's native language is Spanish.  They speak, read, and understand limited English.

339.    In or around December 2013, at the recommendation of a family member, Mr. Sabino Guerrero and Ms. Hernandez met with Defendant Leonard at Hecht Law Firm.  During the first meeting, and in all subsequent meetings, Mr. Sabino Guerrero and Ms. Hernandez truthfully answered all questions asked by Defendant Leonard.  Defendant Leonard did not ask for the information necessary to determine whether Mr. Sabino Guerrero and Ms. Hernandez were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

340.    Defendant Leonard falsely represented to Mr. Sabino Guerrero and Ms. Hernandez that once they both had lived in the United States for ten years they would be eligible to apply for lawful permanent residency "*por los diez años*" ("for the ten years")  and "*por el tiempo*" ("for the time").

341.    In or around March 2014, once they had lived in the United States for ten years, Mr. Sabino Guerrero and Ms. Hernandez returned to Hecht Law Firm to meet with Defendant Leonard, who told them that they would now start the process to apply for lawful permanent residency.

342.     Defendant Leonard's representations caused Mr. Sabino Guerrero and Ms. Hernandez to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and a U.S. citizen child.

343.     At Mr. Sabino Guerrero's and Ms. Hernandez's subsequent visits to Hecht Law Firm, they would sign in on a sign-in sheet that had a column for type of case, where they would write "*tiempo*" ("time").

344.     During one of their meetings, Defendant Leonard instructed Mr. Sabino Guerrero and Ms. Hernandez to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

345.     When Mr. Sabino Guerrero and Ms. Hernandez asked questions about the legal process or the documents they were signing, Defendant Leonard refused to answer their questions and told Mr. Sabino Guerrero and Ms. Hernandez that everything was fine.

346.     Defendants did not advise Mr. Sabino Guerrero or Ms. Hernandez that Defendants intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Sabino Guerrero and Ms. Hernandez to be put in removal proceedings if and when their asylum application was not approved.

347.     On or around August 11, 2014, Defendants submitted an asylum application on behalf of Mr. Sabino Guerrero, with Ms. Hernandez as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

348.     In fact, Defendants submitted the asylum application without telling Mr. Sabino Guerrero or Ms. Hernandez, or reviewing the application with them.  Nevertheless, Defendant

Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Sabino Guerrero and Ms. Hernandez, and that he read the completed application to them in a language they understood for verification. The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

349. In or around April 2016, Mr. Sabino Guerrero and Ms. Hernandez received a letter from Hecht Law Firm, stating that they were "scheduled for an interview in connection with [their] application." An interview notice was attached to the letter. Mr. Sabino Guerrero and Ms. Hernandez met with Defendant Thomas before the interview. Defendant Thomas did not advise Mr. Sabino Guerrero or Ms. Hernandez that the interview was related to an asylum application filed on their behalf.

350. On or around May 2, 2016, Mr. Sabino Guerrero and Ms. Hernandez attended their scheduled asylum interview. Following the interview, Ms. Hernandez noticed that the word "asylum" was written on the interview notice. Mr. Sabino Guerrero and Ms. Hernandez were confused because they had not intended to apply for asylum.

351. Ms. Hernandez asked Defendant Thomas why the notice said "asylum." Defendant Thomas told Ms. Hernandez that even though the notice said "asylum," the case was not actually for asylum. He repeated that they were applying for lawful permanent resident status based on time, their child, and the fact that Mr. Sabino Guerrero and Ms. Hernandez were good people.

352. After discovering that an application for asylum had been filed on her and her husband's behalf, Ms. Hernandez requested a copy of their file from Defendant Leonard. Defendant Leonard refused to provide her with a copy and asked her why she needed a copy of the file.

353.     On or around May 16, 2016, Mr. Sabino Guerrero and Ms. Hernandez received charging documents directing them to appear in immigration court.  On or around June 7, 2016, Mr. Sabino Guerrero and Ms. Hernandez received a hearing notice directing them to appear in immigration court in July 2016.

354.     On or around July 28, 2016, Mr. Sabino Guerrero and Ms. Hernandez attended a master calendar hearing at the New York Immigration Court.  Neither Defendant Thomas nor Defendant Leonard accompanied Mr. Sabino Guerrero and Ms. Hernandez to immigration court; instead they sent a representative that Mr. Sabino Guerrero and Ms. Hernandez had never met before.  This representative was unable or unwilling to communicate with Mr. Sabino Guerrero and Ms. Hernandez in Spanish.

355.     Mr. Sabino Guerrero and Ms. Hernandez's case was administratively closed before the Immigration Court in or around November 2016.  Their removal proceedings could be re-calendared at any time.

356.     In or around May 2018, Mr. Sabino Guerrero and Ms. Hernandez watched news coverage about the lawsuit filed against Hecht Law Firm in relation to the Ten Year Scheme.  At this point, Mr. Sabino Guerrero and Ms. Hernandez learned that Defendants had promised them lawful status through an affirmative immigration application that did not exist.  Mr. Sabino Guerrero and Ms. Hernandez contacted MRNY to inquire about participating in the litigation after seeing the press coverage and making this discovery.

357.     After discovering that they were victims of the Ten Year Scheme, Mr. Sabino Guerrero and Ms. Hernandez fired Hecht Law Firm and ultimately retained pro bono counsel after paying for immigration consultations and a FOIA request in their efforts to understand where their case stood and their options for next steps.

*Injury Suffered*

358. Based on Defendants' false representations, Mr. Sabino Guerrero and Ms. Hernandez agreed to pay a total of $8,500 to Defendants.

359. As of today, Mr. Sabino Guerrero and Ms. Hernandez have paid Defendants approximately $7,860 in multiple payments. Mr. Sabino Guerrero and Ms. Hernandez made each of these payments to Defendant Leonard, Defendant Thomas, or staff at Hecht Law Firm.

360. Mr. Sabino Guerrero believes that he also paid a bill for $80 from Sylvia's Translation Service for translations.

361. But for the false representations made by Defendants Leonard and Thomas, Mr. Sabino Guerrero and Ms. Hernandez would not have hired or paid Defendants.

362. Furthermore, Mr. Sabino Guerrero and Ms. Hernandez paid $800 for immigration consultations and a FOIA request in their efforts to understand where their case stood and their options for next steps.

363. Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Sabino Guerrero and Ms. Hernandez suffered a financial injury of at least $8,740.

### Mr. Gerardo Vargas Diaz & Ms. Gloria Valle Veronica

364. Plaintiffs Gerardo Vargas Diaz ("Mr. Vargas") and Gloria Valle Veronica ("Ms. Valle") are married and live with two of their U.S. citizen children in Brooklyn, New York. Mr. Vargas' and Ms. Valle's native language is Spanish. They speak, read, and understand limited English.

365. In or around August 2015, at the recommendation of a friend of Ms. Valle, Mr. Vargas and Ms. Valle met with Defendant Leonard at Hecht Law Firm. During the first meeting, and in all subsequent meetings, Mr. Vargas and Ms. Valle truthfully answered all questions asked by Defendant Leonard. Defendant Leonard did not ask for the information necessary to determine

whether Mr. Vargas and Ms. Valle were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

366.     Defendant Leonard falsely represented to Mr. Vargas and Ms. Valle that they could fix their status through Ms. Vargas' twenty-seven-year-old daughter and that they were also eligible to apply for lawful permanent residency under the "ten year law."

367.     Defendants' representations caused Mr. Vargas and Ms. Valle to reasonably believe that Mr. Vargas was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency in the United States and U.S. citizen children.  They also believed that they were both eligible for these benefits through Ms. Valle's adult U.S. citizen daughter.

368.     Defendant Thomas instructed Mr. Vargas and Ms. Valle to sign several documents, which he said were the "petition" that was part of the "process" for the lawful permanent residency. Defendant Thomas did not explain or translate the documents.

369.     When Mr. Vargas or Ms. Valle tried to ask questions about the legal process or the documents they were signing, Defendants refused to answer their questions.  Defendant Thomas informed Ms. Valle that she should just wait.

370.     Defendants did not advise Mr. Vargas and Ms. Valle that Defendants intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause Mr. Vargas and Ms. Valle to be put in removal proceedings if and when the asylum application was not approved.

371.     On or around November 30, 2015, Defendants submitted an asylum application on behalf of Mr. Vargas, with Ms. Valle as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

372.     In fact, Defendants submitted the asylum application without telling Mr. Vargas and Ms. Valle, or reviewing the application with them.  Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of Mr. Vargas and Ms. Valle, and that he read the completed application to them in a language they understood for verification.  The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

373.     In or around December 2015, Mr. Vargas and Ms. Valle received a letter from Hecht Law Firm stating that Mr. Vargas would be unable to fix his status through Ms. Valle's adult daughter.  The letter stated that "[w]hatever payment you have made in this matter will be applied toward the other case we have for you, regarding the time you have resided in the United States."  At a subsequent meeting, Defendant Thomas stated that Mr. Vargas could still gain his residency "*por tiempo*" ("for time") and "*por tu hija*" ("by your daughter"), referring to the couple's minor daughter.  Because this letter was specific to her husband, Mr. Vargas, Ms. Valle believed that her own petition through her adult daughter was still pending, and did not know until recently that the Hechts intended to, and did, include her in her husband's application that, as it turned out, requested asylum.

374.     In or around 2017, a member of Ms. Valle's church asked Ms. Valle if she knew that her attorney had applied for asylum on her behalf and informed her that she should examine the receipt notice.  Ms. Valle was confused, because she and her husband had never intended to apply for asylum.

375.     On or around June 28, 2017, Ms. Valle went to Hecht Law Firm to speak with Defendant Leonard, accompanied by her employer, who speaks and understands fluent English.  Defendant Leonard stated that everything was fine and that the asylum application was part of the

process.  Defendant Leonard instructed Ms. Valle not to worry, because "*los diez años era una ley*" ("the ten years was a law").  Defendant Leonard informed Ms. Valle that she would receive a notice to appear in court.  Ms. Valle was confused, because she had not known she or her husband would have to appear in court.

376.    In 2018, Ms. Valle saw television coverage of the current action against Defendants on Univision Channel 41, and learned that Defendants had promised Ms. Valle and her husband lawful status through an affirmative immigration application that did not exist.

377.    On or around May 31, 2018, Ms. Valle and her employer returned to meet with Defendant Leonard.  At that meeting, Defendant Leonard explicitly admitted that he had filed an asylum application on Ms. Valle's behalf, and stated that he did so because that was how Ms. Valle's case would be started.  He reiterated that a "ten year law" existed and was the basis for Ms. Valle's case.  Ms. Valle's employer requested a copy of Ms. Valle's file, but Defendant Leonard refused to provide it.  He informed both of them that Ms. Valle could pay $100 for a copy of her file, but that if she took a copy of her file, Ms. Valle could never return to his office.  They did not take the file.

378.    On or about June 8, 2018, Ms. Valle returned to Defendant Leonard's office to once again request a copy of her file.  She was accompanied by her employer and later joined by Mr. Vargas.  Defendant Leonard yelled at Ms. Valle when she requested the file and stated that he had nothing to give them, and that he had given them everything the previous week.  Pressed by Ms. Valle's employer, Defendant Leonard yelled and threatened to have her arrested for trespassing. After the employer left the office, Defendant Leonard provided Ms. Valle and Mr. Vargas with what is, upon information and belief, only a portion of their file.

379.     After discovering that they were victims of the Ten Year Scheme, Mr. Vargas and Ms. Valle fired Hecht Law Firm and retained new counsel.

### *Injury Suffered*

380.     Based on Defendants' false representations, Mr. Vargas and Ms. Valle agreed to pay a total of $14,000 to Defendants.

381.     As of today, Mr. Vargas and Ms. Valle estimate that they have paid Defendants approximately $4,500 in multiple payments.  Mr. Vargas and Ms. Valle made these payments to Defendants.

382.     Mr. Vargas and Ms. Valle also paid an employee at Hecht Law Firm $80 for the translation of certain documents for their case.  The invoice provided to Mr. Vargas and Ms. Valle is on Sylvia's Translation Service letterhead.

383.     But for the false representations made by Defendants, Mr. Vargas and Ms. Valle would not have hired or paid Defendants.

384.     Furthermore, Mr. Vargas and Ms. Valle were required to pay for legal representation.  Mr. Vargas and Ms. Valle have to date paid $300 for legal representation.

385.     As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Vargas and Ms. Valle suffered a financial injury of at least $4,880.

### Mr. Mejia and Ms. Tacuba

386.     Plaintiffs Ernesto Mejia Gonzalez ("Mr. Mejia") and Oneida Tacuba Mejia ("Ms. Tacuba") are married and live with their four U.S. citizen children in Brooklyn, New York.  Mr. Mejia's and Ms. Tacuba's native language is Spanish.  They speak, read, and understand very limited English.

387.     In or around November 2014, at the recommendation of Mr. Mejia's colleague, Mr. Mejia and Ms. Tacuba met with Defendant Thomas at Hecht Law Firm.  During the first meeting,

and in all subsequent meetings, Ms. Tacuba and Mr. Mejia truthfully answered all questions asked by Defendant Thomas. Defendant Thomas did not ask for the information necessary to determine whether they were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

388. Defendant Thomas falsely represented to Mr. Mejia and Ms. Tacuba that they were eligible to apply for lawful permanent residency under the "ten year law."

389. Defendant Thomas' representations caused Mr. Mejia and Ms. Tacuba to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

390. At their visits to Hecht Law Firm, when Mr. Mejia and Ms. Tacuba would sign in, they would write "*diez años*" ("ten years") as the reason for their appointment. No meeting Mr. Mejia had with Defendants lasted longer than five minutes.

391. During one of their meetings, Defendant Thomas instructed Mr. Mejia and Ms. Tacuba to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Thomas did not explain or translate the contents of the documents.

392. Defendant Thomas told Mr. Mejia and Ms. Tacuba that he would file an asylum application on their behalf because an asylum application was part of the process, and that later he was going to change the application to one for the "ten year visa." Defendants did not advise Mr. Mejia or Ms. Tacuba about the legal requirements for asylum or the fact that Defendants intended to cause Mr. Mejia and Ms. Tacuba to be put in removal proceedings if and when the asylum application was not approved. Instead, Mr. Mejia and Ms. Tacuba understood that Defendants would apply for an affirmative "ten year" benefit.

393.     In or around November 2014, Defendants submitted an asylum application on behalf of Mr. Mejia and Ms. Tacuba and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

394.     Upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he read the completed application to them in a language they understood for verification, and the application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

395.     On or around January 20, 2017, Mr. Mejia and Ms. Tacuba received a letter from Hecht Law Firm notifying them that an "interview" in connection to their application had been scheduled.

396.     Concerned, Mr. Mejia and Ms. Tacuba met with attorneys at MRNY.  At the meeting, Mr. Mejia and Ms. Tacuba learned that Defendants had promised them lawful status through an affirmative immigration application that did not exist.

397.     Mr. Mejia and Ms. Tacuba feared the repercussions of missing their scheduled interview.  Thus, on or around February 1, 2017, Mr. Mejia and Ms. Tacuba met with Defendant Thomas regarding the scheduled interview.  Defendant Thomas told Mr. Mejia and Ms. Tacuba that at their asylum interview, they just had to say that their country was very dangerous.

398.     Mr. Mejia and Ms. Tacuba subsequently fired Hecht Law Firm, and secured new counsel.

399.     Mr. Mejia was placed into removal proceedings in or about March 2017.  Since that time, Ms. Tacuba has also been placed into removal proceedings.

*Injury Suffered*

400.     Based on Defendants' false representations, Mr. Mejia and Ms. Tacuba agreed to pay a total of $8,000 to Defendants.

401.     As of today, Mr. Mejia and Ms. Tacuba have paid at least $3,120 in multiple cash payments.  Mr. Mejia and Ms. Tacuba made the payments to employees at Hecht Law Firm.

402.     But for the false representations made by Defendant Thomas, Mr. Mejia and Ms. Tacuba would not have hired or paid Defendants.

403.     Furthermore, Mr. Mejia and Ms. Tacuba were required to pay for legal representation.

404.     As of today, Mr. Mejia and Ms. Tacuba have paid more than $6,000 for the legal representation.

405.     As a direct and proximate result of Defendants' fraudulent and predatory acts, Mr. Mejia and Ms. Tacuba suffered a financial injury of at least $9,120.

## S.F.C. and A.M.O.

406.     Plaintiffs S.F.C. and A.M.O. are married and live with their three U.S. citizen children in Brooklyn, New York.  S.F.C.'s and A.M.O.'s native language is Spanish.  They speak, read, and understand very limited English.

407.     In or around June 2012, at the recommendation of A.M.O.'s cousin, A.M.O. met with Defendant Leonard at Hecht Law Firm.  Later that same year, S.F.C. went with A.M.O. to meet with Defendant Leonard at Hecht Law Firm.  During their first meetings, and in all subsequent meetings, A.M.O. and S.F.C. truthfully answered all questions asked by Defendant Leonard.  Defendant Leonard did not ask for the information necessary to determine whether A.M.O. or S.F.C. were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

408.     Defendant Leonard falsely represented that S.F.C. and A.M.O. were eligible to apply for lawful permanent residency based on an affirmative application if they could show that they had paid taxes in the United States for ten years and had U.S. citizen children.

409.     Defendant Leonard's representations caused S.F.C. and A.M.O. to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of paying taxes in the United States for ten years and U.S. citizen children.

410.     Defendant Leonard instructed S.F.C. and A.M.O. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

411.     Defendants did not advise S.F.C. or A.M.O. that they intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause S.F.C. and A.M.O. to be put in removal proceedings if and when the asylum application was not approved.

412.     In or around the summer or fall of 2013, Defendants submitted separate asylum applications on behalf of S.F.C. and A.M.O. and used a mail carrier to send the applications across state lines to the USCIS Service Center in Vermont.

413.     In fact, Defendants submitted the asylum applications without telling S.F.C. and A.M.O., or reviewing the applications with them.  Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589 for S.F.C., and, upon information and belief, also signed the preparer attestation in the Form I-589 submitted for A.M.O., falsely representing that he was filing the asylum applications at the request of S.F.C. and A.M.O. and that he read the completed applications to them in a language they understood for verification.  S.F.C.'s application contained

the same boilerplate bases for asylum as the other Plaintiffs' applications, and, upon information and belief, A.M.O.'s application also included the same responses.

414.　　Around 2013, A.M.O. and S.F.C. received notices in the mail that their asylum applications had been received by USCIS.　A.M.O. and S.F.C. were confused by these notices because they did not intend to apply for asylum.　When they contacted and/or visited Hecht Law Firm, Defendants told them not to worry because this was the process toward obtaining legal permanent residence.

415.　　Around Spring 2014, S.F.C. and A.M.O. attended asylum interviews.　They answered all questions truthfully.

416.　　S.F.C. and A.M.O. were placed into removal proceedings in or about March 2014 and September 2015, respectively.

417.　　In or around 2017, S.F.C. and A.M.O. became suspicious when Defendants demanded more money to move their applications forward.　S.F.C. and A.M.O. contacted other attorneys, and learned that Defendants had promised them lawful status through an affirmative immigration application that did not exist.

418.　　After discovering that they were victims of the Ten Year Scheme, S.F.C. and A.M.O. fired Hecht Law Firm.　A.M.O. retained alternative representation for herself and S.F.C. subsequently obtained pro bono counsel for himself.

### *Injury Suffered*

419.　　Based on Defendants' false representations, S.F.C. and A.M.O. initially agreed to pay a total of $4,000 to Defendants.

420.　　During the course of the representation, Defendants demanded additional payments to move the case forward.　Over the course of five years, S.F.C. and A.M.O. paid Defendants a total of $8,500 in ten or twelve separate payments.

421.    But for the false representations made by Defendant Leonard, S.F.C. and A.M.O. would not have hired or paid Defendants.

422.    A.M.O. paid at least $2,500 for legal representation to her new counsel.

423.    Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, S.F.C. and A.M.O. suffered a significant financial injury of at least $11,000.

### D.P.C.

424.    Plaintiff D.P.C. lives with her husband and four children, including three U.S. citizen children, in Brooklyn, New York.  D.P.C.'s native language is Spanish.  She speaks, reads, and understands very limited English.

425.    In or around 2015, at the recommendation of her brother, whose acquaintance recommended Defendants and the "ten year law," D.P.C. met with Defendant Thomas at Hecht Law Firm.  During the first meeting, and in all subsequent meetings, D.P.C. truthfully answered all questions asked by Defendant Thomas.  Defendant Thomas did not ask her for the information necessary to determine whether she was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

426.    Defendant Thomas falsely represented to D.P.C. that she was eligible to apply for lawful permanent residency under the "ten year law."

427.    Defendant Thomas' representations caused D.P.C. to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

428.    When D.P.C. would go for an appointment at Hecht Law Firm, she would inform the receptionist that the reason for her appointment was the "ten year law."

429. During one of their meetings, Defendant Thomas instructed D.P.C. to sign several documents which he said were necessary to apply for lawful permanent residency. Defendant Thomas did not explain or translate the documents.

430. When D.P.C. asked Defendant Thomas questions about the legal process or the documents she was signing, Defendant Thomas refused to answer the questions and told D.P.C. not to worry, because he was the expert.

431. Defendants did not advise D.P.C. that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause D.P.C. to be put in removal proceedings if and when the asylum application was not approved.

432. On or around March 3, 2016, Defendants submitted an asylum application on behalf of D.P.C. and her husband and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

433. In fact, Defendants submitted the asylum application without telling D.P.C., or reviewing the application with her. Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of D.P.C., and that he read the completed application to her in a language she understood for verification. The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

434. Between March and October 2016, D.P.C. received a notice in the mail that her asylum application had been received by USCIS. D.P.C. was confused by this notice because she did not intend to apply for asylum.

435.     D.P.C. called Hecht Law Firm to ask about the notice, and the person who answered the phone told D.P.C. not to worry, because that application was just a "name" of the "form" for the "ten year law" application.

436.     At the end of 2017, D.P.C. met with attorneys at MRNY.  At the meeting, D.P.C. learned that Defendants had promised her lawful status through an affirmative immigration application that did not exist.

437.     After discovering that she was a victim of the Ten Year Scheme, D.P.C. fired Hecht Law Firm and retained new counsel.

### *Injury Suffered*

438.     Based on Defendants' false representations, D.P.C. agreed to pay a total of $8,000 to Defendants for D.P.C. and her husband.

439.     As of today, D.P.C. has paid Defendants $1,880 in cash payments.  D.P.C. made these payments to employees at Hecht Law Firm.

440.     D.P.C. also paid Defendant Thomas $80 for the translation of the birth certificates of D.P.C. and her husband.  The receipt provided to D.P.C. is on Sylvia's Translation Service letterhead.

441.     But for the false representations made by Defendant Thomas, D.P.C. would not have hired or paid Defendants.

442.     Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, D.P.C. suffered a financial injury of at least $1,960.

## B.R.E.

443.     Plaintiff B.R.E. lives with her three U.S. citizen children in Staten Island, New York.  B.R.E.'s native language is Spanish.  She speaks, reads, and understands very limited English.

444. In or around 2012, at the recommendation of her father, B.R.E. met with Defendant Thomas at Hecht Law Firm. During the first meeting, and in all subsequent meetings, B.R.E. truthfully answered all questions asked by Defendant Thomas. Defendant Thomas did not ask for the information necessary to determine whether B.R.E. was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

445. Defendant Thomas falsely represented to B.R.E. that she was eligible to apply for lawful permanent residency through the "*ley de diez años*" ("law of ten years").

446. Defendant Thomas' representations caused B.R.E. to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

447. At B.R.E.'s subsequent visits to Hecht Law Firm, she would sign in on a sign-in sheet that had a column for "*tipo de caso*" ("type of case"), where she would write "*por el tiempo*" ("for the time").

448. During one of their meetings, Defendant Thomas instructed B.R.E. to sign several documents, which he said were necessary to apply for lawful permanent residency. Defendant Thomas did not explain or translate the documents.

449. When B.R.E. asked Defendant Thomas questions about the legal process or the documents she was signing, Defendant Thomas refused to answer the questions and told her not to worry because he was the attorney.

450. Defendants did not advise B.R.E. that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause B.R.E. to be put in removal proceedings if and when the asylum application was not approved.

451.    On or around October 22, 2013, Defendants submitted an asylum application for B.R.E. and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

452.    In fact, Defendants submitted the asylum application without telling B.R.E., or reviewing the application with her.   Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of B.R.E., and that he read the completed application to her in a language she understood for verification.   B.R.E.'s application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

453.    In or around November 2013, B.R.E. received a phone call from Defendant Thomas informing her that she was scheduled for an asylum interview.   B.R.E. was confused by this phone call because she did not intend to apply for asylum.

454.    Defendant Thomas told B.R.E. not to worry, because the interview was the first step towards status through the "*ley de diez años*" ("law of ten years").

455.    On or around December 3, 2013, B.R.E. attended the asylum interview and answered all of the questions truthfully.

456.    On or around December 12, 2013, B.R.E. received a charging document directing her to appear in immigration court in January 2014.   Defendants did not explain that this meant that she had been placed in removal proceedings.

457.    On or around January 14, 2014, neither Defendant Thomas nor Defendant Leonard accompanied B.R.E. to immigration court; instead, they sent a representative that B.R.E. had never met before.

458.    Around August 2016, based on a friend's recommendation, B.R.E. visited the Family Justice Center, where she spoke with an immigration lawyer.   B.R.E. told the immigration

attorney that she had legal status under the "ten year law," and the attorney informed B.R.E. that this law did not exist. After this meeting, B.R.E. realized that Defendants had promised her lawful status through an affirmative immigration application that did not exist.

459. B.R.E. was subsequently referred to MRNY, and in or around October 2016, B.R.E. attended an MRNY workshop, where she learned more about the "myth of the ten year law."

460. After discovering that she was a victim of the Ten Year Scheme, B.R.E. fired Hecht Law Firm and retained alternative representation.

### *Injury Suffered*

461. Based on Defendants' false representations, B.R.E. agreed to pay a total of $1,500 to Defendants.

462. B.R.E. paid Defendants the full amount in five or six separate payments by cash or check. B.R.E. made these payments to individuals employed by Hecht Law Firm.

463. Defendants Thomas and/or Leonard also referred B.R.E. to Sylvia's Translation Service for translations they said were necessary for her case. B.R.E. paid Sylvia's Translation Service $40 for the translation of her birth certificate.

464. But for the false representations made by Defendant Thomas, B.R.E. would not have hired or paid Defendants.

465. Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, B.R.E. suffered financial injury of at least $1,540.

### A.M.M.

466. Plaintiff A.M.M. lives with her two U.S. citizen daughters in Brooklyn, New York. A.M.M.'s native language is Spanish. She speaks, reads, and understands limited English.

467. In or around May 2014, at the recommendation of a family friend, A.M.M. met with Defendant Thomas at Hecht Law Firm. During the first meeting, and in all subsequent

meetings, A.M.M. truthfully answered all questions asked by Defendants Thomas and Leonard. Defendants did not ask A.M.M. for the information necessary to determine whether she was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

468.     Defendant Thomas falsely represented to A.M.M. that she was eligible to apply for lawful permanent residency because she had lived in the United States for more than ten years and had U.S. citizen children.

469.     In or around July 2014, A.M.M. returned to Hecht Law Firm and met with Defendant Leonard, who told her that Defendant Thomas was his father and that they worked together.  Defendant Leonard confirmed that A.M.M. qualified for lawful permanent residency. He also said that after six months, she would get permission to work.  A.M.M. made her first payment in the amount of $750 to Defendant Leonard that day.

470.     Defendants' representations caused A.M.M. to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

471.     In or around August or September 2014, A.M.M. met again with Defendant Leonard, who instructed her to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

472.     When A.M.M. asked Defendant Leonard questions about the legal process or the documents she was signing, Defendant Leonard refused to answer and told her not to worry.

473.     Defendants did not advise A.M.M. that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause A.M.M. to be put in removal proceedings if and when the asylum application was not approved.

474.     In or around October 2014, Defendants submitted an asylum application for A.M.M., and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

475.     In fact, Defendants submitted the asylum application without telling A.M.M., or reviewing the application with her.   Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of A.M.M., and that he read the completed application to her in a language she understood for verification.   The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

476.     Later that month, Defendant Thomas sent A.M.M. a letter directing to her go to a USCIS office to get her fingerprints taken.   Confused by the letter, she went to Hecht Law Firm. Defendant Leonard told her not to worry and advised her to attend the fingerprint appointment.

477.     In or around Fall 2015, A.M.M.'s eldest daughter began an internship with a community organization run by and for immigrants facing deportation.   As she learned more about immigration law, she became suspicious of Defendants.

478.     In or around January 2016, A.M.M., accompanied by her eldest daughter, returned to Hecht Law Firm and met with Defendant Leonard.   When A.M.M.'s daughter asked Defendant Leonard questions about why the paperwork from USCIS said "asylum" when he had told them he was filing an application based on her length of residency and children, Defendant Leonard said he was the lawyer and, in his words, knew what he was doing.

479.     A.M.M. asked Defendant Leonard to withdraw her asylum application.   But in or around July 2016, A.M.M. received another letter signed by Defendant Thomas instructing her to appear at the USCIS office in Brooklyn for an additional set of fingerprints.   A.M.M and her eldest

daughter returned to Hecht Law Firm in or around July 2016 and met with Defendant Leonard. They asked why he had not withdrawn the application, and requested a copy of A.M.M.'s file. Defendant Leonard said that A.M.M. needed to pay everything she owed before he would give her a copy, became very aggressive, and demanded that A.M.M.'s daughter leave the room.

480.    Later in July, A.M.M. received a notice that her asylum interview was scheduled for August 16, 2016.  A.M.M. and her eldest daughter again met with Defendant Leonard to ask why he had not withdrawn the application.

481.    Defendant Leonard dismissed their questions and said that he would note in A.M.M.'s file that she was "difficult to work with" because her daughter asked so many questions. Defendant Leonard also said that he would not accompany her to the asylum interview.

482.    On or around August 2, 2016, now accompanied by her youngest daughter, A.M.M. returned to Hecht Law Firm.  Defendant Leonard encouraged A.M.M. to attend the asylum interview.

483.    Defendant Leonard also repeatedly stated that there was no risk of deportation and that a judge would not deport a single woman without a criminal history.  This is not accurate under immigration law.

484.    When A.M.M. asked Defendant Leonard to accompany her to her asylum interview, he told her not to worry, but stated that he would not accompany her.

485.    After discovering that she was a victim of the Ten Year Scheme, A.M.M. fired Hecht Law Firm and wrote to the Asylum Office to withdraw her application.

486.    A.M.M. was placed into removal proceedings on or around March 30, 2017.

### *Injury Suffered*

487.    Based on Defendants' false representations, A.M.M. agreed to pay a total of $9,000 to Defendants.

488. As of today, A.M.M. has paid Defendants a total of approximately $4,856, in at least eight separate payments by cash and money orders. A.M.M. made these payments directly to an employee at Hecht Law Firm.

489. A.M.M. also paid $40 for the translation of her birth certificate. She sent the payment to Hecht Law Firm via mail.

490. But for the false representations made by Defendants, A.M.M. would not have hired or paid Defendants.

491. As a direct and proximate result of Defendants' fraudulent and predatory acts, A.M.M. suffered a financial injury of at least $4,896.

### J.M. and M.M.

492. Plaintiffs J.M. and M.M. are married and live with their two U.S. citizen children in Staten Island, New York. M.M.'s and J.M.'s native language is Spanish. They speak, read, and understand very limited English.

493. In or around April 2015, J.M. and M.M. met with Mr. Luis Guerrero for assistance with preparing and filing their taxes. Mr. Luis Guerrero asked them how long they had been living in the United States. When they said that they had lived in the United States for almost ten years, Mr. Luis Guerrero told J.M. and M.M. that he understood that Hecht Law Firm could "fix their papers" because they had lived in the United States for at least ten years. Mr. Luis Guerrero encouraged them to schedule an appointment with Hecht Law Firm, assuring them that Defendants were good lawyers and that the process would move quickly because they have U.S. citizen children.

494. At the recommendation of Mr. Luis Guerrero, J.M. and M.M. made an appointment at Hecht Law Firm for a consultation.

495.     At the time of their first meeting with Defendant Thomas, J.M. and M.M. had lived in the United States for just under ten years.  Defendant Thomas informed J.M. and M.M. that they would need to wait a few months to reach the ten-year mark before he could fix their papers using the "ten year law."  During their first meeting, and in all subsequent meetings, J.M. and M.M. truthfully answered all questions asked by Defendants Thomas and Leonard.  Defendants did not ask for the information necessary to determine whether J.M. or M.M. was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

496.     Defendants Thomas and Leonard falsely represented to J.M. and M.M. that they were eligible to apply for lawful permanent residency under the "ten year law."

497.     During their first meeting, J.M. told Defendants that if this form of immigration benefit did not exist, or if receiving lawful permanent residency was not a certainty, he did not want to apply.  Defendants assured J.M. and M.M. that it was possible to obtain lawful permanent residency because they had U.S. citizen children and had lived in the United States for ten years.  Defendants promised J.M. and M.M. that they would receive their "papers" in a year and a half.

498.     Defendants' representations caused J.M. and M.M. to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

499.     When J.M. and M.M. would go to Hecht Law Firm for appointments, they would note the reason for their visit on a sign-in sheet as "*diez años*" ("ten years").

500.     During one of their meetings, Defendant Thomas instructed J.M. and M.M. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain or translate the documents.

501. When J.M. and M.M. asked questions about the legal process or the documents they were signing, Defendants Thomas and Leonard told them not to worry because the "ten year law" was real and they had a good case.

502. Defendants did not advise J.M. or M.M. that Defendants intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause J.M. and M.M. to be put in removal proceedings if and when the asylum application was not approved.

503. In or around July 2015, Defendants submitted an asylum application for J.M., with M.M. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

504. In fact, Defendants submitted the asylum application without telling J.M. and M.M., or reviewing the application with them. Nevertheless, upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of J.M. and M.M., and that he read the completed application to them in a language they understood for verification. Upon information and belief, their application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

505. Defendant Leonard repeatedly told J.M. and M.M. that their case would move faster if they made additional payments.

506. In or around the summer of 2015, J.M. met an immigration attorney at the community center "La Colmena" in Staten Island, New York, who told him that the "ten year law" did not exist.

507. That attorney referred J.M. to an immigration attorney at Staten Island Legal Services, who agreed to represent J.M. and M.M. This attorney instructed J.M. and M.M. to return to Hecht Law Firm to request their case file.

508. On two separate occasions, J.M. and M.M. went to Hecht Law Firm to request their case file. On both occasions, they were made to wait for hours, and each time Defendant Leonard told J.M. and M.M. that they did not need their case file because they do not speak English.

509. Defendants eventually produced J.M.'s and M.M.'s files to their new attorney, but the file did not include the Form I-589 submitted by Defendants on behalf of J.M. and M.M..

510. J.M. and M.M. were placed into removal proceedings and had their first appearance in front of an Immigration Judge on April 20, 2018.

### *Injury Suffered*

511. Based on Defendants' false representations, J.M. and M.M. agreed to pay a total of $7,500 to Defendants.

512. As of today, J.M. and M.M. have paid Defendants a total of $1,060 in three separate cash payments.

513. J.M. and M.M. also paid Defendant Leonard $60 for the translation of their birth certificates. The receipt provided to J.M. and M.M. is on Sylvia's Translation Service letterhead.

514. But for the false representations made by Defendants, J.M. and M.M. would not have hired or paid Defendants.

515. Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, J.M. and M.M. suffered financial injury of at least $1,120.

## E.G.R.

516.     Plaintiff E.G.R. is married and lives with her two U.S. citizen children in Staten Island, New York.  E.G.R.'s native language is Spanish.  She speaks, reads, and understands limited English.

517.     In or around March 2015, E.G.R. met with Mr. Luis Guerrero for assistance with preparing and filing her taxes.

518.     Mr. Luis Guerrero told E.G.R. that she qualified for lawful permanent resident status based on the number of years she had been living in the United States and her U.S. citizen children.

519.     Mr. Luis Guerrero referred E.G.R. to Hecht Law Firm to get help with the legal process in applying for lawful permanent resident status based on the number of years she had been living in the U.S.

520.     In or around March 2015, E.G.R. met with Defendant Thomas at Hecht Law Firm. During the first meeting, and in all subsequent meetings, E.G.R. truthfully answered all questions asked by Defendant Thomas.  Defendant Thomas did not ask for the information necessary to determine whether E.G.R. was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

521.     Defendant Thomas falsely represented to E.G.R. that she was eligible to apply for lawful permanent residency under the "ten year law."

522.     Defendant Thomas' representations caused E.G.R. to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

523.     When E.G.R. would sign in for her appointments, she noted on the sign-in sheet that the purpose for her visit was "ten year law."

524.     During one of their meetings, Defendant Thomas instructed E.G.R. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Thomas did not explain or translate the documents.

525.     When E.G.R. asked Defendant Thomas questions about the legal process or the documents she was signing, Defendant Thomas refused to answer the questions and told her not to worry.

526.     Defendants did not advise E.G.R. that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause E.G.R. to be put in removal proceedings if and when the asylum application was not approved.

527.     In or around April 2015, Defendants submitted an asylum application for E.G.R.'s husband with E.G.R. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

528.     In fact, Defendants submitted the asylum application without telling E.G.R., or reviewing the application with her.  Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of E.G.R. and her husband, and that he read the completed application to them in a language they understood for verification.  The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

529.     In July 2017, E.G.R. received a letter from Defendant Thomas stating that she had an interview with USCIS on August 1, 2017, in relation to an asylum application.  She was confused because she had not intended to apply for asylum.

530.     E.G.R. called Defendant Thomas to ask about the letter and the scheduled interview.  Defendant Thomas told her to not worry and that this was a required step in the process under the "ten year law."

531.     Defendant Thomas told E.G.R. that he would not be present for the interview.  Defendant Thomas advised her to say in the interview that she feared returning to her home country because of the high crime rate and frequent kidnappings.  Defendant Thomas also advised her to say she wanted to stay in the United States to provide her children with a better life.

532.     In or around September 2017, E.G.R. attended a MRNY workshop about the "myth of the ten year law."  At this workshop, E.G.R. learned that Defendants had promised her lawful status through an affirmative immigration application that did not exist.

533.     After discovering that she was a victim of the Ten Year Scheme, E.G.R. fired Hecht Law Firm and retained new counsel.

534.     E.G.R. was placed into removal proceedings in or around November 2017.

### *Injury Suffered*

535.     Based on Defendants' false representations, E.G.R. agreed to pay a total of $7,500 to Defendants.

536.     As of today, E.G.R. has paid Defendants a total of $3,750 in six separate payments by cash and money orders.  E.G.R. made these payments either directly to Defendant Thomas or to his assistant at Hecht Law Firm.

537.     But for the false representations made by Defendants, E.G.R. would not have hired or paid Defendants.

538.     Furthermore, E.G.R. was required to pay for legal representation.  As of today, E.G.R. has paid $2,500 for the legal representation.

539. Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, E.G.R. suffered a financial injury of at least $6,250.

**F.T.R. and J.C.R.**

540. Plaintiffs F.T.R. and J.C.R. are married and live with their three U.S. citizen children in Staten Island, New York. F.T.R.'s and J.C.R.'s native language is Spanish. They speak, read, and understand very limited English.

541. In or around June 2014, at the recommendation of J.C.R.'s aunt, J.C.R. met with Defendant Thomas at Hecht Law Firm. During the first meeting, and in all subsequent meetings, J.C.R. truthfully answered all questions asked by Defendant Thomas. Defendant Thomas did not ask for the information necessary to determine whether J.C.R. was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

542. Defendant Thomas falsely represented to J.C.R. that he and his wife were eligible to apply for lawful permanent residency under the "ten year visa."

543. F.T.R.'s first meeting with Defendant Thomas was in or around October 2014, and J.C.R. also attended this meeting. During this meeting, and in all subsequent meetings, F.T.R. truthfully answered all questions asked by Defendant Thomas. Again, he did not ask for the information necessary to determine whether F.T.R. was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

544. Defendant Thomas also told F.T.R. that she was eligible to apply for lawful permanent residency under the "ten year visa," and repeatedly told her that Defendants would apply for a green card on her behalf.

545. Defendant Thomas' representations caused J.C.R. and F.T.R. to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

88

546.     When F.T.R. went to Hecht Law Firm for appointments, she would sign in on a sign-in sheet, noting the reason for her visit as "*por tiempo*" ("for time").

547.     During one of their meetings, Defendant Thomas instructed J.C.R. and F.T.R. to sign several documents, which he said were necessary to apply for the ten year visa.  Defendant Thomas did not explain or translate the documents.

548.     When J.C.R. or F.T.R. asked Defendant Thomas questions about the legal process or the documents they were signing, Defendant Thomas would cut them off and tell them not to worry.

549.     Defendants did not advise J.C.R. or F.T.R. that they intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause J.C.R. and F.T.R. to be put in removal proceedings if and when the asylum application was not approved.

550.     In or around March 2015, Defendants submitted an asylum application for J.C.R., with F.T.R. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

551.     In fact, Defendants submitted the asylum application without telling J.C.R. or F.T.R., or reviewing the application with them.  Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of J.C.R. and F.T.R., and that he read the completed application to them in a language they understood for verification.  The application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

552. In or around March 2015, J.C.R. and F.T.R. received a notice in the mail that their asylum application had been received by USCIS. J.C.R. and F.T.R. were confused by this notice because they did not intend to apply for asylum.

553. J.C.R. called Hecht Law Firm's office to ask about the notice. The person who answered the phone at Hecht Law Firm told J.C.R. that this was the first step under the "ten year visa."

554. In or around early Fall of 2016, J.C.R. and F.T.R. attended a MRNY workshop about the "myth of the ten year law." At this workshop, J.C.R. and F.T.R. learned that Defendants had promised them lawful status through an affirmative immigration application that did not exist.

555. After discovering that they were victims of the Ten Year Scheme, J.C.R. and F.T.R. fired Hecht Law Firm, secured other counsel, withdrew their asylum application, and reported Defendants' actions to USCIS.

### *Injury Suffered*

556. Based on Defendants' false representations, J.C.R. and F.T.R. agreed to pay a total of $7,000 to Defendants.

557. As of today, J.C.R. and F.T.R. have paid Defendants $850 in three separate cash payments. J.C.R. and F.T.R. made these payments either directly to Defendants Thomas and Leonard or to a secretary at Hecht Law Firm.

558. F.T.R. and J.C.R. also paid either Defendant Thomas or a secretary at Hecht Law Firm $80 for the translation of their birth certificates. The receipt provided to F.T.R. and J.C.R. is on Sylvia's Translation Service letterhead.

559. But for the false representations made by Defendant Thomas, J.C.R. and F.T.R. would not have hired or paid Defendants.

560.     Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, J.C.R. and F.T.R. suffered financial injury of at least $930.

### R.M.R.

561.     Plaintiff R.M.R. lives with her husband and their two U.S. citizen children in Brooklyn, New York.  R.M.R.'s native language is Spanish.  She speaks, reads, and understands very limited English.

562.     R.M.R. heard of Hecht Law Firm's services through her mother-in-law.  She consulted Hecht Law Firm multiple times to advise her about her options for immigration benefits. In all meetings, R.M.R. truthfully answered all questions asked by Defendant Leonard.  Defendant Leonard did not ask for the information necessary to determine whether R.M.R. was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

563.     During a meeting around 2015, Defendant Leonard falsely represented to R.M.R. that she was eligible to apply for lawful permanent residency through an affirmative application. Defendant Leonard repeatedly assured R.M.R. that the application process was safe and that the government would not deport her, because, as Defendant Leonard put it, the government was not looking to split up tax-paying families.

564.     Defendant Leonard's representations caused R.M.R. to reasonably believe that she was eligible for a work permit and lawful permanent residency through an affirmative application.

565.     Defendant Leonard instructed R.M.R. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

566.     Defendants did not advise R.M.R. that they intended to submit an application for asylum on her behalf, and at no point discussed the legal requirements for asylum, or the fact that

Defendants intended to cause R.M.R. to be put in removal proceedings if and when the asylum application was not approved.

567. In or around March 2016, Defendants submitted an asylum application on behalf of R.M.R. and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

568. In fact, Defendants submitted the asylum application without telling R.M.R., or reviewing the application with her. Nevertheless, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of R.M.R., and that he read the completed application to her in a language she understood for verification. R.M.R.'s application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

569. At some point, a family member of R.M.R. advised R.M.R. to seek a second opinion on her immigration case, as the family member had heard complaints about Defendants' services.

570. R.M.R. consulted with MRNY in or around February 2017. At this consultation, R.M.R. learned that Defendants had promised her lawful status through an affirmative immigration application that did not exist.

571. After discovering that she was a victim of Defendants' fraud, R.M.R. fired Hecht Law Firm, and retained pro bono counsel to represent her.

### *Injury Suffered*

572. Based on Defendants' false representations, R.M.R. agreed to pay a total of $7,500 to Defendants.

573.     As of today, R.M.R. has paid Defendants $3,100 in multiple cash payments. R.M.R. made these payments either directly to Defendants Thomas and Leonard or to a secretary at Hecht Law Firm.

574.     R.M.R. also paid either Defendant Leonard or a secretary at Hecht Law Firm $40 for the translation of her birth certificate.  The receipt provided to R.M.R. is on Sylvia's Translation Service letterhead.

575.     But for the false representations made by Defendant Leonard, R.M.R. would not have hired or paid Defendants.

576.     Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, R.M.R. suffered financial injury of at least $3,140.

### F.T.V.

577.     Plaintiff F.T.V. is married and lives with his wife and youngest U.S. citizen child in Bronx, New York.  F.T.V.'s native language is Spanish.  He speaks, reads, and understands very limited English.

578.     In or around early 2016, on the recommendation of an acquaintance, F.T.V. and his wife met with Defendant Leonard at Hecht Law Firm.  During the first meeting, and in all subsequent meetings, F.T.V. truthfully answered all questions asked by Defendant Leonard. Defendant Leonard did not ask F.T.V. for the information necessary to determine whether he was eligible for, or had a reasonable basis in law or fact to apply for, asylum.

579.     Defendant Leonard falsely represented to F.T.V. that he was eligible to apply for lawful permanent residency under the "ten year law."

580.     Defendant Leonard's representations caused F.T.V. to reasonably believe that he was eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

581.    Defendant Leonard instructed F.T.V. to sign several documents.    Defendant Leonard did not explain or translate the documents.

582.    Defendants did not advise F.T.V. that they intended to submit an application for asylum on his behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause F.T.V. to be put in removal proceedings if and when the asylum application was not approved.

583.    On or about May 3, 2016, Defendants submitted an asylum application on behalf of F.T.V., and used a mail carrier to send it to the USCIS Service Center in Vermont.

584.    In fact, Defendants submitted the asylum application without telling F.T.V., or reviewing the application with him.  Nevertheless, upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of F.T.V., and that he read the completed application to him in a language he understood for verification.  Upon information and belief, the application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

585.    Had he known that Defendants intended to submit an asylum application on his behalf, F.T.V. would not have permitted Defendants to do so because he believed that individuals from his home country did not qualify for asylum.

586.    F.T.V. became suspicious of Defendant Leonard's representation because of the brief and simplistic answers he gave to questions.  F.T.V.'s daughter, who speaks English, accompanied him to Hecht Law Firm to ask about the case, but Defendant Leonard evaded answering questions.

587. At the recommendation of his daughter, F.T.V. sought an immigration consultation with an attorney at MRNY in April 2018. At this meeting, F.T.V. learned that Defendants had promised him a benefit through an affirmative immigration application that did not exist.

588. After discovering that he was a victim of the Ten Year Scheme, F.T.V. fired Hecht Law Firm and retained new counsel.

### Injury Suffered

589. Based on Defendants' false representations, F.T.V. agreed to pay a total of $8,000 for Defendants' legal assistance.

590. As of today, F.T.V. has paid Defendants a total of $1,800 in three separate cash payments. F.T.V. made these payments to Defendant Leonard.

591. F.T.V. also paid Hecht Law Firm $120 via money order for the translation of certain documents for his case. The invoice provided to F.T.V. is on Sylvia's Translation Service letterhead.

592. But for the false representations made by Defendants, F.T.V. would not have hired or paid Defendants.

593. As a direct and proximate result of Defendants' fraudulent and predatory acts, F.T.V. suffered a financial injury of at least $1,920.

## O.C.F. and R.M.F.

594. Plaintiffs O.C.F. and R.M.F. are married and live with their two U.S. citizen children in Staten Island, New York. O.C.F.'s and R.M.F.'s native language is Spanish. They speak, read, and understand very limited English.

595. R.M.F. heard from a friend that Hecht Law Firm could help her obtain status.

596.     On or around September 1, 2015, R.M.F. went to Hecht Law Firm to ask about an appointment.  The secretary instructed R.M.F. to fill out an intake form and reviewed the documents R.M.F. brought with her.

597.     The secretary told R.M.F. that she had a "strong case" under the "ten year law." She made copies of all of R.M.F.'s documents, charged R.M.F. $240, and scheduled an appointment for R.M.F. and O.C.F. to meet with Defendant Leonard.

598.     On or around September 29, 2015, R.M.F. and O.C.F. met with Defendant Leonard at Hecht Law Firm.  During their first and only meeting, Defendant Leonard spent no more than ten minutes with R.M.F. and O.C.F.  R.M.F. and O.C.F. truthfully answered all questions asked by Defendant Leonard.  Defendant Leonard did not ask for the information necessary to determine whether R.M.F. and O.C.F. were eligible for, or had a reasonable basis in law or fact to apply for, asylum.

599.     Defendant Leonard falsely represented to R.M.F. and O.C.F. that they were eligible to apply for lawful permanent residency under the "ten year law."

600.     Defendant Leonard's representations caused R.M.F. and O.C.F. to reasonably believe that they were eligible for a work permit and lawful permanent residency through an affirmative application based on the eligibility criteria of length of residency and U.S. citizen children.

601.     Defendant Leonard instructed R.M.F. and O.C.F. to sign several documents, which he said were necessary to apply for lawful permanent residency.  Defendant Leonard did not explain or translate the documents.

602. When R.M.F. or O.C.F. tried to ask questions about the legal process or the documents they were signing, Defendant Leonard cut them off, told them not to worry, and dismissed their concerns.

603. Defendants did not advise R.M.F. or O.C.F. that they intended to submit an application for asylum on their behalf, and at no point discussed the legal requirements for asylum, or the fact that Defendants intended to cause R.M.F. and O.C.F. to be put in removal proceedings if and when the asylum application was not approved.

604. On or around September 29, 2015, O.C.F. delivered certain documents to the secretary at Hecht Law Firm, who, upon information and belief, then remitted them to Sylvia's Translation Service to be translated. Sylvia's Translation Service charged O.C.F. $80, which O.C.F. paid to the secretary.

605. In or around October 2015, Defendants submitted an asylum application for O.C.F., with R.M.F. as a derivative on the application, and used a mail carrier to send it across state lines to the USCIS Service Center in Vermont.

606. In fact, Defendants submitted the asylum application without telling R.M.F. and O.C.F., or reviewing the application with them. Nevertheless, upon information and belief, Defendant Thomas signed the preparer attestation in the Form I-589, falsely representing that he was filing the asylum application at the request of O.C.F. and R.M.F., and that he read the completed application to them in a language they understood for verification. Upon information and belief, the application contained the same boilerplate bases for asylum as the other Plaintiffs' applications.

607. In or around October 2015, R.M.F. and O.C.F. received a notice in the mail that their asylum application had been received by USCIS. R.M.F. and O.C.F. were confused by this

notice because they did not intend to apply for asylum, and they had not wanted to apply for asylum because they believed that individuals from their home country could not be granted asylum.

608.    R.M.F. has been a member of MRNY since December 20, 2011.  Worried that something was wrong, R.M.F. contacted a staff member at MRNY to ask about the notice, and that staff member informed her about the "ten year scam."  R.M.F. learned that Defendants had promised her lawful status through an affirmative immigration application that did not exist.

609.    After discovering that they were victims of the Ten Year Scheme, R.M.F. and O.C.F. fired Hecht Law Firm, and have met with other immigration attorneys in relation to their immigration case.

610.    On or around March 15, 2018, R.M.F. and O.C.F. received notice from USCIS that their asylum interview had been scheduled.  On or around March 16, 2018, R.M.F. and O.C.F. received a letter from Hecht Law Firm notifying them that an interview in connection to their application had been scheduled.  That letter did not mention asylum.

611.    R.M.F. and O.C.F. have both been placed into removal proceedings.

### *Injury Suffered*

612.    Based on Defendants' false representations, R.M.F. and O.C.F. agreed to pay a total of $8,000 to Defendants.

613.    As of today, R.M.F. and O.C.F. have paid Defendants at least $834 in various cash payments.  R.M.F. and O.C.F. made these payments to Defendant Leonard in person or to the secretary at Hecht Law Firm.

614.    R.M.F. and O.C.F. also paid $80 for the translation of certain documents for their case to a secretary at Hecht Law Firm.  The invoice provided to R.M.F. and O.C.F. is on Sylvia's Translation Service letterhead.

615. But for the false representations made by Defendants, R.M.F. and O.C.F. would not have hired or paid Defendants.

616. Furthermore, R.M.F. and O.C.F. were required to pay for legal representation, which, thus far, has cost them $1,000.

617. Thus, as a direct and proximate result of Defendants' fraudulent and predatory acts, R.M.F. and O.C.F. suffered a financial injury of at least $1,914.

**Make the Road New York**

618. Plaintiff MRNY brings this action on behalf of itself, a nonprofit, membership-based § 501(c)(3) organization dedicated to building the power of immigrant, Latinx, and working-class communities in New York. MRNY seeks only injunctive relief on its own behalf.

619. MRNY has offices in Brooklyn, Queens, Staten Island, Suffolk County, and Westchester County. MRNY integrates adult and youth education, legal and survival services, and community and civic engagement in order to support low-income New Yorkers in improving their own lives and neighborhoods.

620. MRNY has more than 22,000 dues-paying members residing in New York City, Long Island, and Westchester, primarily in the boroughs of Brooklyn and Queens. Its members include many of Plaintiffs, along with many others who have suffered from Defendants' scheme but are not participating in this lawsuit.

621. MRNY has a legal department staffed by twenty-seven attorneys and fourteen advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team represents immigrants facing deportation as well as immigrants filing affirmative applications for immigration benefits.

622.     MRNY has had to dedicate significant resources to mitigating the harm caused by Defendants.

623.     MRNY first noticed a trend regarding former clients of Hecht Law Firm in Staten Island in or around 2016.  Since then, MRNY has encountered survivors with similar stories throughout New York, including in Brooklyn, Queens, the Bronx and in Westchester and Suffolk Counties.  Because of the high volume of clients and members who come through MRNY's doors and have been directly impacted by Defendants' actions, MRNY spends significant organizational resources on community education, legal counseling, and representation related to the Ten Year Scheme.

624.     MRNY must now devote resources to a continuous and increasing flow of people from New York and even New Jersey who contact MRNY because they have suffered from Defendants' actions.  Often these individuals have been scheduled for an interview and are seeking a second opinion because they are confused as to why their legal representatives refuse to accompany them to the interview.  Sometimes they come requesting help to renew an employment authorization document only to learn for the first time that they are on a conveyer belt to, or are in fact already in, removal proceedings.  More recently, MRNY has counseled shocked individuals who received removal orders and are in search of representation for a motion to reopen or appeal. In other instances, these individuals have heard about the instant litigation and are concerned that they too may face the risk of deportation and were never advised of this possible consequence.

625.     MRNY's limited legal staff has had to divert significant staff time from their normal case work to provide information and sometimes full immigration consultations for individuals who seek to terminate their representation with Defendants.  Consultations of this type require a disproportionate diversion of resources.  They are resource-intensive and each typically lasts

several hours just in order to appropriately understand the case posture and advise the affected individuals regarding their options moving forward. This is because the threat of removal proceedings requires assessing all potential forms of immigration relief and because the individuals' understanding of their own case posture is far from the reality. As opposed to its normal representation of clients, MRNY attorneys are not starting from scratch with these individuals; rather, they have to first correct a complicated web of misinformation.

626. MRNY's legal department has at present been retained by at least thirteen former clients of Defendants for full representation before the asylum office or immigration court and regarding other attendant matters. These cases have required MRNY to go beyond the ordinary limits of its representation; for example, by immediately diverting work to respond to a fast approaching deadline for a motion to reopen or seeking recovery of a client's financial loss in addition to the immigration representation.

627. MRNY has also invested significant resources in securing new representation for people who are caught up in this scheme and are now without counsel after terminating their relationship with Defendants, because, once started, the process continues to move forward automatically even after Defendants are fired. Seeking representation for someone in this situation is resource-intensive because most organizations that provide free immigration legal assistance in New York are at or near capacity and often cannot accept new cases. MRNY staff must now spend significant time calling providers, sending case blurbs and e-mails inquiring about capacity, and counseling clients who are being referred instead of using that time for their normal work of representing individuals in affirmative immigration cases and deportation defense.

628. Between early 2016 and today, MRNY organizers and legal staff have given at least twenty presentations to groups of community members about Defendants' conduct and similar

conduct by other immigration attorneys so that community members understand, among other things, how to tell when an employment authorization document is based on a pending asylum application.

629.   MRNY lawyers have prepared and given presentations to at least six external groups of lawyers and advocates on the Ten Year Scheme and case strategies for representing people who have been scammed, including former clients of Defendants.  As a result, MRNY's lawyers receive frequent requests for technical assistance from people at other legal services organizations who are representing former clients of Defendants.

630.   As a direct and proximate result of Defendants' racketeering activity and violations of 18 U.S.C. § 1962(c), Plaintiff MRNY suffered injury to its business and property through diversion of organizational resources.

631.   In responding to the massive need created in the community because of Defendants' fraud, MRNY staff, including attorneys, organizers, and paralegals, have spent hundreds of hours working on behalf of members and clients defrauded by Defendants.

632.   Pursuant to 18 U.S.C. § 1964(c), MRNY is entitled to injunctive relief to prevent Defendants from continuing to exploit immigrants through the Ten Year Scheme.

## NON-RICO CAUSES OF ACTION

### Fraud and Deceit

633.   Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

634.   As set forth above, Defendants made numerous intentional misrepresentations and omissions to defraud Plaintiffs through the Ten Year Scheme.

635.   Specifically, Defendants Leonard and Thomas, by and through Hecht Law Firm, intentionally misrepresented (i) the services Defendants intended to provide to Plaintiffs, (ii) the existence of an affirmative immigration benefit based on an individual's ten year residence in the

United States and/or U.S. citizen children, (iii) Plaintiffs' eligibility for work authorization and lawful permanent residency and the requirements for qualifying for these benefits, (iv) the context in which Plaintiffs' ten year residence in the United States and/or U.S. citizen children could potentially be considered in connection to their immigration matters, (v) the type of application Defendants intended to, and did, file on behalf of Plaintiffs, and/or (vi) the risks and purpose of the applications Defendants actually intended to, and did, file on Plaintiffs' behalf.

636. Based on Defendants' blatant intentional misrepresentations and fundamental omissions, Plaintiffs reasonably believed that they were eligible for work authorization and/or lawful status in the United States based on the length of their residency in the United States and their U.S. citizen children.

637. Because of Defendants' misrepresentations and omissions, Plaintiffs did not understand the nature of the applications Defendants actually submitted on their behalf.

638. Based on Defendants' misrepresentations and omissions, Plaintiffs reasonably believed that they were paying for legal representation to lawfully obtain affirmative immigration benefits for which they were qualified.

639. Defendants made these statements with knowledge of their falsity or with recklessness as to whether or not they were true.

640. Defendants made the aforementioned representations with the intent of misleading Plaintiffs and convincing them to pay Defendants.

641. Plaintiffs' reliance on these misrepresentations was justified because Plaintiffs trusted Defendants due to the trust inherent in the attorney-client relationship.

642. Defendants actively concealed the Ten Year Scheme through their material misstatements and omissions.

643. For the reasons described above, Plaintiffs could not have discovered that (i) the immigration benefits Defendants advertised to them did not exist or (ii) Defendants had misrepresented the nature of the applications they were filing on Plaintiffs' behalf.

644. Plaintiffs would not have made payments to Defendants had they known (i) the affirmative immigration benefits Defendants misrepresented to them that they were eligible for do not exist, (ii) Defendants actually intended to, and ultimately did, file generic asylum applications, or (iii) that Defendants intended for them to be placed in removal proceedings and face deportation as a result of those asylum applications.

645. As set out above, as a direct and proximate result of Defendants' false representations and omissions, Plaintiffs suffered a collective financial injury of at least $99,350, the amount they paid to Defendants in justified reliance on Defendants' misrepresentations and omissions and the amount they have had to pay for new counsel as a result of Defendants' actions, including additional legal costs.

646. Defendants' fraud affected Plaintiffs specifically but was aimed at the public generally.

647. Defendants' fraud was malicious, represents a high degree of moral culpability, and rises to such a level of wanton dishonesty as to imply a criminal indifference to civil obligations. Defendants are therefore also liable for punitive damages.

### Deceptive Business Practices (NY General Business Law § 349)

648. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

649. Defendants have engaged in numerous practices that are deceptive and misleading in a material way through the Ten Year Scheme.

650. The Ten Year Scheme was aimed at the consumer public at large given Defendants' routine practice of perpetuating the myth of the "ten year law" and filing substantially similar asylum applications for undocumented immigrants.

651. As a direct and proximate result of Defendants' deceptive and misleading practices, Plaintiffs are each entitled to restitution of the money that they paid to Defendants.

652. Because Defendants acted knowingly when they violated NY General Business Law § 349, Plaintiffs are each entitled to treble damages of up to $1,000.

653. As set out above, Defendants' conduct evidences a high degree of moral culpability. Defendants are therefore also liable for punitive damages.

## Unjust Enrichment

654. Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

655. Plaintiffs conferred a benefit to Defendants in the form of payments for applying for advertised immigration benefits.

656. Defendants accepted and received the payments.

657. It would be against equity and good conscience to allow Defendants to retain these monies, which were procured by false and misleading representations.

658. Specifically, Defendants falsely represented to Plaintiffs that they were eligible to apply for affirmative immigration benefits in the form of work authorization and/or lawful permanent residency based on Plaintiffs' ten year residence in the United States and/or U.S. citizen children in order to induce Plaintiffs to pay Defendants to apply for those benefits.

659. Defendants received payments they should not have received, as Plaintiffs' payments were made under Defendants' false pretenses and due to Defendants' misrepresentations.

660.     Defendants' breaches of fiduciary duty entitle Plaintiffs to disgorgement of the money already paid to Defendants.  Plaintiffs are therefore entitled to relief for this unjust enrichment equal to the benefits unjustly retained by Defendants, as well as interest on these amounts.

661.     As set out above, Defendants' conduct evidences a high degree of moral culpability. Accordingly, Defendants are also liable for punitive damages.

**Breach of Fiduciary Duty**

662.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

663.     At all times relevant, Defendants Thomas and Leonard were attorneys acting within the scope of their actual and apparent agency, and were employed by Hecht Law Firm.  Defendants provided legal services to Plaintiffs.

664.     Defendants had an attorney-client relationship with each Plaintiff.

665.     Pursuant to the attorney-client relationship, Defendants had a fiduciary duty to act in the best interests of Plaintiffs.

666.     Defendants intentionally failed to act in the best interests of Plaintiffs in the matters for which they were retained by intentionally misrepresenting the services they intended to and could provide Plaintiffs.

667.     Alternatively, Defendants negligently failed to act in the best interests of Plaintiffs in the matters for which they were retained.

668.     Plaintiffs suffered injury in the form of payments made to Defendants as a direct result of Defendants' failure to act in their best interests.  Plaintiffs would not have made payments to Defendants had Plaintiffs known (i) the affirmative immigration benefits Defendants misrepresented that they were eligible for do not exist, (ii) Defendants actually intended to, and

ultimately did, file generic asylum applications, or (iii) that Defendants intended for them to be placed in removal proceedings and face deportation as a result of those asylum applications.

669. Defendants' breaches of fiduciary duty entitle Plaintiffs to disgorgement of the money already paid to Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enjoin Defendants from continuing to perpetrate the Ten Year Scheme;

B. Award compensatory and punitive damages to Plaintiffs;

C. Declare, pursuant to 28 U.S.C. § 2201, that documentary submissions, including asylum applications, filed by Defendants on Plaintiffs' behalf are inherently unreliable;

D. Award Plaintiffs costs and reasonable attorneys' fees incurred in this action; and

E. Grant other such relief as the Court deems just and proper.

Dated: August 31, 2018
      New York, New York

Respectfully submitted,

**KATHRYN O. GREENBERG
IMMIGRATION JUSTICE CLINIC
BENJAMIN N. CARDOZO SCHOOL
OF LAW**

Lindsay Nash
*lindsay.nash@yu.edu*
Juan Basadre*
*basadre@law.cardozo.yu.edu*
Alexis Makrides*
*makrides@law.cardozo.yu.edu*
Nolberto Zubia*
*zubia@law.cardozo.yu.edu*
Jaynah Ross-Mendoza*
*jjross@law.cardozo.yu.edu*

55 Fifth Avenue
New York, NY 10003
Tel: (212) 790-0433

*Motion to Appear as Law Students
forthcoming.

**MAKE THE ROAD NEW YORK**

Amy S. Taylor
*amy.taylor@maketheroadny.org*
Scott Foletta
*scott.foletta@maketheroadny.org*
Kendal Nystedt
*kendal.nystedt@maketheroadny.org*
Jessica Young (application for admission
pending)
*jessica.young@maketheroadny.org*

301 Grove Street
Brooklyn, NY 11237
Tel: (718) 418-7690

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**

 /s/  Abena Mainoo           

Abena Mainoo
*amainoo@cgsh.com*
Shannon Daugherty
*sdaugherty@cgsh.com*

One Liberty Plaza
New York, NY 10006
Tel: (212) 225-2000

*Attorneys for Plaintiffs*